**Herman Franck, Esq.** (SB # 123476)
Law Offices of Herman Franck
926 J Street, Suite 914
Sacramento, CA 95814
Tel. (916) 447-8400; Fax (916) 447-0720

Attorney for Plaintiffs
Todd Ashker and Danny Troxell

## THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| TODD ASHKER, DANNY TROXELL, ) | Case No. C053286 CW (PR) |
| ) | |
| ) | CIVIL RIGHTS COMPLAINT FOR |
| Plaintiffs, ) | DAMAGES, INJUNCTIVE, AND |
| ) | DECLARATORY RELIEF |
| vs. ) | [42 USC Section 1983] |
| ) | [With Supplemental State Law Claims] |
| ARNOLD SCHWARZENEGGER; ) | |
| R.Q. HICKMAN; EDWARD ) | |
| ALAMEIDA JR.; JEANNE WOODFORD; ) | JURY TRIAL DEMANDED |
| JOE McGRATH; RICHARD KIRKLAND ) | |
| ) | |
| Defendants, ) | |
| _____) | |

Plaintiffs Todd Ashker and Danny Troxell, and each of them, herewith submit this Civil Rights

Complaint for Damages, Injunctive, and Declaratory Relief with Supplemental State Law

Claims.

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF      1

# I.
## PRELIMINARY STATEMENT

This is a 42 U.S.C. Section 1983 Civil Rights action filed by Todd Ashker and Danny Troxell, who are state prisoners, confined by the California Department of Corrections (hereinafter referred to as "CDC"), at Pelican Bay State Prison's Security Housing Unit (hereinafter referred to as "PBSP-SHU"). Plaintiffs seek damages, injunctive, and declaratory relief alleging Defendants have violated their rights under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and related State Law claims.

These claims were recently dismissed in a pending federal civil rights action entitled *Ashker, Troxell vs. Schwarzenegger et al.*, United States District Court, Northern District Action No. C 04-1967 CW.

These claims were dismissed on the basis that Plaintiffs had not exhausted the third and final level of review under the prison's administrative review process (form 602 appeals). The third level review has now been completed, so the action may now proceed on the merits. See paras. 52-65 herein regarding Ashker's 602 appeal process. See paras. 99-110 herein regarding Troxell's 602 appeal process.

Ashker is serving a prison term of "21 years to life" subsequent to his conviction of second-degree murder in 1990. This was an in-prison incident. Ashker was initially sentenced to a 6-year term for burglary back in 1984.

On or about late 1987, Folsom State Prison gang unit staff labeled him as an "associate" of the Aryan Brotherhood prison gang based on information from inmate informants. Ashker has always denied this and has steadfastly denied being involved in any illegal activity. Ashker has been continuously housed in various SHU units since August 1986. He was transferred to PBSP-SHU on May 2, 1990 where he has been confined even since, except for a few brief trips to Folsom and San Quentin Prisons for court and medical care reasons.  Since 1992, the CDC administration has kept him confined in the SHU on "indeterminate" status solely based on the gang association label they placed on him in 1987.

Troxell is serving a prison term of "26 years to life" subsequent to a first-degree murder guilty plea in 1979.

In January of 1984, Folsom Prison Administrators issued a crono stating that he was an "associate" of the Aryan Brotherhood prison gang. Troxell was programming (working in the kitchen at Folsom) until October 1985, at which time administrative staff ordered his placement in SHU based solely upon inmate informant claims that he was involved in Aryan Brotherhood activity.

Troxell has remained in various SHU units ever since 1985, and he was one of the first prisoners transferred to PBSP-SHU when it opened in December 1989 where he has been continuously housed on "indeterminate" status solely based on the gang label, a label he has always denied (insofar as any involvement in "illegal" activity).

During the relevant time periods, Plaintiffs have been housed in SHU on "indeterminate" status. Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland have subjected them to the ongoing and progressively more restrictive punitive conditions therein. Defendants have tried to compel Plaintiffs to become CDC informants by instituting a policy and telling Plaintiffs that their only way out of SHU is if they parole, die, or "debrief," which means implicating themselves, other inmates, and if possible, CDC staff, in ongoing gang activity. The above named Defendants additionally have a long standing policy and/or practice of treating white prisoners housed in PBSP-SHU differently than all other groups. This includes Plaintiffs as described above.

Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland, via various policies, procedures, and practices, have all failed to provide program opportunities to SHU prisoners, including Plaintiffs, which are requirements by the State Parole Board in order to have any real chance at a parole date. This in turn has also affected public safety in general because SHU prisoners are denied programs that would help them become productive citizens. Such denials of access and opportunity to such programs/rehabilitation services have been in violation of state law and regulations as well as constitutional law.

When Plaintiffs asked to be provided with program opportunities (that were recommended by the Parole Board and used by the Board when considering parole suitability issues), Defendants McGrath and Woodford stated that Plaintiffs are "terrorists" involved in criminal conspiracies, and until they "take all possible steps towards frustrating and preventing the goals of that

conspiracy, divulging all their secrets," they will remain in PBSP-SHU and should never get a

parole date, nor have program opportunities recommended by the Board.

When Plaintiffs asked for release from SHU based on "inactive gang status" (not being involved

in any prison rules violations for over six years, neither being found guilty of participating in

"illegal gang activity" in 12 to 20 years, and actually never found guilty of such a charge in all

their time in prison), Defendants denied their requests, stating they were still "active" based

solely on undisclosed inmate informants claiming Plaintiffs were "members of a gang." In

Ashker's case, Defendants stated that he was involved in illegal conspiracies, yet he was never

charged, nor issued a rules violation, which is mandated by CDC rules and regulations.

Defendants then told Plaintiffs they could seek "inactive status" review in six more years. In the

meantime, their sole means of release from SHU is to die or debrief.

When Plaintiffs pointed out that informants place not only their own lives in danger, but also the

lives and well being of family and friends as well and that they do not have information to

provide, Defendants ignored them.

Defendants have also claimed that Plaintiffs' SHU status is not punitive in nature, but rather an

administrative action. Yet the conditions Plaintiffs are subject to are severely punitive and

intended to coerce them into debriefing. And they are treated differently than similarly situated

prisoners (who are confined in administratively segregated units such as Transitional Housing

Units and Protective Custody Units). They have been treated differently in PBSP-SHU than other

races by Defendants allowing staff to keep whites isolated from their social group (other whites), and specifically, ordering that no other whites are to be housed around Plaintiffs at all.

Plaintiffs are challenging their 13 to 20 plus years of SHU confinement based not on their participation in illegal gang activities, but solely on association. They further challenge Defendants' debriefing and/or application of the "inactive gang status" criteria for release from SHU and the adverse impact such has on their ability to meet the Parole Board's recommendations.

Plaintiffs also challenge Defendants treating them differently than others similarly situated.

Additionally, Plaintiffs are raising First Amendment constitutional with related state law claims, challenging Defendants' policies in denying hard cover books (Troxell), several kinds of magazines, and ongoing, excessive delays in processing their mail.

## II.
## JURISDICTION AND VENUE

1.      The U.S. District Court has jurisdiction over this 42 U.S.C. Section 1983 action alleging violations of Plaintiffs' federal constitutional rights under 42 U.S.C. Sections 1331 and 1343. The Court has supplemental jurisdiction over their state law claims under 28 U.S.C. Section 1367.

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF      6

2.      Venue is proper under 28 U.S.C. 1391(b)(2) because a substantial portion of the events giving rise to the claims alleged in this complaint arose within the Northern District of California in the County of Del Norte.

### III.
### PARTIES

3.      Plaintiffs Todd Ashker and Danny Troxell are both serving life terms and have been confined to PBSP-SHU during the events described in this complaint.

4(a).   The Defendants are state officials responsible for the policies, practice, and procedures by which California operates both prison classification and rehabilitation program opportunities as well as parole proceedings. Defendant Arnold Schwarzenegger is the Governor of the State of California and Chief Executive of The State Government. Defendant Roderick Q. Hickman is the Secretary of the California Youth Adult Correctional Agency. Defendant Jeanne Woodford is the Director of the California Department of Corrections. Edward S. Alamedia, Jr., is a former Director of Corrections. Joe McGrath is the former Warden of Pelican Bay State Prison. Richard Kirkland is the Warden of Pelican Bay Prison.

4(b).   Each and all of the above Defendants are being sued in their personal and individual capacities for damages and in their official capacities for injunctive relief purposes.

5.      Each and all of the Defendants have acted, and for those still in office, continue to act under the color of authority and state law at all times relevant to this complaint.

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF      7

**IV.**
**FACTS**

**A. Plaintiff Ashker.**

6.      Ashker has been in state prison since January 1985, following a plea of guilty to first-degree burglary for which he received a six-year term.

7.      He has been housed in various SHU units on a continuous basis beginning in August 1986. Originally, his SHU placement was for prison "disciplinary" reasons.

8.      On May 25, 1987, while housed in the SHU at New Folsom State Prison, he was charged (by prison staff) with the murder of inmate Dennis Murphy.

9.      Trial commenced in early 1990. The CDC and prosecutor's theory was that the murder was a premeditated gang-hit, yet Ashker was the sole person charged and tried.

10.      Ashker's position was that Murphy's death was not intentional and came about while he was defending himself from Murphy.

11.      The jury rejected the DA's first degree, gang-hit theory, and convicted Ashker of second-degree murder.

12.      In April 1990, the Court sentenced him to a term of 21 years to life.

13.     New Folsom Prison had Ashker transferred to Pelican Bay State Prison's SHU unit on May 2, 1990, which is where he has been incarcerated ever since (other than a few temporary transfers to Folsom or San Quentin prisons for medical care and court proceedings).

14.     Prior to the death of Murphy in May 1987, CDC did not have Ashker labeled with any gang associations. In mid May 1987, the committee at New Folsom Prison actually approved him for placement in the "general population" that coming July of 1987 so long as he remained disciplinary free during that time period.

15.     Murphy's death occurred on May 25, 1987. It was shortly after that when the Folsom staff housed him in a unit known as "Bed Rock" (or violence control unit) where most of the white prisoners were labeled as Aryan Brotherhood members/associates. It was within the first 90 days of being placed in there that CDC labeled him as an Aryan Brotherhood associate based on inmate informant's claims.

16.     The prosecutor based his entire premeditated Aryan Brotherhood gang-hit theory in the Murphy case on CDC gang investigators information, which was based solely on inmate informants seeking and receiving favors. Yet at the trial, the prosecutor chose not to use any of these informants, stating on the record:

        "Now, the testimony of an informant in court is suspect.  I, for

        example, chose not to use any of this at trial."

These are the same informants CDC used to originally label Ashker in the first place (based on information and belief). This is the only criminal act that CDC ever actually charged as being directly tied into "illegal gang activity." The prosecution based their case on CDC's gang-hit theory, a theory the jury rejected.

17.     At some point around 1992, the PBSP Classification Committee placed him on indeterminate SHU status based on the gang-association label, but it was back in 1990 when he arrived at PBSP-SHU that the staff told him his only way out of SHU would be to parole, die, or debrief. Debrief means to inform CDC staff about any gang activity, gang members, or other criminal conduct.

18.     Ashker has always denied being an "associate of the Aryan Brotherhood gang." By this he means that he is not a member, associate member, or any kind of member to the Aryan Brotherhood gang and has not been privy to or involved in illegal gang activity.

19.     He has been housed around, gone to the yard with, and been celled with other white prisoners who were either admitted members or whom CDC also had labeled as gang associates based on informants' claims. While at PBSP-SHU, Ashker has been kept virtually isolated from all other white prisoners other than his cell mate(s) and a few other exceptions.

20.     CDC staff has placed Asker with these white inmates since the Murphy incident (Folsom Prison, May 25, 1987). During that period (1987-present), Ashker has often helped these

prisoners with legal matters (including gang-label charges) and formed some friendships. That is the extent of this "alleged" association.

21.     Ashker has not been involved in "illegal gang activity," and therefore, has no information to provide CDC. He is aware of what CDC informants generally say when they are trying to "successfully debrief" based on the reports and transcripts he has reviewed over the years while helping others and dealing with his own cases. It would be a simple matter for him to be deemed a "reliable informant" per CDC's criteria. All he would have to do is "make a weapon and give it to the staff saying 'I was ordered by the gang to assault staff, but I wanted to debrief'." Then Ashker could copy the statements that other inmates have made, listing names of the same prisoners, and detailing the same criminal conduct. He could further make up a few new stories that he knows would aid CDC's agenda. Presto, Ashker would be deemed a "reliable source" by CDC officials because he has (a) incriminated himself in illegal activity and (b) provided information proved true (e.g. a gang-hit-on-staff conspiracy and presentation of a weapon), and (c) provided information that is corroborated by other informants (list of names and other conspiracies), and it would have all been a gigantic lie, which shows how weak the debriefing system is.

22.     Ashker refuses to tell such a lie. He has repeatedly challenged CDC's gang-label on him via each level of the CDC Rule 602 Administrative Grievance and Appeal process. Ashker started this process back in 1992 wherein he denied any and all parts of the gang label and stated his desire to program on "general population." All of these 602s were denied at each level of review.

23.     CDC also publishes in the media its findings about gang status. Ashker is a well-known prison conditions litigator, having prevailed on several cases. In 1993, he did an interview for 60 Minutes (under the premise of the show's interest in his suit stemming from being shot by PBSP staff in 1990 and terrible follow-up care, which was severely edited with no mention of any of this), in which the voice over begins, "Meet Todd Ashker, who CDC alleges is a member of the Aryan Brotherhood." In November of 2002, Sgt. McGrath, a PBSP gang unit, and two informants were on the Channel 2 news talking about "Aryan Brotherhood conspiracies." This sergeant showed on air several photos of alleged Aryan Brotherhood members, including photos of Ashker and Troxell. Such TV segments were viewed by the general public and by thousands of prisoners, thus facilitating other inmates' efforts interested in and/or going through debriefing. The on air information tells inmates what CDC is looking for (e.g. any adverse information on any of the shown inmates).

24.     Between 1985 and 1987, the CDC did not provide prisoners with any notice at all that an "association" with a prison gang would be cause for permanent, "indeterminate SHU" status until the prisoner successfully "debriefed."

25.     "Debriefing" means becoming a CDC informant, which requires the debriefing prisoner to tell on himself, other inmates, and CDC staff members as well as some kind of "new" information about gang-related and/or criminal activities that CDC staff were not aware of, or rather, heard rumors about and want corroborating details about in which they obtain via manipulative interrogation sessions.

26.     At no time have any CDC staff informed Plaintiff that a "gang associate" label, resulting in "indeterminate SHU" status, would be the cause for his "21 years to life" prison sentence to be changed to a "life without parole" sentence. However, the reality is that the State Parole Board operates with a "no-parole" policy for prisoners held in SHU on "indeterminate status."

27.     It was not until some time between 1995 and 1998 that CDC formally adopted any rules or regulations specifically dealing with their practice of keeping prisoners with "gang association" labels in SHU on "indeterminate" status.

28.     It was not until some time in 1999 or so that Defendant Alameida formally promulgated any specific rule, regulations, and guidelines for CDC staff to follow with regards to the "debriefing" process. (15 CCR 3378.1 et seq).

29.     In 2000 or so, Defendant Alameida formally promulgated a new alternative means for a prisoner on "indeterminate SHU" status to gain release from SHU. This is referred to as "inactive" gang status. (15 CCR 3378(e)).

30.     "Inactive gang status" is defined as: "The inmate has not been identified as having been involved in gang activity for a minimum of six years."

31.     A single so-called "reliable source" claiming that a prisoner is involved in gang activity is sufficient cause for CDC staff to deem said prisoner "active," at which point, the six year term

period starts all over. CDC equates "gang activity" with one source stating the prisoner being reviewed is "a member or associate of a gang."

32.     Defendants Alameida, Woodford, and McGrath know that this "inactive status" avenue for a prisoner to get released from SHU is a sham that was enacted to make it appear that there was an "alternative means" for a prisoner to get out of SHU other than becoming a CDC informant as demonstrated by the following:

33.     Even if a prisoner was to meet the standards for "in active status," CDC can still keep him in SHU. The Departmental Review Board (DRB) is authorized to retain an inactive gang-member or associate in SHU based on the inmate's "past or present level of influence in the gang, history of misconduct, history of criminal activity, or other factors indicating that the inmate poses a threat to other inmates or to institutional security." (15 CCR 3341.5(c)(5)).

34.     What it boils down to is this. If CDC staff wants to let a prisoner on "indeterminate" status out of SHU, they do so by simply claiming he meets "inactive" status regardless of whether he actually does meet the criteria or not.

35.     Plaintiff personally does not know of a single white prisoner housed in PBSP's SHU unit (for the past 6-14 years labeled as an Aryan Brotherhood member or associate) to be deemed on "inactive" status except one and he was never released to one of CDC's general populations because CDC staff claimed that they had no place to put him. Notably, Defendants keep whites more isolated from each other than all other races as an extra punitive measure to coerce them

1  into debriefing. This is even more suspect because they are more isolated from each other than
2  any other group. So how is it possible that all of the ones who have been broken down and
3  decided to debrief would have reliable, new information about alleged gang activity unless staff
4  was providing them with information and/or their stories were based on rumors, innuendos,
5  hearsay, and out-right lies? Because the conditions in PBSP-SHU are so punitive in nature (and
6  even more so for whites who are already a minority race there and who Defendants intentionally
7  keep even more isolated from being able to socially interact with each other than all other
8  groups), many inmates cannot take it and will say or do anything to get out of SHU. As a result,
9  all sorts of lies are told by inmates with the primary motivation of getting out of PBSP.
10  Defendants are fully aware of the desperate motivations of these inmates, and yet still consider
11  all that is told by them as the gospel.

12

13

14  36.    Ashker's last (CDC 115) rules violations consisted of a 1990 assault on a prisoner, a pair
15  of 1992 assaults on staff, a 1994 possession of contraband (not drugs), and a 1995 "talking in the
16  law library."

17

18  37.    The 1990 charge was about a fist fight orchestrated by staff during which Ashker was
19  shot by staff and permanently disabled, which became the subject of a successful wrongful
20  shooting and medical malpractice claim. The pair of 1992 "staff assaults" occurred on the same
21  day and guard on a transport bus. It was the first time Ashker was fully shackled, hands and feet,
22  when a guard attacked him. The second time was later on after numerous guards surrounded him
23  while the same guard removed his shackle. None of these incidents were in any way gang
24  related.
25

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF    15

38.     By July of 2001, Ashker had over six years of "disciplinary clean" time in. Ashker asked his unit counselor to put him up for a review regarding eligibility for "inactive" status (while maintaining he was not a member of any gang.)

39.     On August 24, 2001, Ashker received a CDC-128B crono, which listed four items of "confidential information" indicating that he was still an active gang member and informing him that he can renew his "inactive review" request after June 18, 2007.

40.     On September 3, 2001, Ashker submitted a detailed 602 appeal challenging CDC's positions regarding their confidentiality claims as well as specifically addressing and refuting each of the four claims, which was substantially hindered because no specific details were provided to him.

41.     In October 2001, Ashker received Defendant McGrath's generic, generalized response denying all aspects of the appeal.

42.     Ashker then sent the appeal on to Defendant Alameida for the director level and final review. He received it back in 2002, denied in full, thus exhausting a second time all available administrative remedies.

43.     Defendants Alameida, Woodford, McGrath, and Kirkland have known for many years that prisoners subjected to their progressively restrictive, punitive SHU conditions' (together with their position that prisoners be subject to "indeterminate" status) only real means for being

let out of SHU is for them to parole, die, or debrief has been the cause for literally hundreds of

inmates to come forward and "debrief". Defendants know that such inmates' stories are often

bold-faced lies or based on rumor, innuendo, and/or the same old "conspiracy" theories from

thirty or more years ago.


44.     These same five Defendants are also each fully aware of the fact that a vast majority of

all of their "reliable" sources have no personal knowledge about what other prisoners are

involved in because PBSP-SHU, by its very construction and purpose, is meant to isolate people.

They are fully aware of the Los Angeles County scandal of the 1990s regarding jailhouse

informants (one of which gave a demonstration of how easy it was to make it appear his

information was the result of people confessing their crimes to him). Defendants know such

confession practices are more prevalent within CDC and especially in PBSP. Plaintiffs have been

even more isolated than most other PBSP-SHU prisoners, in so far as being isolated from their

social group (other whites).


45.     These same Defendants know that there are many inmates who are so desperate to get out

of PBSP-SHU that there is a backlog of hundreds of them who are currently going through the

various stages of the debriefing process, while many are on the waiting list to do so. (Based on

information and belief.)


46.     Defendants Alameida, Woodford, McGrath, and Kirkland have intentionally sought to

make the conditions in PBSP-SHU progressively more punitive, not for legitimate penological

reasons, but rather to coerce more informants into "debriefing" (out of a sense of desperation and

hopelessness), as well as increasing the amounts of fabricated information CDC staff receive by mandating that inmates must provide "new" information in order to "successfully debrief."

47.     Alameida, Woodford, McGrath, and Kirkland are each fully aware of what a complete fraud their rules and regulations are with regard to certain SHU inmates and their ability to ever be able to meet the criteria to be released from SHU on "inactive" status. This includes Plaintiff Ashker. (Based on information and belief).

48.     Thus, Ashker's only way out of SHU will be to parole, die, or via "debriefing." The Parole Board requires him to get out of SHU and complete various programs prior to any chance of getting a parole date. The CDC and Defendants herein, do not provide a SHU inmate the opportunity to participate in most of the programs recommended by the Board (such as self-help, group type programs, and vocational programs).

49.     The Defendants' gang-label and subsequent placement of Ashker on SHU "indeterminate" status for approximately thirteen years now has substantially prejudiced his chance of ever being paroled and has thus violated his due substantive and procedural due process rights under the 5th and 14th Amendment to the U.S. Constitution. He has suffered irreparable injury because during the past thirteen years, Defendants have not provided program opportunities, thirteen years that are now gone forever. These are all cases of program opportunities denied without penological justification, mainly for refusing to debrief.

50.      While he has repeatedly challenged the gang label and "inactive" member label, his ability to do so has been futile because Defendants would not disclose any specific details about their sources or their claims, which is necessary to be able to adequately refute it.

51.      In 1998 and 2001, Ashker had his parole documentation hearings at which time he was notified by Board member Roos that getting out of SHU and upgrading his education, vocation, work-related, and self-help was needed. In August of 2003, Board members Lawin and Lehman conducted his initial parole eligibility hearing at which time they noted his failure to follow previous recommendations, which was partly used to find him unsuitable and set his next eligibility hearing five years away, and again recommending programs, etc.

52.      On September 15, 2004, Ashker submitted another 602 appeal challenging CDC's "inactive gang" status criteria and that CDC was not adhering to their own rules and regulations that are applicable to a prisoner's ability to meet such criteria, and asking to be reconsidered per provisions in settlement agreement of *Castillo v. Alameida.*

53.      Ashker's 602 appeal pointed out that Defendants were not complying with California's Code of Regulations, Title 15, Sections 3000 or 3023 (defining "gang" and "gang activity").

54.      Defendants' own rules and regulations define "gang activity" as an "illegal act" committed on behalf of the gang. Ashker pointed out that "illegal acts" require the issuance of a "serious rule violating report" per CCR Title 15, Sections 3312 (a)(3) and 3315, and that he has

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF    19

1    not received a single "serious rules violation" write-up for over ten years and none that ever

2    specified such "illegal gang activity".

3

4    55.    In the "Action Requested" section of the above-referenced appeal, Ashker asked

5    Defendants to follow their own rules and regulations and find that he met "inactive" gang criteria

6    and release him to the general population.

7

8

9    56.    At the first and second levels of Ashker's 602 Appeal (referenced above), Defendants

10    totally ignored his points regarding their failure to adhere to their own rules and regulations and

11    denied him relief. At the third (and final) level of review, they refused to accept the appeal,

12    issuing a letter stating they would not address Ashker's issues because he has exceeded the

13    fifteen day time limit. Thus Ashker's available administrative remedies are exhausted per *Ngo v.*

14    *Woodford*, 2005 DJDAR 3445 (9th Cir. 2005). The issues presented here are in the nature of

15    continuous occurrence, thus a fifteen day period regarding starts every day. The time period of

16    15 days is extremely short, possibly the shortest rules of limitations in the law books.

17

18

19    57.    On November 23, 2003, Ashker submitted a group of 602 appeals on behalf of himself

20    and Plaintiff Troxell challenging CDC policies and practices of subjecting them to the punitive

21    restrictions in SHU solely for 'administrative reasons' since 1985 and 1992 rather than behavior,

22    which has effectively denied them the opportunity to participate in the programs required by the

23    Parole Board, all of which results in a life-without-parole sentence, and also treating them

24    differently than other prisoners subject to segregation for administrative reasons.

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF    20

58.     In the above-referenced appeal, Ashker and Troxell requested "opportunities and access to programs and activities as described in the 602 appeal per provisions in their own rules and regulations. The first level denied any relief.

59.     At the second level of review, Ashker and Troxell pointed out that the first level ignored their references to CCR Title 15 Sections 3040(c) and 3343(k) regarding program opportunities to be made available to prisoners in segregated housing units. They also asked the Defendants to halt their practice of treating white prisoners differently than other races.

60.     Defendant McGrath denied relief at the second level of review stating that Plaintiffs are members of a terrorist organization and so long as they "remain involved in criminal conspiracies dedicated to violence and other crimes, pleas for rehabilitation are less than credible".

61.     Defendant McGrath further stated that "until they renounce their membership in that conspiracy and take all reasonable steps towards preventing that conspiracy from continuing – meaning divulging all of their secrets – they should be viewed as criminals who continue to conduct criminal acts".

62.     Defendant McGrath further stated that until Plaintiffs "formally renounce their membership in this group and divulge all of their secrets to the authorities … they will remain in SHU and should never be paroled".

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF     21

63.     Plaintiffs sent this appeal to the third level of review. On July 22, 2004, Defendant Woodford denied relief stating the second level response "represents CDC's position" and "the request to be provided access to programs required by the BPT cannot be granted".

64.     All of Plaintiffs' points were ignored, including their points concerning being subject to punitive measures despite years of going without receiving any disciplinary rules violations and unequal treatment based on race. Plaintiffs recently learned from staff that a sign has been posted in the SHU custody office stating, "No whites are to be housed around Ashker and Troxell".

65.     Defendants McGrath and Woodford's position that Plaintiffs are deemed terrorist criminals based solely on their association and until they agree to cooperate with authorities against gang members, they will never get out of SHU and should never be paroled was made very clear in the 602 appeal (referenced in the above paragraphs #57 to 62).

**B. Plaintiff Troxell.**

66.     Troxell has been in state prison since July of 1979 after a plea of guilty to first degree murder for which he received a term of 26 years-to-life.

67.     The circumstances of the case were, in summary (based on eyewitness testimony at the preliminary hearing), that Troxell entered a store armed with a single-shot shotgun with the intent of robbery. A store manager ran up to Troxell and grabbed the barrel of the gun, which caused Troxell's reflex response of pulling back, and he accidentally fire the gun, killing the store manager.

68.     Troxell acknowledged his wrongdoing and agreed to and did plead guilty. Troxell did this after reading the first degree murder statute with his attorney and which both understood to mean that so long as he did not lose any "good time" credits in prison, he would be entitled to a release date after serving 17 years, 8 months.

69.     Upon his arrival in state prison, he wound up in SHU at San Quentin for allegedly being involved in some serious rule violations, the last one of which occurred in 1980. "Serious" means causing serious injury to another.

70.     He was assessed a SHU term for such violations (but did not lose any good time), and upon completion of his SHU term, he was transferred to Folsom State Prison's general population in January of 1984.

71.     When the committee at Folsom let him out to the general population in 1984, they also issued a crono, stating he was an "associate of the Aryan Brotherhood" prison gang and that the "association" label was based on confidential information (which Troxell believed came from an inmate informant at San Quentin whom he never even had any personal interactions with). Troxell has not been given details of whatever this information was.

72.     Troxell has always denied any and all of CDC's gang labels. From the time he entered prison in July of 1979 up to January 1984, he was never told by anyone that being labeled as an "associate" and/or member of a prison gang would be the cause for prison administrators to place him in "indeterminate" SHU status until he agreed to become a CDC informant, solely based on

inmate informants saying he was a member of the Aryan Brotherhood. (Troxell's position on the association issues is akin to Ashker's at paragraphs 15-23).

73.     Troxell was never notified that CDC's gang labeling would be the cause for the State Parole Board to change his sentence to "life without any possibility of parole" until he agrees to become a CDC informant.

74.     Between January 1975 and January 1984, Troxell knew of people who had life sentences, who allegedly were gang members, and who were granted parole dates.

75.     When he was released to the general population at Folsom in January 1984, he was programming well and even received "positive work" reports from his job in the kitchen.

76.     He was able to maintain a good relationship with his fiancée and daughter via regular contact visits. He was only confined to his cell for an average of 10 hours a day. The rest of the time he was working or enjoying his visits and yard time.

77.     He had a color TV and radio in his cell, various items of personal clothing, access to a wide variety of store items from the canteen seven days a week, four thirty-pound packages of food, clothes, tobacco products, etc., per year, social interactions with numerous people throughout each day, phone calls, and photos.

78.     In October 1985, Folsom Prison administrators ordered that Troxell be placed in SHU solely for administrative reasons.

79.     Shortly thereafter, he was transferred to Shino State Prison's administrative segregation and kept on "strip cell" status for six months without any property after which, he was then placed in the regular administration segregation unit there and issued a small amount of his property. His visits were behind glass, once a month.

80.     He was kept in Chino until he was transferred to the newly opened Tehachapi SHU unit around November 1986 at which time, the administrative committee told him he was to be placed on "indeterminate" SHU status based on CDC's labeling him as a "member of the Aryan Brotherhood".

81.     In December 1989, he was transferred to (and was one of the first prisoners housed in) PBSP-SHU where he has been confined ever since, during which time, he has been kept virtually isolated from other white prisoners with few exceptions (other than cell mates).

82.     In 1988, he submitted his first 602 appeal, challenging CDC's policy and practice of keeping him continuously confined within (and subjected to the punitive conditions therein) the SHU on "indeterminate" status solely for administrative reasons.

83.     CDC administrative personnel have denied his 602 appeal at each of the three levels of review.

84.     Troxell had his initial parole eligibility hearing back in September 1995 before a panel of Pete Wilson's biased commissioners (by "biased," Plaintiff refers to Wilson's practice of only appointing people to the Board who share his political views about rarely granting parole regardless of what the law and status say, based on information and belief.)

85.     At this time, the Board noted Troxell had been free of any serious disciplinary violations since 1981 and that he had family support were he to be released.

86.     The Board nevertheless denied a parole date in large part based on CDC labeling him a gang member, stating he needed to get out of SHU (meaning becoming a CDC informant), upgrade his education and vocation skills, obtain a good work record, and participate in self-help programs. The Board then scheduled his next hearing for the year 2000, five years away.

87.     Yet, his next hearing was not held until nearly six years later, occurring in July of 2001.

88.     At his second parole hearing, Board members Welch, Granlund, and Starn denied a parole date again for the same reasons as those of his first hearing.

89.     The Board members above named then set his next parole hearing for the year 2005, four years away, again stating he needed to get out of SHU and participate in programs.

90.     Back on December 14, 1999, the PBSP Institutional Classification Committee (hereafter ICC) submitted his case to the gang unit in order to determine if he met the criteria for inactive status. (See paragraphs 29 to 35 above for details about this inactive status criteria, etc.)

91.     On April 12, 2000, another ICC committee noted the following: "Committee reviewed subject for inactive gang status and the date of the most recent gang activity as noted in the C-file could not be established. On December 14, 1999, ICC referred this case to the in lieu via PBSP IGI for clarification of S's current prison gang validation status. The in lieu review is pending."

92.     On March 21, 2001, another ICC committee noted that "S was referred to IGI by ICC of December 14, 1999 for inactive gang status, but due to administrative oversight, he was not reviewed. Committee acts to re-submit the referral to IGI for inactive gang status review."

93.     The lieu reviewed his case and on June 23, 2001, they issued a CDC-128B crono stating that he will be retained on active status in SHU and his next eligible date for "inactive" status will be after August 3, 2006.

94.     The basis for lieus' determination that Troxell was still an "active" gang member was based on confidential memos dated September 20, 1999 and August 3, 2000.

95.     The September 20, 1999 confidential memo stated that Troxell is a "gang member". Defendant McGrath knows this is not sufficient to demonstrate a prisoner as an "active"

participant prior to the last confidential memo (from one of CDC's informants stating he was a gang member, dated January 9, 1989).

96.     As a matter of fact, not one of the five original confidential memos (these are dated May 2, 1988; July 26, 1988; August 5, 1988; August 10, 1988; and January 9, 1989) used to justify keeping Troxell on "indeterminate" SHU status make any claims that he was a participant in any actual illegal activity on behalf of the gang. All they state is that he was a member of the gang (based on information and belief).

97.     Troxell should have been released from SHU back in early 2000 because there was nothing to indicate his activity involvement in any gang activity. PBSP administration had no intention of ever releasing him from SHU and instead acted like his case was being reviewed and/or had slipped through the cracks while IGI staff asked all of their debriefing inmates about Troxell's activities.

98.     Then, conveniently in mid 2000, one of their informants claimed Troxell was a "member of the Aryan Brotherhood Counsel", which was then used to justify keeping him in SHU and subject to the "no parole" policy of the Parole Board. His 602 challenging the "inactive" status issue was not processed by PBSP staff in 2004; thus, their refusal to process his 602 constitutes an exhaustion of his administrative remedies.

99.     On November 23, 2003, Troxell and Ashker submitted a Group 602 Appeal to challenge CDC's policy and practice of keeping them on "indeterminate" SHU status (subject to the

punitive, destructive conditions therein for over 18 years) solely for "administrative reasons" rather than behavior, which has denied them the chance of ever getting a parole date because none of the basic programs are available in SHU that are required by the Parole Board as well as the "no parole" policy.

100.    On November 16, 2004, Troxell submitted a 602 appeal challenging Defendants' refusal to release him to the general population pursuant to meeting "inactive gang member" criteria. The basis for such denial was the two confidential inmate informants hearsay statements that "Troxell was a gang member", which does not demonstrate "participation in any illegal gang activity".

101.    On November 23, 2004, the appeals coordinator refused to process this appeal stating Troxell was beyond the 15-day time limit. Thus Troxell's available administrative remedies had been exhausted on this issue per *Ngo v. Woodford*, 2005 DJDAR (9th Cir. 2005). The issues presented here are in the nature of continuous occurrence, thus a fifteen day period regarding starts every day. The time period of 15 days is extremely short, possibly the shortest rules of limitations in the law books.

102.    On November 8, 2004, Troxell filed a 602 appeal challenging Defendant's criteria regarding what constitutes "gang activity" and their refusal to adhere to their own rules and regulations (see details in above paragraphs #52-55) and requested a review of his status based on the provisions in the recent settlement agreement in *Castillo v. Alameida*, USDC- N.D. Cal

#94-2874 such as CDC not using "hearsay" statements against a prisoner as the basis for determining "active" gang involvement.

103.    On February 2, 2005, the appeals coordinator refused to process this appeal stating Troxell was beyond the time limits to appeal his inactive status issue. Thus Troxell's available administrative remedies have been exhausted on this issue per *Ngo v. Woodford,* 2005 DJDAR (9th Cir. 2005).

104.    Defendants' actions, as described above, have substantially affected Plaintiffs' chances of ever being paroled. They have told Plaintiffs flat out that it is their positions that Plaintiffs will be subject to the punitive SHU conditions for the remainder of their lives until they cooperate with authorities in bringing down the gang.

105.    Defendants have presented Plaintiffs with the "Hobson's Choice" of remaining in SHU until they die or become informants (which Defendants know would place Plaintiffs, as well as their families and friends outside of prison, in serious danger). Plaintiffs have challenged such policies to no avail, and the bottom line is Defendants have been totally indifferent to this issue.

106.    On February 7, 2005, Plaintiffs submitted a group 602 appeal (per provisions of CCR Title 15 Section 3084.2) in which they again sought to challenge their continued illegal SHU confinement and specifically, pointing out Defendants' practices/policies violating provisions of the 5th and 8th Amendments to the U.S. Constitution.

107.    The appeals coordinator rejected this appeal, stating that Plaintiffs cannot proceed with a group appeal, nor can they challenge an action or decision occurring beyond the 15-day time limit.

108.    On February 22, 2005, Plaintiffs resubmitted the above referenced appeal with a note to the appeals coordinator explaining why they did meet "group appeal" criteria. On March 7, 2005, the appeals coordinator again rejected their appeal for exceeding the 15-day time limit.

109.    On April 11, 2005, Plaintiffs again submitted a new 602 appeal in which they challenged Defendants' debriefing policy (pointing out the adverse consequences informants and their family/friends face) as well as Defendants' policy of treating whites differently than other races.

110.    On May 26, 2005, the appeals coordinator rejected this appeal (thus he exceeded the time limits for processing this appeal that he received on April 13, 2005 as a response was required within 30 working days per CCR Title 15, Section 3084.6(a)(2)). The appeals coordinator referenced their prior 602 that was rejected due to time constraints and a laundry list of other excuses.

111.    The above paragraphs 52-65 (re: Ashker) and 99-110 (re: Troxell) demonstrates that Plaintiffs have fully exhausted their "available administrative remedies" per *Ngo v. Woodford*, 2005 DJDAR 3445 (9th Cir. 2005).

112.    In addition to challenging the policies, practices, and conditions via the available administrative appeals process as detailed above, Plaintiffs have also sent letters (on January 20, 2004 and February 6, 2004) and memorandums to Defendants Governor Schwarzenegger, Hickman, and McGrath notifying them of their position that such policies, practices, and conditions are wrong and illegal. They asked Defendants to remedy such problems.  Defendants thus are knowingly acting with deliberate indifference and conscious disregard to Plaintiffs' liberty interest rights by failing to do anything to fix the problems described in this complaint, which is unconstitutional and violates Plaintiffs' rights to due process of law (5th and 14th Amendments), violates the Ex Post Facto Clause of the United States Constitution (Art. I, Section 9), and constitutes cruel and unusual punishment in violation of the 8th Amendment to the United States Constitution.

113.    Defendants' policies and practices regarding confining prisoners to the SHU on indeterminate status for administrative reasons based on alleged gang membership/association has been without adequate due process, and based on vague/contradictory rules and regulations which Defendants' abuse and manipulate to keep Plaintiff's segregated forever.

114.    Plaintiffs point out that at the time that they entered CDC on up to the time the gang label based "indeterminate" terms in SHU were placed upon them, they were not notified of the consequences of such determinations basically because such severe sanctions did not exist. No rules or regulations concerning SHU indeterminate, debriefing, and inactive status were ever formally promulgated into the CCR Title 15 until the time period between 1995 and 2000.

1   115.   Defendants have long had the practice of affording SHU prisoners the opportunity to

2   attend the Institutional Classification Committee (ICC) hearings (an average of every 180 days)

3   allegedly in order to hear from the prisoner and regularly review his status. Such ICC hearings

4   are a sham (just as the 'inactive' status is) because the criteria for release from SHU

5   "indeterminate" terms is via becoming a CDC informant and "successfully debriefing". Period.

6

7   116.   Defendants Schwarzenegger, Hickman, Alameida, and Woodford have each been

8   responsible for approving and/or implementing severe budget cuts for a majority of all prisoner

9   programs and services necessary for prisoners to participate in in order to have any real chance

10  of receiving a parole date from the Board.

11

12

13  117.   Such programs and services include, but are not limited to jobs, education (beyond high

14  school 'GED'), vocations, and "self-help" programs, all of which are scarce and virtually non-

15  existing at the majority of CDC institutions housing lifers.

16

17  118.   Such programs and services are totally non-existent in PBSP-SHU with the exception of

18  the fairly new opportunity for SHU prisoners who qualify to study for and obtain their GED.

19  (And recently they added a few college correspondence courses to those who qualify and can

20  cover their own expenses).

21

22

23  119.   This program is conducted via the PBSP Education Department providing prisoners with

24  material to study in their cells as well as lessons being conducted via an institutional TV channel.

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF    33

120.    This in itself demonstrates the ability of Defendants including Hickman, Alameida, Woodford, and McGrath to provide all SHU prisoners who want to participate with additional educational, vocational, and "self help" programs via the same process as the GED program without any safety or security concerns.

121.    Yet they have declined to do so for reasons described in the previous paragraphs, all of which has caused serious injury to many PBSP-SHU prisoners, including Plaintiffs, by affecting their chance of getting a parole date (not to mention public safety in general).

122.    Plaintiffs have both wanted to participate in all of the programs that the Board has said they needed to get into.

123.    Troxell has participated in the G.E.D. program and has recently received his G.E.D.

124.    Ashker obtained his GED so he asked his Unit Counselor about the availability of some of the programs mentioned by the Board. The response was, "First of all, you need to get out of SHU via 'debriefing' or 'inactive status.'" She also suggested contacting the Education Department to inquire about self-help and correspondence type vocational programs as well as the Psychiatric Department for "self help" programs.

125.    Ashker contacted Education and is currently taking a paralegal correspondence course (which he will have to pay thousands of dollars for and he is one year behind schedule on). Education has no "self help" courses for SHU prisoners of any substance.

126.    The Psychiatric Department said they do not provide "self help" programs either.

127.    Currently, Defendants Woodford and Kirkland are working towards making PBSP-SHU more punitive by further restricting allowable property including toothpaste, deodorant, canteen items, books, and magazines. In 2002, Defendant McGrath halted SHU prisoners from obtaining hardcover books, which are what most educational books are.

128.    Defendants do not provide SHU prisoners access to any exercise equipment nor personal phone calls, and the only SHU prisoners permitted a yearly photograph to send to family outside prison are debriefers and those deemed inactive. Plaintiffs have not been able to send a recent photograph to family for 20 years and many of their young relatives have never seen them.

129.    McGrath banned hardcover books back in 2002 because "too many prisoners were 602'ing staff alleging they damaged their books when removing covers."

130.    McGrath's motivation was thus a matter of retaliatory, group punishment, and Troxell has exhausted a 602 appeal challenging this policy a few months ago after staff refused to allow him to have books on "How to Draw" and "Dictionary of Cultural Literacy" sent in. The appeals coordinator refused to process his appeal to the first level on July 12, 2004 due to exceeding the 15-day time limit. Thus, this issue has been exhausted. (See *Ngo v. Woodford, supra.*).

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF      35

131.   Plaintiffs are challenging Defendants' practice/policies of banning a whole list of magazines without legitimate penological justification and/or as an unreasonable response to CDC's alleged interests.

132.   For many years, Plaintiffs had subscriptions to various magazines dealing with the biker lifestyle, i.e. Easyrider, Biker, Outlaw Biker.  These are the only magazines available, which are centered on the biker lifestyle and the content is centered on biker get-togethers, legislation, articles, fiction stories, jokes, etc.

133.   For many years, Plaintiffs had subscriptions to various magazines dealing with skin art( i.e., Tattoo, Flash, Tabu Tattoo, and Savage Tattoo).  These magazines are the only magazines available dealing with skin art and the content is centered on skin art history, happenings and different styles, and examples of various artists around the world as well as articles, some of which address the importance of keeping tattoo equipment sterile to prevent the spread of disease (like Hepatitis) and potentially deadly infections like flesh-eating Necrosis.

134.   Plaintiffs have had access to such magazines as described above for the better part (23 to 26 years) in CDC prisons. They like to keep up on the biker lifestyle and related happenings, and they like the skin art magazines for the unique styles and content of the art.

135.   In 2002, Defendants banned all seven of the magazines described above. They banned all biker lifestyle magazines because each issue would generally have anywhere from one to five pages of frontal nudity (women flashing breasts).

136.    In June of 2002, Ashker challenged the denial of his "Outlaw Biker" magazines and second level of review stated it was CDC's policy to deny all publications containing frontal nudity, period. Ashker knew third level review was futile. This issue is raised as a supporting example of Defendants' unreasonable policy.

137.    In 2002, Defendants banned all skin art magazines stating such were centered on tattooing and since tattooing is not allowed in CDC prisons, the magazine constitutes "contraband and a serious rules violation" because it had pictures of tattoos and now and then a breast was exposed on a single page.

138.    Between November 2003 through May 2004, Ashker and Troxell filed a total of five 602 appeals challenging this ban, pointing out these magazines are centered on art and contain articles detailing the importance of maintaining sterile equipment. Also, that such a ban was unreasonable because it was not going to have any effect at all on prisoners' tattooing and CDC already has a process which states tattooing is a rules violation subject to disciplinary action. Each of these 602 appeals was denied by all three levels of review.

139.    In 2003, Defendants approved Troxell's request to send money from his prison account in order to purchase a new tattoo magazine subscription (he was not aware of the ban), and then all of his issues were banned. When he complained via 602 appeal, Defendants ignored and/or denied his points and suggested he order a different art magazine.

140.    On November 6, 2003, PBSP administrative staff approved Troxell's request to purchase an art magazine called "Juxtapoz". He received one issue of "Juxtapoz". The rest were all denied because of frontal nudity (obscene material based on art impressions wherein a breast or two were exposed in a couple of pages). For example, the staff claimed three pages in the May 2004 issue contained "nudity" out of over fifty pages and all of which were artistic in nature.

141.    Troxell's 602 appeal was denied at all three levels of review and his request for reimbursement for the cost of the subscription was also denied.

142.    Defendants' denials of the above magazines is just another example of being punitive without reasonable penological justification and without taking the content of the publications into consideration as a whole. It is a simple matter for them to issue a rule stating no pictures depicting frontal nudity are to be displayed in the cells. Plaintiffs submit that since CDC banned all frontal nudity, incidents of inmates sexually harassing female staff have gotten a lot more prevalent (based on information and belief), and that pictures of frontal nudity were never a problem at Pelican Bay Prison.

143.    Defendants even refused to give Ashker a catalogue entitled "Northern Tool and Equipment," described as a "Christmas sale catalog" listing a very general collection of imported items such as mopeds, hat racks, model airplanes, and tools. The reason for denial was based on unspecified safety and security issues and "It is difficult to see how the inmate could purchase any of these items."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

144.   Ashker's 602 appeal challenging this catalogue denial was denied at all three levels of review.

145.   After exhausting their available administrative remedies, Plaintiffs both submitted a state tort claim alleging Defendants' magazine bans as detailed above violates State Penal Code Sections 2600 and 2601 provisions regarding allowable reading material. The State Board of Control denied these claims in early 2005.

146.   Over the past ten years, the staffing for (PBSP) mailroom has been inadequate, resulting in lengthy delays in processing inmate mail. The time period from October 2004 through May 2005, such mail was delayed an average of 30 days (from post date until receipt). Such lengthy delays are the cause for a lot of turmoil to inmates and their correspondents. Defendants are aware that this happens each year, yet they do nothing to prevent it ahead of time and waits months to deal with it. Troxell's (602) appeal on this issue was denied by the third level of review on July 16, 2005.

147.   Many prisoners cannot afford to pay large amounts of money in order to participate in programs the Parole Board requires before even giving any real consideration to a prisoner seeking parole.

148.   Such programs should be available to all prisoners including the Plaintiffs. Defendants are responsible for providing such programs because they are the ones in control and such

programs are a parole requirement and help improve public safety in general by reducing recidivism by better preparing prisoners for their reintroduction to society.

149.    Defendants have all been aware of this, yet they have chosen to do the opposite by cutting off programs and warehousing prisoners while subjecting prisoners to a "no parole" policy while citing SHU status and "failure to program" to justify the denials.

150.    Plaintiffs have been subjected to Defendants' illegal, unjustified actions for the past 13 to 20 years now and they are left with no reasonable means of obtaining relief other than court action.

**V.**
**FIRST CLAIM FOR RELIEF**
**VIOLATION OF FIFTH AMENDMENT**
**RIGHT AGAINST SELF-INCRIMINATION,**
**LOSS OF CONDITIONAL LIBERTY**

151.    Plaintiffs refer to and incorporate by reference herein the allegations of Paragraphs 1 through 150, inclusive.

152.    This is a claim by Plaintiffs Todd Ashker and Danny Troxell for violation of 42 U.S.C. Section 1983 against Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland for violation of Plaintiffs' Fifth Amendment rights against self-incrimination and Fifth and Fourteenth Amendment rights to procedural and substantive due process of law.

153.    Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland have kept Plaintiffs continuously confined in SHU subject to "indeterminate" status (solely for administrative reasons) subsequent to sticking "gang associate" labels on them. The support for which is "confidential information" provided by prisoner informants.

154.    Plaintiffs have always denied the gang association/membership labels, and they have also been substantially hindered in their ability to attack such labels in any meaningful fashion because of the alleged "confidential" nature of the information being used against them to the extent that no real specifics are ever provided.

155.    Defendants have kept them on this status for 13-20 years and counting, and have promulgated policies and procedures, which mandate that Plaintiffs' sole means of obtaining a release from SHU and the progressively punitive conditions therein, are to parole, die, or debrief. To debrief one necessarily has to give self-incriminatory information. The officials never believe an inmate that does not also confess to his own crimes.

156.    Plaintiffs are lifers, subject to the Parole Board's "no parole policy" for SHU status. Thus, they are left with the "Hobson's Choice" of never getting out of prison and dying in SHU or becoming a CDC informant, and thereby placing the lives of family, friends, and their own in serious danger. Plaintiffs must also incriminate themselves, a requirement here that would require Plaintiffs to make stuff up. The incriminating information may later be used against them for prosecution of crime(s), for perjury, and/or the Parole Board's using such against them at parole hearings. Defendants expect them to incriminate others too.

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF    41

157.     Thus, the cost of Plaintiffs' exercising their right to silence is the loss of conditional liberty as well as emotional distress, which is forcing a person to incriminate themselves, a compulsion prohibited by the Fifth Amendment to the U.S. Constitution. By using the refusal to debrief as a basis to continue Plaintiffs' indeterminate SHU assignment, Defendants have further violated Plaintiffs' rights to substantive and procedural due process of law. Defendants cannot punish Plaintiffs for the exercise of their Fifth Amendment rights against self-incrimination.

158.     As a proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer, general damages according to proof in excess of $1,000,000 in the form of loss of parole opportunities and continuous confinement in SHU (for 13-20 years, and counting) without any hope of being released from SHU or prison. Plaintiffs also claim damages of emotional distress. Plaintiffs will continue to suffer such damages into the future.

159.     In acting as described herein above, Defendants acted knowingly, willfully, and maliciously or with reckless or callous disregard for Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

160.     Defendants' conduct is continuing and is expected to continue into the future. Plaintiffs have and will continue to suffer irreparable harm for which there is no adequate remedy at law, and request all injunctive relief available under the Federal Civil Rights Act.

Wherefore, Plaintiffs pray for relief as set forth below.

# VI.
## SECOND CLAIM FOR RELIEF
## EIGHTH AMENDMENT VIOLATION
## CRUEL AND UNUSUAL PUNISHMENT

161.    Plaintiffs refer to and incorporate by reference herein the allegations of paragraphs 1-149, inclusive.

162.    This is a claim by Plaintiffs Todd Ashker and Danny Troxell for relief under 42 U.S.C. Section 1983 against Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland for violating Plaintiffs' rights under the Eighth Amendment's prohibition of cruel and unusual punishment. Plaintiffs have been subject to punitive, hard conditions of confinement for over 13 years, which has adversely affected their chance for release and freedom based on status rather than illegal activity.

163.    The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" and punishment that is "grossly disproportionate to the severity of the crime".

164.    Plaintiffs submit that the "debriefing process" (that Defendants require them to "successfully complete" in order to be released from SHU as well as being able to have any real chance of release on parole) is cruel and unusual punishment. Not only would their lives and well being be placed at risk, but the lives and well being of their family members and friends if they were to implicate others in criminal and/or gang activity.

165.    Making a no-release policy on SHU inmates that choose not to debrief constitutes cruel and unusual punishment in violation of the Eighth Amendment.

166.    Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland are each personally aware of the fact that "informants" are targets, as are informants' family members and friends. Each of these Defendants knows of (and/or is responsible for the knowledge of) numerous incidents of informants and/or their families and friends on the streets being threatened, attacked, subject to physical harm, and killed. These Defendants all know that it is simply not possible to ensure the safety of any prisoner in CDC and their abilities to make such assurances with regard to their informants is even lower. Even the informants housed in CDC's "protective custody" units have been the subject of assaults, producing great bodily injury. (Based on information and belief). They have no way of assuring the safety of family members or friends on the street either.

167.    The debriefing policy also gives a huge incentive for inmates to lie. Defendants are all aware of the fact that many debriefings contain all sorts of lies. These lies then become a basis of tying an inmate to a gang, and thus submitting them to indefinite SHU status.

168.    Thus, Defendants' requirement that Plaintiffs "debrief" in order to get out of the progressively punitive conditions of SHUs (knowing they would be deemed "informants" and thereby face a life-long) constant threat of serious harm to themselves (and to their family members and friends outside prison), constitutes "deliberate indifference" and conscious

disregard to Plaintiffs' rights under the Eighth Amendment prohibition against cruel and unusual punishment.

169.    Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland are all "deliberately indifferent" to Plaintiffs' (and their family members and friends') lives and well being by mandating that they agree to become "successful CDC informants" in order for release from SHU and in order to receive any "meaningful consideration" for parole. This policy constitutes cruel and unusual punishment.

170.    As a proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer general damages according to proof, but in excess of $1,000,000 in the form of loss of parole opportunities, continuous SHU confinement without program opportunities required by the Parole Board, and which in turn has them subject to the Board's "no parole" policy as well as emotional distress. Plaintiffs will continue to suffer such damages in the future.

171.    Defendants' conduct is continuing and is expected to continue into the future. Plaintiffs have and will continue to suffer irreparable harm for which there is no adequate remedy at law, and request all injunctive relief available under the Federal Civil Rights Act.

172.    In acting as described herein above, Defendants acted knowingly, willfully, and maliciously, or with reckless or callous disregard for Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

Wherefore, Plaintiffs pray for relief as set forth below.

**VII.**
**THIRD CLAIM FOR RELIEF**
**FOURTEENTH AMENDMENT VIOLATIONS**
**EQUAL PROTECTION DUE PROCESS**

173.    Plaintiffs refer to and incorporate by reference herein in the allegations of Paragraphs 1 through 150, inclusive. This is a claim by Todd Ashker and Danny Troxell against Defendants Arnold Schwarzenegger; R.Q. Hickman; Edward Alameida, Jr.; Jeanne Woodford; Joe McGrath; and Richard Kirkland for violations of Plaintiffs' rights under the Fourteenth Amendment and violations of the Federal Civil Rights Act, 42 U.S.C. 1983.

174.    The Fourteenth Amendment imposes an obligation to the states to safeguard the rights under the U.S. Constitution. Plaintiffs, and each of them, state a Fourteenth Amendment claim for relief as based on four violations, each of which constitutes a separate violation and constitutes a further violation from the cumulative affects of being combined together. The four claims for relief here are:

A)    Defendants' Violation of the Ex-Post Facto Clause (Art. I, Section 9 U.S. Constitution) (Retroactive punishments);

B)      Defendants' Violation of Equal Protection Clause (U.S. Constitution, Fourteenth Amendment) – Procedural and Substantive due process (deprivations of liberty exceeding their sentence(s) in an unexpected, unlawful manner);

C)      Defendants' Violation of the Equal Protection Clause – Procedural and Substantive due process (U.S. Constitution, Fifth and Fourteenth Amendments) (deprivations of a state created liberty interest or "real substance" i.e. statutory expectation of receiving a parole release date; opportunities, and access to programs required by the Parole Board in order for meaningful consideration by the Board concerning parole; and release from SHU on "inactive" status, when no "reliable evidence" is present to demonstrate participation in recent illegal gang activity); and

D)      Equal Protection Clause (U.S. Constitution, Fourteenth Amendment) Unequal treatment based on race (Defendants subjecting whites to more isolation from their social group than other races housed at PBSP-SHU).

175.   Defendants Alameida, Woodford, and McGrath have violated the Fourteenth Amendments prohibition on "retroactive punishments" per the Ex-Post Facto Clause (Art. I, Section 9 U.S. Constitution) in the following manner: The SHU's "No release policy" and its sub-aspects as described above have affectively after the fact transformed Plaintiffs' convictions with sentences allowing for parole into murder convictions into convictions with a sentence of "life without parole."

176.    Plaintiffs were each labeled gang associates/members by CDC staff prior to Defendants'

enactment of any policies or practices, which subjected CDC prisoners to punitive sanctions

based solely on such alleged "associations."

177.    It was not until years after they entered prison that CDC began to sanction prisoners for

mere "association" and/or "gang membership". Plaintiffs have been continuously subject to

Defendants' SHU "indeterminate" status and denied access/opportunities to the programs

required by the Parole Board in order to receive "meaningful consideration" of a parole date for

the past 13-20 years and counting without meaningful due process.

178.    Such programs were supposed to be made available to them by Defendants per C.C.R.

Title 15 Article 3, work and education, Sections 3040(c) and 3343(k):

> "A classification committee *shall assign each inmate* to an appropriate work,
>
> education, vocation, therapeutic, or other institutional programs…" See also
>
> C.C.R. Title 15 Section 3343, conditions of segregated housing … (k)
>
> Institution programs and services. "Inmates assigned to segregated housing
>
> units *will be permitted to participate and have access to* such programs and
>
> services as can be reasonably provided within the unit without endangering
>
> security or safety of persons. Such programs and services *will include, but are*
>
> *not limited to*: education, commissary, library services, social services,
>
> counseling, religious guidance and recreation." (Emphasis added).

1   179.   Defendants' acts and/or failures to act have thus prevented Plaintiffs from opportunities

2   to participate in programs necessary in order for them to meet the Board's "parole eligibility

3   requirement," which in turn, has altered their chance of ever getting a parole date; thus causing

4   them substantial, irreparable injury.

5

6   180.   Plaintiffs' equal protection due process claim (para. 188(b)) is based on the following:

7   Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland have

8   denied Plaintiffs' requests for release from SHU for meeting "inactive" criteria without just

9   cause or "reliable information" demonstrating illegal gang activity. Defendants' policy and/or

10  practices of keeping white prisoners housed in PBSP-SHU nearly completely isolated from their

11  social group (other whites) while placing other races together (with their various social groups)

12  constitutes unequal treatment by race. Such unequal treatment by race is even more glaring when

13  looked at in the context that there are currently over 60,000 gang members in CDC's general

14  population prisons who are African American or Latino, many of whom have recent disciplinary

15  activity (within the past 2-5 years), yet a handful of whites (who have no serious rule violations

16  in the past 6-20 years) are kept in SHU forever.

17

18

19  181.   Plaintiffs' due process claims (Fifth and Fourteenth Amendments) are based on the

20  following: Plaintiffs have a due process (5th and 14th Amendments) liberty interest in release

21  from SHU and parole, subject to protection under the substantive due process clause of the Fifth

22  and Fourteenth Amendment. The right of SHU release is a significant liberty right embedded

23  into state and federal law, thus creating a legitimate expectancy of state compliance therewith.

24  This liberty interest arises per federal law and Defendants have denied Plaintiffs adequate due

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF     49

process in keeping them confined in SHU forever based on association rather than in violation of their own rules and regulations.

182.    Plaintiffs' due process claims are further based on the following: Plaintiffs have a due process and equal protection right under the Fourteenth Amendment of the U.S. Constitution to be treated the same as other prisoners who are similarly situated. Each of the defendants named have, through their acts and/or failures to act, violated plaintiffs' right to be treated equally as those similarly situated (as well as singling plaintiffs out for different, more punitive treatment based on race) as described above.

183.    Each of the Defendants named in this action, through their acts, and/or failures to act, have taken away any and all hopes the Plaintiffs ever had for getting a parole date and being released from SHU some day because of Defendants' policies/practices over the past 13-20 years and counting. Giving Plaintiffs a Hobson's Choice to wit: Agreeing to become "successful CDC informants" and thereby subjecting themselves as well as their family members and friends to a lifetime of problems described above, or be continuously subjected to the progressively more punitive SHU conditions until they die. All of the above violates due process clause of the Fourteenth Amendment to the U.S. Constitution.

184.    As a proximate result of Defendants' conduct, Plaintiffs, and each of them, have suffered and continue to suffer general and compensatory damages in an amount according to proof, but in excess of one million each.

185.    Defendants' conduct is continuing and is expected to continue into the future. Plaintiffs have and will continue to suffer irreparable harm for which there is no adequate remedy at law, and request all injunctive relief available under the Federal Civil Rights Act.

186.    In acting as described herein above, Defendants acted knowingly, willfully, maliciously, or with callous or reckless disregard for Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

Wherefore, Plaintiffs pray for relief as set forth below.


**VIII.**
**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF FIRST AMENDMENT**
**FREEDOM OF SPEECH**


187.    The allegations of paragraphs 129-146 are incorporated herein.

188.    Defendants McGrath and Kirkland's policy of banning and other publication magazines is without justification and constitutes a violation of Plaintiffs' free speech rights under the First Amendment of the U.S. Constitution and a violation of the Federal Civil Rights Act, 42 U.S.C. Section 1983.

189.    Alternatives to such blanket bans are already in place such as rules stating that prisoners who disrespect staff in any way are subject to disciplinary measures and prisoners caught tattooing are also subject to disciplinary measures.

190.    Plaintiffs are both serving term-to-life sentences, each has been incarcerated for over 20 years now, and up until recently they were able to receive the above described reading, pictorial, and artistic-based materials without any problem. They were thereby able to keep abreast of current events concerning lifestyle and art related issues of particular interest and value to them. These are the only items available to them which cover such interests; thus, Defendants have arbitrarily and without reasonable penological justification denied Plaintiffs access to said material in violation of California State Penal Codes 2600 and 2601 regarding prisoners' entitlement to receive any/all magazines that are available to the public except materials deemed "obscene" as well as violating the First Amendment to the U.S. Constitution.

191.    Plaintiffs request declaratory relief in the form of an order declaring the Defendants' conduct as a violation of the First Amendment, Freedom of Speech.

192.    The lengthy mail processing delays constitutes a violation of the First Amendment to the U.S. Constitution.

193.    As a proximate result of Defendants' actions, Plaintiffs have suffered general damages in an amount according to proof, but believed to exceed $10,000.00 for the magazine prohibitions, and $10,000 for the delayed mail.

194.    Defendant Kirkland's conduct is continuing and is expected to continue in the future. Plaintiffs have and will suffer irreparable harm as they have no adequate remedy at law. Plaintiffs thus request injunctive relief.

Wherefore, Plaintiffs pray for relief as set forth below

## XI.
## FIFTH CLAIM FOR RELIEF
## VIOLATION OF FIRST AMENDMENT
## (RIGHT TO ASSOCIATE)

193.    Plaintiffs refer to and incorporate by reference herein the allegations of paragraphs 1 through 149, inclusive.

194.    This is an action for violation of 42 U.S.C. Section 1983 based on Defendants' violations of Plaintiffs' right to associate under the First Amendment to the U.S. Constitution.

195.    Defendants, and each of them, while acting under color of law, consciously disregarded with deliberate indifference to Plaintiffs' federally protected rights, namely here, the First Amendment Right of Association.

196.    Defendants Alameida, Woodford, McGrath, Hickman, and Kirkland have labeled Plaintiffs associates and/or members of the Aryan Brotherhood prison gang based on "confidential information" provided by inmate informants.

197.    Defendants have subjected Plaintiffs to the extremely punitive conditions of SHU for the past 13-20 years based on their alleged "association" status, which in turn, has caused them ongoing irreparable injury by preventing them from participating in programs required by the Parole Board in order to have any change of obtaining a parole release date. Such SHU

placement is based solely on "association" rather than personal involvement in "illegal gang activity," (e.g., you can do absolutely nothing wrong, just the mere fact of association with them violates you and puts you in a no-general-population and no-parole status forever).

198.    Defendants' actions have also contributed to Plaintiffs being subjected to the Parole Board's "No Parole-Policy" and illegal gang classification system for prisoners in SHU on indeterminate status based on the gang association label and failure to program. It is on the basis of this illegal "SHU Confinement Forever Policy" that the Defendants have based their decisions to deprive Plaintiffs of their associational rights.

199.    Defendants Alameida, Woodford, McGrath, Hickman, and Kirkland's actions violate the First Amendment to the U.S. Constitution Right to Associate. They are also in violation of 42 U.S.C. 1983, which bars punishment on basis of association.

200.    Plaintiffs do not challenge here the legitimate penological goals and programs that vest Defendants with a wide range of deferential and discretionary functions. Plaintiffs point out here that where the premise of depriving Plaintiffs of their right to associate turns out to be a false premise, then the right to violate their association right goes with it. Also, the power of the government should be to eliminate conduct, not just innocent associational conduct.

201.    Defendants Schwarzenegger and Hickman have supported the above-named Defendants' intent to keep the Plaintiffs in SHU forever with no chance of parole based solely on allegations that they are members of a prison gang. The SHU status has in turn made their participation in

the programs necessary for any real consideration for release on parole virtually impossible over the last 13-20 years.

202.     Plaintiffs have forever lost the benefits of 13-18 years of solid programming. This deprivation is continuing and is causing both Plaintiffs, and each of them, ongoing irreparable injury in violation of the First Amendment to the U.S. Constitution for which they are without an adequate remedy at law. Plaintiffs request all injunctive relief available under the Federal Civil Right Act.

203.     As a proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer general damages in an amount according to proof, but in excess of $1,000,000 in terms of loss of parole opportunities and continuous confinement in SHU (for 13-20 years, and counting) without any hopes of ever being released from SHU or prison. Plaintiffs each and both claim emotional distress damages. Plaintiffs will continue to suffer such damages in the future and the damages of lost opportunities of doing beneficial programming.

204.     In acting as described herein above, Defendants acted knowingly, willfully, and maliciously or with reckless or callous disregard to Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

205.     Defendants, and each of them, while acting under color of law, consciously disregarded with deliberate indifference to Plaintiffs' federally protected rights, namely here the First Amendment right of association.

# X.
## SIXTH CLAIM FOR RELIEF
## STATE LAW CLAIM FOR NEGLIGENCE

206.    Plaintiffs refer to and incorporate by reference herein the allegations of Paragraphs 1 through 206, inclusive.

207.    Plaintiffs have complied with the notice of tort claims requirements of Cal. Gov. Code Section 910. The claim was rejected by operation of law 45 days later when no one responded to it.

208.    This is a state law claim for damages and injunctive relief based on negligence for violations of duties of care and *per se* negligence for violation of 15 CCR Sections 3040 and 3343(k).

209.    The actions of Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland in failing to provide Plaintiffs with opportunities to participate in meaningful rehabilitative programs (that are required by the Board of Prison Terms in order to have any reasonable chance of getting a parole date) such as, but not limited to, educational, vocational, and self-help courses over the past 12-18 years were done negligently in violation of 15 CCR Sections 3040 and 3343(k). Defendants are liable for negligently violating their duties of due care and/or duties arising from 15 CCR Sections 3040 and 3343(k). Defendants have also violated the intent of the "indeterminate sentencing law" (ISL) as defined in *In Re: Minnis*, 7 Cal.3d 639, 644 (1972):

"The purpose of the indeterminate sentencing law(s)… place emphasis upon the reformation of the prisoner … and with it … a hope and prospect of liberation from prison … at the earliest period when permitted by law … under the restrictions and conditions of a parole."

210.    The Defendants, and each of them, have all negligently used CDC's "gang member" association status against Plaintiffs and have wrongly predicated the Plaintiffs' chances of ever receiving meaningful consideration for a parole date by giving them a "Hobson's Choice" of:

Agreeing to become "successful CDC informants" and thereby get out of SHU and be able to program (when everyone knows that Governors Davis and Schwarzenegger, Secretary Hickman, and CDC Directors Alameida and Woodford, and Warden McGrath's policies and practices have all contributed to rehabilitative programs to be practically non-existent for all lifers especially those confined in PBSP; or

Living the rest of their lives without any hope of ever getting a parole date.

211.    Defendants know, or should know, that this inmate debriefing process produces false links to crimes, all given to CDC officials to get a "get out of Pelican Bay SHU" card.

212.    Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland's conduct is continuing and is expected to continue in the future. Plaintiffs have and will suffer irreparable harm as they have no adequate remedy at law. Plaintiffs thus request injunctive relief.

213.     As a proximate result of Defendants' negligent conduct, Plaintiffs, and each of them, have suffered and continue to suffer general and compensatory damages in an amount according to proof, but in excess of one million dollars.

Wherefore, Plaintiffs pray for relief as set forth below.

## XI.
## PRAYER FOR RELIEF

Wherefore, Plaintiffs Ashker and Troxell pray for the following relief:

1)     For judgment in favor of Plaintiffs Todd Ashker and Danny Troxell as to each and all of the claims for relief set forth in this complaint and against Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, and Kirkland.

2)     For injunctive relief, which includes, but is not limited to, the following:

     a.     Enjoining Defendants Hickman, Woodford, and McGrath to implement program opportunities for SHU "indeterminate" prisoners consisting of education, vocation, and self-help courses, which said prisoners can participate in and receive credit for at their Parole Board hearings.

b.      Enjoining Defendants from keeping Plaintiffs in SHU on indeterminate status based on CDC's "gang member association" status/label(s), absent, credible, reliable evidence which demonstrates that Plaintiffs have been directly involved in recent illegal gang activity.

c.      Enjoining Defendants, named above, from subjecting the Plaintiffs to the "Hobson's Choice" of agreeing to become a CDC informant and getting out of SHU prior to receiving release from SHU.

d.      Ordering Defendants to note in their prison files that their years of SHU status and inability to meet the Parole Board's recommendations re: programming was based on "association" and not in participation in illegal activity.

e.      Enjoining Defendants, above-named, from using CDC's gang member association labels against Plaintiffs, absent additional due process protection (i.e. full, detailed disclosures pertaining to the information relief upon which to support such labels such as the name(s), dates, and specific statements from CDC's sources).

f.      Enjoining Defendants, above-named, to follow the statutory laws and legislative intent contained in Penal Codes 2600 and 2601 and CCR Title 15 Sections referenced in the complaint.

g.      Such other further injunctive and other equitable relief as the Court deems appropriate.

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF      59

3)      Plaintiffs request the appointment of a Master to monitor compliance with any injunction issued herein.

4)      Plaintiffs request a declaratory judgment defining the rights and obligations of each of the parties named herein and declaring the practices and conducts stated herein as being a violation of Plaintiff's constitutional rights and a violation of the Civil Rights Act, 42 U.S.C. Sec. 1983.

5)      Plaintiffs Todd Ashker and Danny Troxell each request compensatory damages from each and all of the Defendants according to proof in excess of the amount of $1,000,000 (one million dollars).

6)      Plaintiffs request punitive and exemplary damages against each and all of the Defendants according to proof.

7)      Plaintiffs request attorney's fees according to proof pursuant to 42 U.S.C. 1988.

8)      Plaintiffs request costs of suit.

9)      Plaintiffs request trial by jury on all issues triable.

10)     Plaintiffs request such further relief as the Court deems just, proper, and equitable.

CIVIL RIGHTS COMPLAINT FOR DAMAGES,
INJUNCTIVE, AND DECLARATORY RELIEF     60

1    Respectfully Submitted,

2

3    _____/s/_____          Dated: August 9, 2005
     Herman Franck, Esq. (SB# 123476)
4    Attorney for Plaintiffs
     Todd Ashker and Danny Troxell
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Demand for Jury Trial**

Plaintiffs Todd Ashker and Danny Troxell herewith demand trial by jury as to all issues triable to a jury.

Respectfully Submitted,

_____/s/_____          Dated: August 9, 2005
Herman Franck, Esq. (SB# 123476)
Attorney for Plaintiffs
Todd Ashker and Danny Troxell