1   J. RANDALL ANDRADA (SBN 70000)
    BRENDAN KENNY (SBN 237969)
2   **ANDRADA & ASSOCIATES**
    **PROFESSIONAL CORPORATION**
3   180 Grand Avenue, Suite 225
    Oakland, California 94612
4   Tel.:   (510) 287-4160
    Fax:    (510) 287-4161
5   E-mail: bkenny@andradalaw.com

6   Attorneys for Defendants

7

8                   UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11                                          Case No.:  C 05-03286-CW

    TODD ASHKER and DANNY TROXELL,
12                                          **NOTICE OF MOTION AND MOTION**
         Plaintiffs,                        **FOR SUMMARY JUDGMENT OR, IN**
13                                          **THE ALTERNATIVE, SUMMARY**
         v.                                 **ADJUDICATION AND MEMORANDUM**
14                                          **OF POINTS AND AUTHORITIES**
    ARNOLD SCHWARZENEGGER, R. Q.            **PURSUANT TO FED. R. CIV. P. 56(c)**
15  HICKMAN, EDWARD ALAMEIDA, JR.,          **AND CIV. L.R. 7-2**
    JEANNE WOODFORD, JOE McGRATH,
16  CAROL DALY, RICHARD KIRKLAND,
    GRAY DAVIS, SUSAN FISHER, BRETT
17  GRANLUND, SHARON LAWIN, GEORGE          Judge:      The Honorable Claudia Wilken
    LEHMAN, JONES M. MOORE, KENNETH L.      Courtroom:  2
18  RISEN, MR. ROOS, LARRY STARN,           Trial Date:
    BOOKER T. WELCH, PETE WILSON,
19
         Defendants.
20

21

22

23

24

25

26

27

28

---

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................ 1

II.  STATEMENT OF ISSUES TO BE DECIDED ................................ 2

III.  STATEMENT OF UNDISPUTED FACTS ...................................... 2

IV.  SUMMARY JUDGMENT STANDARD ........................................ 9

V.  ARGUMENT ................................................................................ 9

    A.  A FEW BRIEF MAIL DELAYS THREE OR FOUR YEARS AGO DO NOT VIOLATE THE FIRST AMENDMENT. ................ 9

        1.  The General Rules Regarding the Right to Receive Mail. ............... 9

        2.  Ashker's Mail. ............................................................... 10

        3.  Troxell's Mail. ............................................................... 10

        4.  Alternatively, The Defendants Are Entitled to Qualified Immunity. ........... 10

    B.  THE REGULATIONS PROHIBITING POSSESSION OF CERTAIN MAGAZINES DO NOT VIOLATE THE FIRST AMENDMENT ..................... 11

        1.  The General Rules Regarding First Amendment Restrictions in Prison. ................................................................... 11

        2.  Alternatively, The Defendants Are Entitled to Qualified Immunity. ........... 13

    C.  THE PLAINTIFFS CANNOT RECOVER ON THEIR DUE PROCESS CLAIMS REGARDING GANG VALIDATION. ................................. 13

        1.  The General Standards Regarding the Statute of Limitations. .................... 13

        2.  Any Claim Relating to Events Occurring Before May 19, 2001 Is Barred.. 13

            a)  Ashker's Claim. ......................................................... 13

            b)  Troxell's Claim. ......................................................... 14

        3.  Plaintiffs' Retention in the SHU Does Not Constitute a "Continuing Violation." ................................................................... 14

            a)  Ashker's Claim. ......................................................... 14

            b)  Troxell's Claim. ......................................................... 14

        4.  There Is Overwhelming Evidence That Mr. Ashker Continued To Be An Active Member of The AB – Much More Evidence Than The "Some Evidence" Standard Requires. ........................... 15

            a)  The General Standards Regarding Inactive Status

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

i

Review/ Re-validation. ................................................................15

    b)  Ashker's Inactive Review and Subsequent Re-Validation....................16

        (1)  *Procedural Due Process*................................................17

        (2)  *Substantive Due Process* ...........................................18

  5.   Alternatively, The Defendants Are Entitled To Qualified Immunity...........19

D.   THERE WAS OVERWHELMING EVIDENCE TO DENY PAROLE
     – THE "SOME EVIDENCE" STANDARD WAS EASILY MET. .....................19

  1.   The General Standards Regarding Parole Hearings. .....................................19

  2.   Ashker's Parole Hearing.............................................................................20

  3.   The BPH Does Not Have a "No Parole Policy"............................................21

  4.   The Plaintiffs Cannot State A Claim Against the Three Governors. ............23

E.   THE PLAINTIFFS' INABILITY TO PARTICIPATE IN CERTAIN
     PROGRAMS BECAUSE OF THEIR SECURITY CLASSIFICATION
     DOES NOT VIOLATE THEIR DUE PROCESS RIGHTS. ...............................23

  1.   General Rule Regarding Access to Prison Programs. ...................................23

  2.   Programs Available in the SHU. .................................................................23

  3.   The Plaintiffs Cannot State A Claim Against the Governors
      Regarding Prison Programs.........................................................................24

  4.   Alternatively, The Defendants Are Entitled to Qualified Immunity. ...........24

  5.   The State Law Claims Must be Dismissed...................................................24

    a)  The Plaintiffs' Claims are Untimely......................................................24

    b)  Alternatively, The Defendants Did Not Commit A State Law Tort.
      The Defendants Are Statutorily Immune From Suit. .............................25

VI.    CONCLUSION ....................................................................................25

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

# TABLE OF AUTHORITIES

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

<u>Page</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........................................................................................ 1, 9

*Bruce v. Ylst,*
351 F.3d 1283 (9th Cir.2003) ...................................................................... 16, 18

*Cato v. Rushen,*
824 F.2d 703 (9th Cir.1987) .............................................................................. 16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ......................................................................................... 1, 9

*Chance v. Marshall,*
1993 WL 451511, *2-3 (N.D.Cal October 21, 2003) ........................................ 12

*Crofton v. Roe,*
170 F.3d 957 (9th Cir. 1999) ............................................................................... 9

*Estate of Abdollahi v. County of Sacramento,*
405 F.Supp.2d 1194 (E.D. Cal. 2005) ............................................................... 25

*Fayle v. Stapley,*
607 F.2d 858 (9th Cir.1979) .............................................................................. 23

*Flast v. Cohen,*
392 U.S. 83 (1968) ............................................................................................ 24

*Gomez v. Marshall,*
1994 WL 184639 *2 (N.D.Cal. April 26, 1994) ........................................... 13, 16

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) .......................................................................................... 10

*Hoptowit v. Ray,*
682 F.2d 1237 (9th Cir. 1982.) .......................................................................... 23

*In re Norman,*
102 Cal.App.4th 280 (2002) .............................................................................. 21

*In re Powell,*
45 Cal.3d 894 ............................................................................................... 19, 21

*In re Rosenkrantz,*
29 Cal.4th 614 (2002) ................................................................................... 19, 22

*In re Serrano,*
10 Cal.4th 447 (1995) ....................................................................................... 22

*In re Van Houten,*
116 Cal.App.4th 339 .......................................................................................... 8

iii

*Johnson v. State of California,*
   207 F.3d 650, 653 (9th Cir. 2000) .................................................................. 13, 23

*Jones v Blanas,*
   393 F.3d 418, 927 (9th Cir. 2004 (citing C.C.P § 352.1) ......................................... 13

*Knox v. Davis,*
   260 F.3d 1009 (9th Cir. 2001) .............................................................. 13, 14, 15

*Leyva v. Nielsen,*
   83 Cal.App.4th 1061 (2000) ............................................................................. 25

*Mauro v. Arpaio,*
   188 F.3d 1054 (9th Cir. 1999) .......................................................................... 11

*Monell v. Dept. of Social Services,*
   436 U.S. 658 (1978) ...................................................................................... 23

*Moody v. Daggett,*
   429 U.S. 78 (1976) ........................................................................................ 23

*Nelson v. Woodford,*
   2006 WL 571359 *3 (N.D.Cal. March 2, 2006) ............................................... 11, 12

*Odello Bros. v. County of Monterey,*
   63 Cal.App.4th 778 (1998) .............................................................................. 25

*Owens v. Oqurokure,*
   48 U.S. 235 (1989) ........................................................................................ 13

*Rowe v. Shake,*
   196 F.3d 778 (7th Cir. 1999) ............................................................................. 9

*Saucier v. Katz,*
   533 U.S. 194 (2001) ...................................................................................... 10

*Stefanow v. McFadden,*
   103 F.3d 1466 (9th Cir.1996) ........................................................................... 17

*Thompson v. City of Lake Elsinore,*
   18 Cal.App.4th 49 (1993) ................................................................................ 25

*Toussaint v. McCarthy,*
   801 F.2d 1080 (9th Cir. 1986) ..................................................................... 16, 17

*Turner v. Safley,*
   482 U.S. 78 (1987) ................................................................................... 11, 12

*Tworivers v. Lewis,*
   174 F.3d 987 (9th Cir. 1999.) .......................................................................... 13

*Zimmerlee v. Keeney,*
   831 F.2d 183 (9th Cir. 1987) ........................................................................... 17

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

iv

**Statutes**

§ 3006(c)(17) .................................................................................................... 3, 11, 12

C.C.P. § 335.1 ............................................................................................................ 13

Civ. L.R. 7-2 ................................................................................................................ 1

Evid. Code § 664 ....................................................................................................... 22

Fed. R. Civ. P. 56(c) .................................................................................................... 1

Govt. C. § 845.2 ........................................................................................................ 25

Govt. C. § 845.8 ........................................................................................................ 25

Govt. Code § 820.2 ................................................................................................... 25

Govt. Code § 905 ...................................................................................................... 24

Govt. Code § 945.6 ................................................................................................... 24

**Regulations**

§ 3312 (a)(3) ............................................................................................................. 12

§3315 (a)(2) .............................................................................................................. 12

California Code of Regulations (CCR) Tit. 15, §§ 3130-3147 ....................................... 2

CCR § 3378(c)(7) ........................................................................................................ 6

CCR Tit. 15, § 2402 .................................................................................................... 7

CCR tit. 15, § 2402(a) ............................................................................................... 19

CCR tit. 15, § 2402(b) ............................................................................................... 22

CCR tit. 15, § 2402(c) ............................................................................................... 21

CCR tit. 15, § 2402(d) ............................................................................................... 21

CCR tit. 15, § 3006 ................................................................................................ 3, 11

CCR tit. 15, § 3040 ................................................................................................... 23

CCR tit. 15, § 3343 ................................................................................................... 24

CCR tit. 15, § 3378(c) ........................................................................................ 4, 5, 15

CCR Tit. 15, § 3378(c) ................................................................................................ 4

CCR tit. 15, § 3378(e) ............................................................................................... 15

CCR Tit. 15, § 3378.) ................................................................................................ 15

v.

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

CCR Tit. 15, §§ 3040(c) and 3343(k).................................................................................8, 9

CCR Tit. 15., § 3378(c)(8) ....................................................................................18

CCR, Title 15, § 3063................................................................................................12

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

vi

1  NOTICE IS HEREBY GIVEN to the plaintiffs that the defendants herein, will move for

2  summary judgment on the plaintiffs' complaint, or in the alternative, summary adjudication, pursuant

3  to Fed. R. Civ. P. 56(c) and Civ. L.R. 7-2.

4  THE DEFENDANTS HEREBY MOVE the Court for summary judgment or, in the

5  alternative, summary adjudication, pursuant to Fed. R. Civ. P. 56(c) and Civ. L.R. 7-2.  This Motion

6  is based on this Notice, the Memorandum of Points and Authorities, the Declarations of Brendan

7  Kenny, Mark Castellaw, Joseph Beeson, Raoul Silva, and the Request for Judicial Notice, filed

8  herewith.  This Motion is also based on the pleadings, records, and files herein, and upon such oral

9  and documentary evidence as may be presented to the Court at the time of the hearing.

10  Summary judgment is appropriate because there are no issues of material fact regarding any

11  of plaintiffs' stated causes of action. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477

12  U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Alternatively, summary

13  adjudication is appropriate because there are no issues of material fact with regard to most of the

14  plaintiffs' claims.  Thus, the defendants are entitled to judgment as a matter of law as to some or all

15  causes of action in the above captioned case.

16  WHEREFORE the defendants move the Court to Order summary judgment as to all claims as

17  set forth in the Memorandum of Points and Authorities below.  Alternatively, the defendants move

18  the Court to Order summary adjudication as to the several claims plaintiffs have made as set forth in

19  the Memorandum of Points and Authorities below.

20  ### MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

21  ### I.    INTRODUCTION

22  The plaintiffs claim that a few mail delays three to four years ago and some state regulations

23  prohibiting magazines with frontal nudity and tattoo magazines violate the First Amendment.  They

24  claim that the CDCR's response to their (essentially admitted) gang activity violates due process.

25  They claim that they have been denied parole because of a "no parole policy" and a lack of prison

26  programs.  They claim that three California governors, nine Parol Boards Commissioners, and five

27  prison administrators have conspired to deny them parole and access to prison programs.

28  As a matter of law, the plaintiffs cannot recover on their claims.  The motion must be granted.

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1

## II.   STATEMENT OF ISSUES TO BE DECIDED

(1)   Did the defendants violate the plaintiffs First Amendment rights in processing personal mail?  Are they entitled to qualified immunity?

(2)   Did the defendants violate the plaintiffs' First Amendment rights in denying them magazines that have frontal nudity and/or promote tattooing?  Are they entitled to qualified immunity?

(3)   Does the statute of limitations bar Mr. Troxell's claim regarding gang validation?

(4)   Does the statute of limitations limit Mr. Ashker's claim regarding gang validation to events occurring after May 19, 2001?

(5)   Did the defendants violate Mr. Ashker's due process rights in denying him parole?

(6)   Did the defendants violate Mr. Ashker's due process rights in denying him access to some prison programs?  Are they entitled to qualified immunity?

(7)   Are the plaintiffs' state-law tort claims untimely under the Tort Claims Act?

(8)   Did the defendants commit state-law torts by denying the plaintiffs parole and denying them access to some prison programs?  Are they entitled to statutory immunity?

## III.   STATEMENT OF UNDISPUTED FACTS

1.  **Mr. Ashker** was sentenced to six years in state prison for burglary in 1984.  In 1990, he was convicted of second degree murder of another prisoner.  He was then sentenced to twenty-one years to life.  He has been housed continuously in the Security Housing Unit (SHU) at various prisons since 1986.  He has been incarcerated in the Pelican Bay State Prison (PBSP) SHU since 1990.  He was initially housed in the BPSP SHU for the murder, but was later retained in the SHU based on his gang validation.  (Compl. ¶ 7.)

2.  **Mr. Troxell** was sentenced to twenty-six years to life pursuant to a 1979 plea of guilty to first degree murder.  He has been housed continuously in the SHU at various prisons since 1985.  He has been housed in the PBSP SHU since 1990 based on his gang validation.  (Compl. ¶¶ 7-9.)

## MAIL

3.  California Code of Regulations (CCR) Tit. 15, §§ 3130-3147 sets forth the procedures that the CDCR must follow regarding the inspection and delivery of mail including "legal mail" (i.e., mail

2

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1    related to judicial matters).

2    4.   In simple terms, PBSP Operation Procedure (OP) 205 implements §§ 3130-3147 at PBSP.  OP

3    205 provides that all non-confidential inmate mail is subject to being read before it is mailed or

4    delivered.  Per Title 15 and OP 205, the PBSP mailroom handles incoming and outgoing mail in as

5    timely a manner as possible.  (Silva Dec. ¶¶ 3-11.)

6    5.   On August 6, 2003, **Mr. Ashker** filed 602 appeal 03-0226 alleging that he received letters on

7    August 5, 2003 that were postmarked three weeks earlier.  He did not specify whether the letters

8    were personal or legal in nature.  The appeal was denied at the Third Level of Review on December

9    17, 2003.  (Jud. Not. 7.)

10   6.   On January 23, 2005, **Mr. Troxell** filed 602 appeal 05-00268 alleging that his outgoing personal

11   mail was delayed 15-30 days.  The appeal was denied at the Third Level of Review on July 15, 2005.

12   (Jud. Not., 8.)

13   **MAGAZINES -- Nudity**

14   7.   CCR tit. 15, § 3006 was amended on June 13, 1995 to add subsection (c)(15), which provides

15   that inmates may not possess "obscene material."  See CCR tit. 15, § 3006 History.

16   8.   Supplement # 1 to PBSP OP 806, dated April 2002, implemented CCR tit. 15, § 3006.  Per

17   Supplement # 1, a prisoner cannot have "publications, pictorials, or drawings in which genitalia of

18   either gender and/or the breast of a female are exposed."  (Jud. Not., 1.)

19   9.   CCR tit. 15., § 3006 was amended on September 30, 2002 to add subsection (c)(17), which

20   provides that inmates may not possess sexually explicit images depicting frontal nudity.  See CCR

21   tit. 15, § 3006 History.  There is an artistic exception to the provision.  § 3006(c)(17)(B).

22   10. Attachment 10 to OP 205, dated August 2005, lists magazines that are permanently excluded.

23   The magazine "Juxtapoz," at issue herein, is on the list.  (Jud. Not., 3; Silva Dec. ¶¶ 15-16.)  The list

24   was amended in May 2006 to provide a more current list of publications that are permanently

25   excluded.  Juxtapoz is listed as a prohibited publication.  (Jud. Not. 3-4.)

26   11. Attachment 9 to OP 205, also dated August 2005, provides that mailroom employees are charged

27   with reviewing magazines to determine whether they should be excluded.  If a recommendation is

28   made to exclude a publication, the recommendation is sent up the chain of command.  If the Warden

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

3

1  approves the exclusion, the magazine is added to the list. (Jud. Not. 2; Silva Dec. ¶ 12-16.)

2  12. On April 27, 2004, **Mr. Troxell** filed 602 appeal 04-01126 claiming that the prohibition of

3  magazines with frontal nudity violated the First Amendment, and, alternatively, that "Juxtapoz" falls

4  under the "artistic exception." The appeal was denied at the Third Level of Review on October 14,

5  2004. (Jud. Not. 9.)

6  **Magazines – Tattoos**

7  13. CCR Tit. 15., § 3063 provides that inmates cannot tattoo themselves or other inmates. PBSP

8  prohibits inmates from possessing tattoo contraband because it may be used as a pattern for tattoos or

9  for other tattooing purposes. (Silva Dec. ¶¶ 12, 14.) <u>Magazines whose primary purpose is to</u>

10 <u>encourage tattooing are considered tattoo contraband and prohibited.</u> (Id. at ¶ 14.) The magazines

11 "Savage Tattoo", "Tattoo", and "Flash Tattoo", at issue herein, are on the list of banned publications.

12 (Jud. Not. 3, 4.)

13 14. On February 29, 2004, **Mr. Ashker** filed 602 appeal 04-00527 claiming that the prohibition of

14 tattoo magazines violated the First Amendment, and that, alternatively, "Flash Tattoo," "Tattoo," and

15 "Savage Tattoo" fall under the "artistic exception." The appeal was denied at the Third Level of

16 Review on July 16, 2004. (Jud. Not., 6.)

17 15. On February 28, 2003, **Mr. Troxell** filed 602 appeal 04-00026 claiming that the prohibition of

18 tattoo magazines violated the First Amendment, and that, alternatively, "Tattoo" and similar

19 magazines fall under the "artistic exception." The appeal was denied at the Third Level of Review

20 on June 7, 2004. (Jud. Not., 5.)

21 **GANG RE-VALIDATION[1] AND RESULTING RETENTION IN THE SHU**

22 16. CCR Tit. 15, § 3378(c) sets forth the procedures that the CDCR follows to "validate" inmates as

23 active members of prison gangs. (Beeson Dec. ¶¶ 7-14.)

24 17. **Mr. Ashker** was initially validated on May 23, 1988 as a member of the Aryan Brotherhood

25 Prison Gang (A.B.). He was re-validated on July 13, 1995. (Kenny Dec. Ex. A.)

26 18. **Mr. Troxell** was initially validated as a member of the A.B. in 1984. (Compl. ¶ 104.) He was

27

28

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

---

[1] Strictly speaking, Mr. Ashker's status as a validated member of the A.B. was "re-evaluated" by the Institutional Gang Investigations Unit and the Law Enforcement & Investigations Unit, as set forth below. However, for the sake of clarity, the defendants describe this process as "re-validation."

4

{00053928.DOC/} DOC 0594                                          *Ashker et al. v. Schwarzenegger, et al.*
MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION         C 05 3286 CW (PR)

1 | re-validated on August 1, 1995. (Kenny Dec. Ex. B.)

2 | 19. An inmate who has been validated or re-validated as an active gang member may thereafter apply

3 | for an official change in status from active to "inactive," as set forth in CCR tit. 15, § 3378(c) and

4 | (d). (Beeson Dec. ¶¶ 4-23.)

5 | 20. In July 2001, **Mr. Ashker** requested that he be classified as "inactive." (Compl.) The IGI

6 | reviewed Mr. Ashker's Central File[2] ("C-File") on August 1, 2001. The IGI concluded that Mr.

7 | Ashker "is still continuing to affiliate . . . with the Aryan Brotherhood (AB) prison gang," and thus

8 | could not be classified as "inactive." (Kenny Dec. Ex. A; Beeson Dec. ¶¶ 19-23.) The IGI relied

9 | upon the following documents in the C-file: (1) a February 22, 2001 Confidential Memo, which

10 | stated Mr. Ashker was sending coded messages to A.B. members to kill certain black inmates; (2) a

11 | February 23, 2001 Confidential Memo, which stated a search of Ashker's cell revealed personal

12 | property that was gang-related and/or proved a current association with the A.B; (3) a June 18, 2001

13 | Confidential Memo, which stated PBSP staff discovered outgoing mail identifying Mr. Ashker as

14 | being in a position of authority in the A.B. and asking that information be forwarded to him; and (4)

15 | a June 29, 2001 Confidential Memo, which stated Mr. Ashker was immersed in gang activity.[3]

16 | (Kenny Dec. Ex. A.)

17 | 21. Mr. Ashker received notice of the IGI's reliance on the confidential memos on August 24, 2001.

18 | (Compl. ¶ 59; Kenny Dec. Ex. A)

19 | 22. On September 3, 2001, Mr. Ashker filed a 602 appeal 01-02335 claiming that the inactive review

20 | was a "sham" and that the four memos were false. The appeal was denied at the Third Level of

21 | Review on September 26, 2001. (Jud. Not. 10.)

22 | 23. On December 28, 2001, the IGI conducted a review of Mr. Ashker's C-File for the purpose of re-

23 | validation. The IGI reviewed the evidence used in the 1988 validation, the 1995 re-validation, and

24 | the four memos described above to ensure that the evidence complied with § 61020.7 of the

25 | Department Operations Manual ("DOM") and the CCR regarding gang validation. The IGI

26 | determined that the items complied with those requirements. The IGI also relied upon four

27 |

28 |

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

---

[2] The Central File is the inmate's "personal file." Records regarding an inmate's activities in prison are maintained in the C-File.

[3] The defendants have concurrently filed a motion for an *in camera* review of the confidential memos.

{00053928.DOC/} DOC 0594                                     *Ashker et al. v. Schwarzenegger, et al.*
MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION                        C 05 3286 CW (PR)

5

1    additional memos evidencing his continued gang activity:  (1) a June 19, 2001 Confidential Memo,

2    which stated Mr. Ashker and other AB members/associates discussed gang-related business between

3    cells on April 19, 2001; (2) a July 16, 2001 Confidential Memo, which stated Mr. Ashker was an

4    active A.B. member holding a leadership position in the gang; (3) July 30, 2001 Confidential Memo,

5    which stated Mr. Ashker ordered assaults on inmates and recruited for the A.B; and (4) a August 21,

6    2001 Confidential Memo, which stated Mr. Ashker ordered assaults on inmates in July of 1999.[4]

7    (Kenny Dec. Ex. A.)

8    24. Mr. Ashker was informed of the IGI's findings, but refused to participate in an interview with the

9    IGI.  The IGI then sent the information to the LEIU for it to determine whether Mr. Ashker should be

10   re-validated.  (Kenny Dec. Ex. A.)

11   25. The LEIU re-validated Mr. Ashker as a member of the A.B. on February 19, 2002 and again on

12   July 8, 2003.  The re-validation forms cited 16 independent documents which supported this re-

13   validation, including the eight memos described above.  (Kenny Dec. Ex. A.)

14   26. On August 4, 2004, as part of its annual review, and pursuant to CCR § 3378(c)(7), the

15   Institutional Classification Committee ("ICC") retained Mr. Ashker in the SHU based on his re-

16   validation(s).  (Jud. Not., 10 at CDC 128-G form attached; Beeson Dec. ¶¶ 4, 15.)

17   27. On September 15, 2004, **Mr. Ashker** filed 602 appeal 04-02600 challenging the 2002 and 2003

18   re-validations and his 2004 retention in the SHU.  The appeal was denied at the Third Level of

19   Review on December 14, 2004.  (Jud. Not., 10.)

20   28. **Mr. Troxell** was re-validated by the LEIU on July 8, 2003.  (Kenny Dec. Ex. B.)

21   29. **Mr. Troxell** filed 602 appeal 88-1657 while he was housed in the SHU unit at Tehachapi State

22   Prison (TSP) on January 4, 1988.  He alleged that the policy of placing him in the SHU at TSP

23   without finding him guilty of "disciplinary behavior" violated due process.  The appeal was denied at

24   the Third Level of Review of April 11, 1988.  He did not exhaust any other 602 appeals relating to

25   his gang re-validations before filing the instant action.  (Jud. Not., 11.)

26

27

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

---

[4] The defendants have concurrently filed an ex parte application for the Court to review the confidential memos *in camera*.

6

**DENIAL OF PAROLE**

30. CCR Tit. 15, § 2402 sets forth the procedures that the Board of Parole Hearings (BPH) must follow in conducting a parole hearing and determining whether an inmate is suitable for parole.

31. **Mr. Ashker's** parole hearing at issue was held on August 7, 2003. He freely chose <u>not</u> to attend. (Jud. Not., 12 at 2:12-13.) The panel concluded that Ashker was not suitable for parole and would pose a threat to public safety if released. (*Id.* at 28:9-12.) The panel considered the following: (1) Ashker's lengthy criminal history; (2) his commitment offense of 2nd degree murder; (3) his negative behavior since incarceration; (4) A.B. membership; (5) failure to participate in self-help and vocational programs; (6) failure to participate in the psychiatric evaluations that he had been scheduled to attend; (7) lack of any parole plans and a work record; (8) the opposition of the Sacramento District Attorney's Office to a finding of parole suitability;[5] and (9) the opposition of Mr. Ashker's PBSP counselor to a finding of parole suitability. (*Id.* at 28:13 – 32:17.)

32. As explained below in pars. 33-42, the BPH set forth in detail why those factors made Mr. Ashker unsuitable for parole.

33. Mr. Ashker's **criminal history** began long before his commitment offense and the original term for burglary. He was first arrested at 13 years of age. After committing numerous crimes, he was sentenced to six years in prison in 1985 for assault with a deadly weapon, infliction of great bodily injury, and burglary. (*Id.* at 14:19-17:10.)

34. Mr. Ashker's **commitment offense** was for the murder of Dennis Murphy on May 25, 1987, and was described as an A. B. gang hit. Mr. Ashker stabbed Murphy to death while in Murphy's own cell. The crime was calculated and pre-meditated. (*Id.* at 28:15-24.)

35. In addition to his commitment offense, Mr. Ashker engaged in **negative behavior** by assaulting PBSP employees and inmates. (*Id.* at 22:13-23:13.)

36. After the commitment offense, Mr. Ashker was placed in various SHU units throughout the state. He was validated as an **A.B. member** in 1995. He was associated with the A.B. well before that, as evidenced by his killing of Murphy. He was re-validated thereafter. (*Id.* at 19:8-20:24.)

37. A review of Mr. Ashker's C-file showed he had not participated in any **self-help and vocational**

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

---

[5]   The Sacramento District Attorney successfully prosecuted Mr. Ashker for the murder of prisoner Dennis Murphy.

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1   **programs.**[6]  In his previous parole eligibility hearings, the commissioners told him to enroll in these

2   programs and attempt to get released from the SHU.  However, Mr. Ashker did not do so.  (Jud. Not

3   12 at 20:25-22:8.)

4   38. Mr. Ashker refused to participate in a **psychiatric evaluation** in 1998 and 2003.  He stated he

5   refused to participate because decisions regarding program placements or release should be based on

6   custody rather than psychiatric factors.  (*Id.* at 24:11-25:7.)

7   39. Mr. Ashker did not have any parole plans.  He stated that his **parole plans** were "none of the

8   BPT's business." (*Id.* at 18:5.)  He had no work record.  (*Id.* at 30:18-19.)  There were no letters

9   received from family members which offered any support if he paroled and he appeared to have poor

10  family ties.  (*Id.* at 18:7-11.)

11  40. The **Sacramento DA's opposition to parole** was based on Mr. Ashker's "extremely high degree

12  of threat to the public if released from prison at [that] time." (*Id.* at 27:2-11.)

13  41. Mr. Ashker's **PBSP counselor** believed he posed an extremely high degree of threat to the public

14  if released.  (*Id.* at 32:14-17.)

15  42. The panel recommended that Mr. Ashker follow the prison rules, participate in self-help when it

16  became available to him, and enroll in work programs when they become available.  (*Id.* at 32:19)

17  43. On November 5, 2003, **Mr. Ashker** filed an appeal with the BPH claiming he was improperly

18  denied parole. (Jud. Not. 14.)

19  44. **Mr. Troxell** has not exhausted his administrative remedies relating to his claim that he was

20  improperly denied parole.  (June 14, 2007 Order Granting in Part Defendants' Motion to Dismiss

21  ("June 14, 2007 order") 21:19-21.)

22  **NO ACCESS TO SOME PROGRAMS**

23  45. CCR Tit. 15, §§ 3040(c) and 3343(k), regulates prison programs for SHU inmates.  Per those

24  regulations, SHU inmates are denied access to some programs available to other prisoners.

25  (Castellaw Dec. ¶¶ 3-14.)

26  46. On February 23, 2004, Mr. Ashker filed 602 appeal 04-00566 claiming that PBSP denied him

27

28  ---
    [6]  The BHP uses the term "programs" to refer to the various therapeutic, self-help, service, educational, and religious programs, all considered to have rehabilitative effects. . ." *In re Van Houten*, 116, Cal.App.4[th] 339, 354 n.8.

8

1    access to the programs required for parole.  He claimed PBSP's actions violated CCR Tit. 15, §§

2    3040(c) and 3343(k).  On July 22, 2004, the appeal was denied at the Third Level of Review.  (Jud.

3    Not. 13.)

4    47. **Mr. Troxell** has not exhausted any 602 appeal alleging a lack of access to prison programs.

5    (June 14, 2007 order at 21:10-22:19.)

6                   **GOVERNMENT TORT CLAIMS REGARDING PAROLE AND PROGRAMS**

7    48. **Mr. Ashker** failed to file the instant action within six months after his government claim

8    regarding the parole denial and prison programs was rejected pursuant to the Government Tort

9    Claims Act.  (Kenny Dec. Ex. C.)

10   49. **Mr. Troxell** failed to file the instant action within six months after his government claim

11   regarding the parole denial and prison programs was rejected pursuant to the Government Tort

12   Claims Act.  (Kenny Dec. Ex. D.)

13               **IV.    SUMMARY JUDGMENT STANDARD**

14          Summary judgment is appropriate when, viewing the evidence in the light most favorable to

15   the nonmoving party, there are no genuine issues of material fact.  Fed. R. Civ. P. 56; *Celotex, supra,*

16   477 U.S. at 322-323.  The moving party need only to identify "an absence of evidence to support the

17   nonmoving party's case." *Celotex*, supra, 477 U.S. at 325.  Thus, the moving party is entitled to

18   summary judgment if the nonmoving party fails to produce evidence sufficient to raise a triable issue

19   of fact. *Anderson, supra,* 477 U.S. at 249; *Celotex, supra,* 477 U.S. at 324-325.

20                          **V.    ARGUMENT**

21       **A.    A FEW BRIEF MAIL DELAYS THREE OR FOUR YEARS AGO DO NOT
               VIOLATE THE FIRST AMENDMENT.**

22

23           **1.   The General Rules Regarding the Right to Receive Mail.**

24          Prisoners have a First Amendment right to send and receive mail.  *Rowe v. Shake,* 196 F.3d 778, 782

25   (7th Cir. 1999).  A temporary delay in the delivery of mail, resulting from security inspection, does not

26   violate the First Amendment because the policy of diverting mail for inspection has been held to be

27   reasonably related to the security of the prison.  *Crofton v. Roe,* 170 F.3d 957, 961 (9th Cir. 1999).  In

28   *Shake,* the court held that 2 to 26 day delays of non-legal mail over a 3 month period did not violate the

     First Amendment.  196 F.3d at 782

**ANDRADA & ASSOCIATES**
PROFESSIONAL CORPORATION

{00053928.DOC/}  DOC 0594                                          *Ashker et al. v. Schwarzenegger, et al.*
MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION                C 05 3286 CW (PR)

9

### 2.  Ashker's Mail.

Mr. Ashker's only allegation of delayed mail relates to his 602 appeal alleging that he received "letters" on August 5, 2003 that were postmarked on July 17 and July 18, 2003.  (UDF 5.)  Mr. Ashker has failed to assert any claim for delayed mail in the complaint.  The complaint and the facts are insufficient on their face to state a First Amendment claim.

### 3.  Troxell's Mail.

Mr. Troxell's only allegation of delayed mail relates to his 602 appeal alleging that his outgoing personal correspondence was delayed 15-30 days on a few occasions.  (UDF 6.)  The complaint and the facts are insufficient on their face to state a First Amendment claim.

### 4.  Alternatively, The Defendants Are Entitled to Qualified Immunity.

The courts recognize that public servants might inadvertently violate the law, i.e., despite acting "reasonably."  The courts in their wisdom do not punish public servants in these cases.  Instead, public servants are entitled to qualified immunity from liability for damages caused by such inadvertent or reasonable violations of law.  *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In other words, public servants are immune from suit as long as they reasonably believe their actions are within the law.  *Saucier v. Katz,* 533 U.S. 194, 202 (2001).

This so-called defense of qualified immunity protects "[g]overnment officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818.

"[T]he defense [of qualified immunity] . . . turn[s] primarily on objective factors."  *Harlow, supra*, 457 U.S. at 819.

> "[W]here an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences."  *Id.* at 819 (citation omitted).

Here, even if the delays in mail violated the First Amendment, the defendants are entitled to qualified immunity because based on the provisions of Title 15 and case law, it would not be clear to a reasonable prison official that the mailroom policy was unconstitutional.

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

10

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

**B.    THE REGULATIONS PROHIBITING POSSESSION OF CERTAIN MAGAZINES DO NOT VIOLATE THE FIRST AMENDMENT.**

**1.   The General Rules Regarding First Amendment Restrictions in Prison.**

The plaintiffs allege that the CDCR's ban on magazines containing frontal nudity and/or constituting tattoo contraband violate their First Amendment right of free speech.

Prisoners have the right to receive publications, but with limitations. *Turner v. Safley,* 482 U.S. 78, 84 (1987). Prisoners are not entitled to receive magazines that conflict with legitimate penological objectives. *See Mauro v. Arpaio,* 188 F.3d 1054, 1058-59 (9th Cir. 1999) (prison policy of banning sexually explicit materials is aimed at maintaining jail security and reducing sexual harassment of female detention officers, which are legitimate penological interests). The *Turner* four-factor test is used to determine whether a prison policy serves legitimate penological objectives. The factors are:

1.   Whether the regulation is rationally related to a legitimate and neutral objective;

2.   Whether there are other avenues that remain open to the inmates to exercise the right;

3.   The impact that accommodating the asserted right will have on guards and prisoners, and on the allocation of prison resources; and

4.   Whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

**Magazines – Nudity**

Since 1995, CCR tit. 15, § 3006 has prohibited inmates from having "obscene material."   § 3006 was implemented by PBSP's OP 806 in 2002 to prohibit magazines containing frontal nudity. Soon thereafter, § 3006 was amended to specifically prohibit magazines with frontal nudity. (UDF 7, 9.)

Applying the four factors of *Turner,* the court in *Nelson v. Woodford,* 2006 WL 571359 *3 (N.D.Cal. March 2, 2006), a case involving a PBSP prisoner, held that § 3006(c)(17) is constitutional. Specifically, the court held that PBSP could prohibit inmates from receiving issues of Esquire magazine and Star Distribution Catalog because they contained frontal nudity.

Regarding the first factor, the *Nelson* court held that the objectives of § 3006(c)(17) are neutral because they are designed to "aid in the legitimate penological interests in maintaining the safety and

11

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1  security of the prisons, rehabilitating inmates, reducing sexual harassment of correctional officers

2  and preventing a hostile work environment. *Ibid.* (quoting Initial Statement of Reasons for the

3  adoption of § 3006(c)(17)).

4      Regarding the second factor, the regulation provides "ample" alternative means because it does

5  not prohibit sexually explicit letters, sexually explicit articles, or photographs of clothed females.

6  Additionally, § 3006(c)(17) has an "artistic exception." *Nelson, supra,* *4.

7      Regarding the third factor, unrestricted access to sexually explicit materials could lead to

8  violence among inmates and sexual harassment of female officers. *Id.* at *4.

9      Regarding the fourth factor, § 3006(c)(17) is not an exaggerated response because there are

10  ample alternatives for inmates to acquire sexually explicit materials. *Id.* at *4.

11      The *Nelson* court's holding is persuasive. CDCR's prohibition easily meets the *Turner* test.

12  **Magazines – Tattoo**

13      Under CDCR regulations, inmates may not tattoo themselves or other inmates. CCR, Title 15, §

14  3063. (UDF 13.) Tattooing or possession of tattoo contraband in prison is a serious rule violation.

15  *Id.* at § 3315(D). A "serious rule violation" is defined as a violation of the law (§ 3312 (a)(3)), and

16  includes violence, breach of security, disruption of facility operations, or possession of contraband.

17  (§3315 (a)(2)).

18      The defendants could not locate any cases involving prohibition of tattoo magazines. However,

19  there is a "tattoo art" case, *Chance v. Marshall*, 1993 WL 451511, *2-3 (N.D.Cal October 21, 2003).

20  In *Chance*, PBSP confiscated an inmate's inmate tattoo art from his cell <u>and his mail</u>. The inmate

21  alleged a First Amendment violation. The court held that because inmate tattooing is prohibited by

22  Title 15, and tattoo "diagrams and sketches" are considered contraband, the seizure of the inmate's

23  tattoo art was valid because it was reasonably related to the proscription of tattooing.

24      The *Chance* court held that PBSP's prohibition of tattoo contraband was constitutional. Mail

25  room employees, pursuant to OP 806 and Title 15, have determined which magazines constitute

26  tattoo contraband. (UDF 13.) Therefore, PBSP's prohibition of these magazines does not violate the

27  First Amendment.

28

12

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

2.    **Alternatively, The Defendants Are Entitled to Qualified Immunity.**

The defendants hereby incorporate, as though fully set forth, the qualified immunity analysis set forth in Section A., subsection 4., *supra.*

C.    **THE PLAINTIFFS CANNOT RECOVER ON THEIR DUE PROCESS CLAIMS REGARDING GANG VALIDATION.**

1.    **The General Standards Regarding the Statute of Limitations.**

Section 1983 causes of action are governed by the personal injury statute of limitations of the state in which the action arose. See *Owens v. Oqurokure,* 48 U.S. 235 (1989). Personal injury actions in California are now subject to a two year statute of limitations. C.C.P. § 335.1. The statute of limitations is tolled for two years for prisoners. *Jones v Blanas,* 393 F.3d 418, 927 (9th Cir. 2004 (citing C.C.P § 352.1). Filing a 602 appeal does not toll the statute of limitations. *Gomez v. Marshall,* 1994 WL 184639 *2 (N.D.Cal. April 26, 1994).

Federal law controls the question of when a § 1983 claim accrues. *See Johnson v. State of California,* 207 F.3d 650, 653 (9th Cir. 2000). Under federal law, "a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Tworivers v. Lewis,* 174 F.3d 987, 991 (9th Cir. 1999.)

In *Knox v. Davis,* 260 F.3d 1009 (9th Cir. 2001), a lawyer's legal visitation and correspondence privileges with CDCR inmates were suspended by the CDCR in 1996. A few months later, the suspension was modified, and the lawyer was allowed to have contact with some inmates. The lawyer filed her § 1983 complaint more than a year after the 1996 suspension. She alleged that each time she was denied access to an inmate, a new cause of action arose under the continuing violations doctrine. *Id.* at 1013. The court held that the cause of action accrued when she received the original suspension. The court explained that "subsequent and repeated denials of [her] privileges with her clients [are] merely the continuing effect of the original suspension." *Ibid.*

With these standards in mind, the defendants turn to the plaintiffs' gang validation claim.

2.    **Any Claim Relating to Events Occurring Before May 19, 2001 Is Barred.**

a)    **Ashker's Claim.**

Mr. Ashker has argued that *Ashker v. Schwarzeneger, et al.*, ND-Cal, C 04-1967 (CW) ("04-1967"), filed on May 19, 2004 tolled the statute of limitations until the plaintiffs filed the instant

1    action on August 15, 2005.

2         Even granting Mr. Ashker's argument, it does not affect the outcome, as the statue of limitations

3    would begin to run on May 19, 2001. The two appeals that Mr. Ashker exhausted regarding the re-

4    validation do not encompass events occurring before May 19, 2001. On August 24, 2001, Mr.

5    Ashker received notice of the IGI's review of his C-File and the recent evidence of gang activity the

6    IGI discovered. (UDF 21.) On September 13, 2001, he filed 602 appeal 01-02335 challenging the

7    reliability of the evidence relied upon by the IGI. (UDF 22.) On September 15, 2004, Mr. Ashker

8    filed 602 appeal 04-02600 challenging the LEIU's re-validation dated July 8, 2003, and his retention

9    in the SHU by ICC on August 4, 2004. (UDF 23-27.)

10              **b)    Troxell's Claim.**

11        Any tolling of the statute of limitations by 04-1967 has no effect here, as Mr. Troxell's claim

12   accrued in 1988, when he filed 602 appeal 88-1657. (UDF 29.)

13        **3.    Plaintiffs' Retention in the SHU Does Not Constitute a "Continuing
              Violation."**

14

15              **a)    Ashker's Claim.**

16        Mr. Ashker was validated in 1988 and re-validated in 1995. After serving a SHU term for his

17   murder of inmate Murphy, he was placed on indeterminate SHU status because of his validation in

18   the A.B. (UDF 1.) Mr. Ashker was retained in the SHU by the ICC based on his continuing gang

     validation between 1995 and 2001. (UDF 17.)

19

20        The only claims that are not barred by the statute of limitations are those between 2001 and 2004

21   described above. The annual ICC decisions to retain Mr. Ashker in the SHU were a "continuing

     effect" of the gang validations and thus, are not related to any timely filed claim. See *Knox, supra*,

22   260 F.3d at 1013.

23

24              **b)    Troxell's Claim.**

25        Mr. Troxell was validated in 1985 and re-validated in 1995. He exhausted a 602 appeal related to

     his validation when he was housed at Tehachapi State Prison in 1988. Mr. Troxell has been housed in

26   the SHU at PBSP since 1990. He was re-validated as a member of the A.B. in 1995. Between his

27   re-validations in 1995 and July 8, 2003, he was retained in the SHU based on his 1995 gang

28   validation. (UDF 1, 23, 28.)

                                                                                                        14

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

The annual ICC decisions to retain Mr. Troxell in the SHU were a "continuing effect" of the gang validations and thus, are not related to any timely filed claim. *Knox, supra,* 260 F.3d at 1013.

### 4. There Is Overwhelming Evidence That Mr. Ashker Continued To Be An Active Member of The AB – Much More Evidence Than The "Some Evidence" Standard Requires.

#### a) The General Standards Regarding Inactive Status Review/ Re-validation.

In the interest of prison security, CDCR validates inmates as members of prison gangs and reviews inmates already validated as members to determine whether they should be re-validated. (UDF 16, 19)

Specifically, it is the IGI that investigates an inmate and determines whether there is sufficient evidence to initially recommend that he be validated. CCR tit., § 3378(c).  (UDF 16, 19.)

An inmate may be validated based on a minimum of three items of evidence.  CCR,tit., § 3378(c)(3) and (4).  (UDF 16, 19.)

The inmate is given an opportunity to challenge the evidence used in the validation or re-validation in an interview with the IGI. *Id.* at (c)(6)(A).  (UDF 16, 19.)  If confidential information is used, the general contents of these items are disclosed to the inmate via a CDC Form 1030. *Id.* at (c)(6)(C).

After the interview, if the IGI determines that the inmate is an active gang member, the IGI recommends to the LEIU that the inmate be officially validated.  LEIU then makes the formal decision. (UDF 16, 19.)

Validated inmates are housed in the SHU.  The ICC reviews their SHU placement on an annual basis.  As part of the ICC review, the IGI reviews the inmate's file to ensure that the relevant documents  were approved by the LEIU and are reliable per CCR tit. 15, § 3378(c).  (UDF 16, 19.)

Every six years, the IGI reviews the status of each validated inmate to determine whether the inmate is still actively involved with the prison gang and should be re-validated.  Generally, the rules for validation also apply to re-validation, with one notable exception.  CCR tit. 15, § 3378(e).  Namely, only one item of evidence indicating continued gang activity is required to re-validate an inmate.  CCR Tit. 15, § 3378. (UDF 16,19.)

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1    A gang validation and re-validation implicate due process.  As a practical matter, the issues

2    involving validation arise from the effect of validation, namely, placement in administrative

3    segregation.

4    **Procedural Due Process**

5    The Ninth Circuit has held that the assignment of validated gang members to the SHU is an

6    administrative measure rather than a disciplinary measure, and is "essentially a matter of

7    administrative segregation." *Bruce v. Ylst,* 351 F.3d 1283, 1287 (9th Cir.2003).  Of course, inmates

8    are entitled to certain minimal procedural protections, such as notice, an opportunity to be heard,

9    review before placement in the SHU and periodic review afterwards.  *Ibid.*

10    **Substantive Due Process**

11    The Ninth Circuit has held that the hardship of administrative segregation per se is not so severe

12    as to violate Due Process.  *See Toussaint v. McCarthy,* 801 F.2d. 1080, 1091-91 (9th Cir. 1986).

13    However, because of the more restrictive conditions in the SHU versus other prison housing, SHU

14    placement implicates due process.

15    Specifically, due process requires that there be an evidentiary basis for the decision to retain an

16    inmate in the SHU.  *Toussaint, supra,* 801 F.2d at 1104-05.  This standard is met if there is "some

17    evidence" from which the conclusion of the administrative tribunal could be deduced.  *Id.* at 1105.

18    The standard is only "minimally stringent."  "[T]he relevant question is whether there is *any*

19    evidence in the record that *could* support the conclusion…" *Cato v. Rushen,* 824 F.2d 703, 705 (9th

20    Cir.1987) (internal quotation and citation omitted).

21    The "some evidence" standard applies to an inmate's retention in the SHU for gang affiliation.

22    See *Bruce, supra,* 351 F.3d at 1287-88.  The "some evidence" used to retain an inmate in the SHU

23    for gang affiliation need only have "some indicia of reliability" to satisfy due process requirements.

24    *Madrid v. Gomez,* 889 F.Supp. 1146, 1273-74 (N.D Cal. 1995); *Rushen supra,* 824 F.2d at, 705.

25          **b)    Ashker's Inactive Review and Subsequent Re-Validation.**

26    Mr. Ashker alleges that his due process rights were violated because (1) he was not given an

27    adequate opportunity to challenge inactive review and the resulting re-validation; and (2) the

28    evidence used for inactive review and the resulting re-validation was unreliable.  Effectively, he

16

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1  alleges violations of procedural and substantive due process.

2               **(1)   *Procedural Due Process***

3       The procedures governing inactive status review were followed in this case.

4       Here, Mr. Ashker had the opportunity and did challenge the recommendation that his active gang

5  status remain unchanged.  Mr. Ashker received notice of the IGI finding and recommendation and

6  the four CDC 1030 forms disclosing the confidential information on August 24, 2001. He received

7  notice of the eight items relied upon for the two IGI recommendations.  After he refused to

8  participate in an interview with the IGI, the IGI forwarded the evidence to the LEIU, which re-

9  validated him on February 19, 2002 and July 8, 2003. (UDF 20-25.)

10      On August 4, 2004, in its annual review of Mr. Ashker's SHU placement, the ICC retained him

11 in the SHU based on his re-validations.   (UDF 26.)

12      In short, Mr. Ashker knew about the evidence and was given a chance to dispute it.  He refused

13 to do so.

14      Mr. Ashker concedes that he was provided the CDC-1030 forms summarizing the "confidential

15 information" evidence.  He argues that he was entitled to the confidential information itself, not just

16 the summaries.  He is incorrect.

17      Due process does not compel the prison to release confidential materials to the inmate if

18 disclosure would compromise institutional security. *Zimmerlee v. Keeney*, 831 F.2d 183, 186 (9th

19 Cir. 1987) (disclosure of informant's identity denied); *Toussaint, supra,* 801 F.2d at 1101 (same).

20 The courts defer to a determination by prison officials that release of information would pose a threat

21 to institutional security. *Stefanow v. McFadden,* 103 F.3d 1466, 1473 (9th Cir.1996).

22      Here, Mr. Ashker's claim that he is entitled to the confidential memos fails for two reasons:  (1)

23 disclosure would compromise ongoing investigations of prison gang activity; and (2) disclosure

24 would allow Mr. Ashker to disseminate information, thus threatening the safety and security.[7]

25      In short, Mr. Ashker was provided information sufficient for him to challenge the denial of his

26 request for reclassification and his re-validation.  As a matter of law, he was provided with more than

27

28

---

[7] In order to provide the court an opportunity to review the documents themselves, the defendants have filed a motion for the Court to review the confidential memos *in camera*.  The basis for providing the documents *in camera* as opposed to providing them to the plaintiffs is set forth in William Barlow's declaration in support of the ex parte application.

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1    the minimal procedural due process protections required.

(2)   *Substantive Due Process*

3    CCR Tit. 15., § 3378(c)(8) provides that the IGI may identify the following "categories" of evidence to support recommendation to re-validate an inmate: (1) self-admission; (2) tattoos and symbols; (3) written material; (4) photographs; (5) staff information; (6) information from other agencies; (7) association; (8) informants; (9) offenses; (10) legal documents; (11) visitors; (12) communications observed by CDCR employees; and (13) debriefing reports.

8    In *Bruce v. Ylst*, 351 F.3d 1287, 1288 (9th Cir. 1997), the court noted that the following three pieces of evidence, as a matter of law, were sufficient to support the validation of the plaintiff as a gang member:  a sheriff's department report; a probation report; and a statement from a confidential informant.

12   Here, the eight memos described above demonstrate that Mr. Ashker continued to be an active member of the A.B per § 3378(c)(8).  Specifically:

14   The February 22 memo stated that Mr. Ashker was sending coded messages to A.B. members outside of the SHU to kill black inmates, and was regularly referred to as a leader in the prison war with blacks as of May 2000, and falls within category (13).  (UDF 20.)

17   The February 23 memo stated that a search of Ashker's cell recovered personal property that was gang-related, and falls within categories (3), (4), and (12).  (UDF 20.)

19   The June 18 memo stating that PBSP staff discovered outgoing mail identifying Mr. Ashker as a leader of the A.B. falls within categories (3) and (12).  (UDF 20.)

21   The June 19 memo stated that Mr. Ashker and other AB members/associates discussed gang-related business between cells on April 19, 2001, and falls within categories (5) and (12).  (UDF 20.)

23   The June 29 memo stated that Mr. Ashker was immersed in gang activity and identified him as the A.B. member arranging for the murder of a white inmate who had fallen into disfavor with the A.B., falls within category (13).  (UDF 20.)

26   The July 16 memo stated that Mr. Ashker was an active A.B. member holding a leadership position in the gang, and falls within categories (8) and (13).  (UDF 23.)

28

---

{00053928.DOC/}  DOC 0594

*Ashker et al. v. Schwarzenegger, et al.*

MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION          C 05 3286 CW (PR)

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1    The July 30 memo stated that Mr. Ashker ordered assaults on inmates and recruited for the A.B.,

2    and falls within categories (8) and (13).  (UDF 23.)

3    The August 21 memo stated that Mr. Ashker ordered assaults on inmates in July of 1999, and

4    falls within categories (8) and (13).  (UDF 23.)

5    The evidence is more than sufficient to justify Mr. Ashker's re-validation.  Any one of the

6    memos would be enough.  Therefore, substantive due process is met.

7          **5.**     **Alternatively, The Defendants Are Entitled To Qualified Immunity.**

8    The defendants hereby incorporate, as though fully set forth, the qualified immunity analysis set

9    forth in Section A., subsection 4., *supra.*

10      **D.**     **THERE WAS OVERWHELMING EVIDENCE TO DENY**

11                   **PAROLE – THE "SOME EVIDENCE" STANDARD WAS EASILY MET.**

12         **1.**     **The General Standards Regarding Parole Hearings.**

13   The courts are authorized to review the factual basis of a BPH decision denying parole to

14   determine if due process was met.  The court may only inquire whether there is "some evidence" in

15   the record to justify the denial, based upon the factors specified by statute and regulation. *In re*

16   *Rosenkrantz,* 29 Cal.4th 614, 658 (2002).

17   The BPH's discretion in parole matters is "great" and "almost unlimited." *In re Powell,* 45

18   Cal.3d 894, 901 (internal quotations and citations omitted).  "Only a modicum of evidence is

19   required." *Rosenkrantz, supra,* 29 Cal.4th at 677.  Conflicts in the evidence and the weight to be

20   given certain evidence are matters for the board to resolve.  The manner in which the factors are

21   considered will not be disturbed by the court unless the decision does not reflect an individualized

22   consideration of the specified criteria and is arbitrary or capricious.  It is irrelevant that a court would

23   reach a different conclusion than the BPH based on the same evidence relied upon by the BPH.

24   *Rosenkrantz, supra,* 29 Cal.4th at 677 (emphasis added.)

25   The BPH must deny parole to a life prisoner if, in the judgment of the BPH, "the prisoner will

26   pose an unreasonable risk of danger to society if released from prison." CCR tit. 15, § 2402(a).  Six

27   circumstances are specified in § 2402(c) as showing unsuitability.  Three of those circumstances are

28

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

19

1  relevant here:  (1) "The prisoner committed the offense in an especially heinous, atrocious or cruel

2  manner" and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense;"

3  (2) "The prisoner has a history of unstable or tumultuous relationships with others;" and (3) "The

4  prisoner has engaged in serious misconduct in prison . . . ."  *Id.* at (c).

5     The BPH applies the following factors to a particular life prisoner to determine whether he is

6  suitable for parole:  no juvenile record (*Id.* at § 2402(d)(1)); stable social history (*Id.* at (d)(2));

7  remorse (*Id.* at (d)(3)); the crime was "the result of significant stress" in the prisoner's life (*Id.* at

8  (d)(4)); lack of criminal history (*Id.* at (d)(6)); "[t]he prisoner's present age reduces the probability of

9  recidivism" (*Id.* at (d)(7)); "[t]he prisoner has made realistic plans for release" (*Id.* at (d)(8)); and

10  "[i]nstitutional activities indicate an enhanced ability to function within the law upon release" (*Id.* at

11  (d)(9)).

12       **2.   Ashker's Parole Hearing.**

13     The BPH denied parole for the following reasons:

14      1.  Mr. Ashker was first arrested at 13 years of age, and after committing numerous other

15  crimes, sentenced to six years in prison for assault with a deadly weapon, infliction of great bodily

16  injury and burglary.  (UDF 33.)

17      2.  Mr. Ashker murdered inmate Dennis Murphy at FSP in 1987.  The crime was calculated

18  and pre-meditated as part of an A.B. "gang hit."  (UDF 34.)

19      3.  In 1990, Mr. Ashker threatened guards and assaulted an inmate.  In 1992, he assaulted a

20  guard.  (UDF 35.)

21      4.  Since murdering Dennis Murphy, Mr. Ashker was placed in various SHU units

22  throughout the state.  He was validated as an A.B. member in 1995, but was associated with the A.B.

23  before the murder of Mr. Murphy.  He has been re-validated since that time.  (UDF 36.)

24      5.  Mr. Ashker had not participated in any self-help vocational programs.  He has refused to

25  participate in psychiatric evaluations because he deems them irrelevant.  (UDF 37-38.)

26      6.  Mr. Ashker believed his parole plans were "none of the BPT's business."  Mr. Ashker had

27  no work record.  He had no letters of support from family members.  The D.A. and Mr. Ashker's

28  PBSP counselor were both opposed to a finding of parole eligibility by the BPH.  (UDF 39-41.)

20

7.   Applying the circumstances set forth in § 2402(c), the BPH found that the murder of Mr. Murphy was "especially heinous, atrocious or cruel," constituted "serious misconduct in prison," and that Mr. Ashker's lengthy criminal record indicated "a history of unstable or tumultuous relationships with others…" (UDF 42.)

Further, most of the circumstances "tending to show suitability" for parole under § 2402(d) were not present in Mr. Ashker's case.  Namely, Mr. Ashker had a lengthy juvenile record (*Id.* at (d)(1)), an unstable social history (*Id.* at (d)(2)), stabbed Mr. Murphy to death (*Id.* at (d)(4)), had an extensive criminal history, (*Id.* at (d)(6)), had no realistic plans for release from prison (*Id.* at (d)(8)), and had no involvement with self-help and work programming that could help him function after release.  (*Id.* at (d)(9)).

In short, there is ample evidence supporting the BPH's parole denial based on its individualized assessment of Mr. Ashker.

### 3.   The BPH Does Not Have a "No Parole Policy".

Mr. Ashker claims his right to parole was violated because the BPH policies for gang members serving indeterminate periods in the SHU amounts to a de facto "no parole policy."

Of course, the BPH must "…consider the particular circumstances relevant to an inmate's individual suitability for parole"  and a refusal to do so would be contrary to the law.  *In re Norman,* 102 Cal.App.4th 280, 293 (2002).

The factors listed in CCR tit. 15, § 2402(c) and (d) are "general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." CCR tit. 15, § 2402(d).  In implementing the CCR's general guidelines regarding parole, the BPH assesses a wide variety of individualized factors on a case-by-case basis and strikes a balance between the interests of the inmate and of the public.  *Powell, supra,* 45 Cal.3d at 902.

Mr. Ashker alleges the "no parole policy" functions as follows:  The BPH has certain requirements that inmates meet in order to be given a parole date.  (Compl. ¶ 11.) The plaintiffs, by virtue of their SHU placement, do not have the opportunity "to participate in programs necessary in order for them to meet [the BPH's] 'parole eligibility requirement…'" (*Id.* at ¶ 272.)  The decision of BPH to deny parole

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

21

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1   to inmates who have not met BPH's 'parole eligibility requirement' constitutes a "blanket No Parole

2   Policy for PBSP-SHU prisoners." (Compl. at ¶ 98.) Mr. Ashker argues that such a practice involves

3   "predetermining the outcome" of the parole hearings for SHU inmates.

4       Mr. Ashker does not claim that the BPH's parole eligibility requirement is an abuse of discretion.

5   He admits that he "is not seeking a release from prison, nor [is he] challenging any of the BPH's

6   "'discretionary functions'" via this action. Instead, [he is] seeking to enjoin … illegal policy decisions

7   that keep non-debriefing inmates in SHU on an indeterminate status, and a policy that such SHU

8   inmates will never be paroled." (*Id.* at ¶ 18.) He does not deny that the programs are beneficial – he

9   simply claims that he does not have access to the programs the BPH requires. His use of the term "no

10   parole policy" is thus a misnomer.

11       Interestingly, Mr. Ashker is concerned that the lack of programs and self-help make an inmate less

12   suitable for parole. The extent to which an inmate has freely participated in programs and self-help are

13   important factors in determining whether to grant a parole date. Even if failure to enroll in programs is

14   insufficient to deny parole on its own, the BPH's regulations specifically indicate that any

15   "[c]ircumstances which taken alone may not firmly establish unsuitability for parole may contribute to a

16   pattern which results in a finding of unsuitability." CCR tit. 15, § 2402(b).

17       Further, to the extent that Mr. Ashker is alleging that the BPH has a pattern of improperly

18   considering an inmate's placement in the SHU at other inmates' hearings, it is Mr. Ashker who bears

19   the burden of demonstrating that the BPH's parole denials in those cases are unlawful under the

20   applicable statute and regulations, and that the parole denials are relevant to this case. *In re Serrano*,

21   10 Cal. 4th 447, 456 (1995) (plaintiffs bear the burden of proof in habeas corpus proceedings); *In re*

22   *Rosenkrantz, supra*, 29 Cal. 4th at pp. 656-658, 665 (plaintiff bears the burden of proving that the

23   BPH acted arbitrarily or capriciously in denying parole.)

24       This burden is especially significant given the evidentiary presumption that the BPH hearing

25   commissioners have appropriately performed their official duties in determining parole suitability.

26   (Evid. Code § 664 (presumption that an official duty has been regularly performed).) Here, Mr.

27   Ashker has not even alleged such a pattern. He all but admits that his failure to participate in

28   programs is valid grounds for the denial of parole. He simply argues he should have programming

                    22

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1    opportunities.  Mr. Ashker, as a matter of law, cannot meet his burden.

2        The factors the BPH relied upon to find Mr. Ashker unsuitable for parole have been set forth at

3    length.  In order for Mr. Ashker to prove that the result of his parole hearing was "predetermined," he

4    must prove that the BPH did not engage in an individualized consideration of his case.  Yet the

5    transcript from Mr. Ashker's parole hearings demonstrates that he received an individualized evaluation,

6    and was found unsuitable.  The balance between the interest of Mr. Ashker and the public clearly falls

7    on the side of the public.  As these factors stated above provide ample evidence supporting the BPH's

8    decision, Mr. Ashker, as a matter of law, cannot recover on his due process claim.

9        **4.        The Plaintiffs Cannot State A Claim Against the Three Governors.**

10        Liability under § 1983 requires personal participation by the defendant in the alleged

11    constitutional violation. *Fayle v. Stapley,* 607 F.2d 858, 862 (9th Cir.1979).  Personal participation

12    requires an affirmative act, participation in another's affirmative act, or omission to perform a duty.

13    *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978).  Obviously, there is no evidence of personal

14    participation on the part of the governors.

15        Of course, even if the BPH did violate Mr. Ashker's rights, the governors are not thereby liable

16    for the violation as there is no respondent superior liability under § 1983. *See Monell v. Dept. of*

17    *Social Services,* 436 U.S. 658, 690 (1978).

18        **E.        THE PLAINTIFFS' INABILITY TO PARTICIPATE IN CERTAIN
          PROGRAMS BECAUSE OF THEIR SECURITY CLASSIFICATION DOES**
19          **NOT VIOLATE THEIR DUE PROCESS RIGHTS.**

20        **1.    General Rule Regarding Access to Prison Programs.**

21        State prisoners have no liberty interest in participation in rehabilitative programs and cannot state

22    a due process claim against a prison for lack of access to rehabilitative programs unless the lack of

23    these programs constitutes "cruel and unusual punishment." *Moody v. Daggett,* 429 U.S. 78, 88 n.9

24    (1976); *Hoptowit v. Ray,* 682 F.2d 1237, 1254-1255 (9th Cir. 1982.)

25        **2.    Programs Available in the SHU.**

26        Mr. Ashker claims that the lack of certain programs in the SHU constitutes a due process

27    violation.  CCR tit. 15, § 3040 provides that an inmate shall be assigned to appropriate programs

28    taking into account the inmate's eligibility for the programming, the security of the institution, the

                                                                                                    23

safety of the inmate, and the safety of staff, inmate, and the general public.  CCR tit. 15, § 3343
provides that inmates in the SHU are permitted to participate in programming that can be reasonably
provided without endangering security or the safety.  SHU inmates do not have access to certain self-
help and work programs based on these concerns.  (UDF 45-46.)

Mr. Ashker's due process claim for lack of access to prison programs thus lacks substance in law
and fact because there is no constitutional right to rehabilitation.

### 3.  The Plaintiffs Cannot State A Claim Against the Governors Regarding Prison Programs.

The plaintiffs seek damages against the governors for failure to adequately fund prison programs.
As a matter of law, they cannot state a claim.  The prison budget is voted upon by the legislature, not the
governor.  The governor is not liable for the decision of the legislature to only spend a limited amount of
money.  Even if the governors were responsible, the plaintiffs do not have standing to challenge the
funding of prison programs as they have not even alleged a nexus between the challenged actions and a
constitutional limitation on the governor's powers.  (See *Flast v. Cohen,* 392 U.S. 83, 88 (1968).

### 4.  Alternatively, The Defendants Are Entitled to Qualified Immunity.

The defendants hereby incorporate, as though fully set forth, the qualified immunity analysis set
forth in Section A., subsection 4., *supra.*

### 5.  The State Law Claims Must be Dismissed.

#### a)  The Plaintiffs' Claims are Untimely.

The Tort Claims Act requires timely presentation and rejection of a written claim before suit is
filed.  Govt. Code § 905.  A suit must be filed within six months after the Government Claims Board
rejects a claim.  Failure to do so is fatal to the cause of action.  Govt. Code § 945.6.

Mr. Ashker's claim regarding his parole denial and access to prison programs was rejected on
November 4, 2004, and Mr. Troxell's claim was rejected on October 7, 2004.  The initial complaint
in this case was filed on August 16, 2005.

As the plaintiffs filed their complaint more than six months after both claims were rejected, the
plaintiffs' state law claims must be dismissed.

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

**b) Alternatively, The Defendants Did Not Commit A State Law Tort. The Defendants Are Statutorily Immune From Suit.**

Even if the plaintiffs complied with the Tort Claims Act, the defendants did not commit a state-law tort. There is no Government Code section creating a state law cause of action. See *Thompson v. City of Lake Elsinore*, 18 Cal.App.4[th] 49, 63 (1993) (no common law liability and Tort Claims Act).

In any case, the defendants are statutorily immune from suit. Regarding the plaintiffs' parole policy claim, the governors cannot be liable for their appointment of BPH commissioners because an appointment is a discretionary act. Govt. Code § 820.2; *Odello Bros. v. County of Monterey*, 63 Cal.App.4th 778, 793 (1998) (immunity for basic policy decisions which have been committed to coordinate branches of government). The BPH defendants cannot be liable for their decision not to parole the plaintiffs. Govt. C. § 845.8; *Leyva v. Nielsen*, 83 Cal.App.4[th] 1061, 1067 (2000) (BPH commissioners immune from inmate's suit alleging fraudulent parole denial.)

Regarding the plaintiffs' prison programs claim, the governors and the CDCR and PBSP defendants cannot be held liable for any alleged failure to provide sufficient funding for PBSP. Govt. C. § 845.2; *Estate of Abdollahi v. County of Sacramento*, 405 F.Supp.2d 1194, 1213-14 (E.D. Cal. 2005) (prison officials immune for allegedly failing to provide adequate suicide prevention programs.)

## VI.    CONCLUSION

Based on the foregoing, the defendants are entitled to summary judgment in their favor as set forth above and in the accompanying Motion. Alternatively, the defendants are entitled to summary adjudication as to all of the plaintiffs' claims.

Dated:    February 26, 2008                    ANDRADA & ASSOCIATES

                                              By _____
                                                 BRENDAN KENNY
                                                 Attorneys for Defendants

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

25

**PROOF OF SERVICE**

<u>Todd Ashker, et al. v. Arnold Schwarzenegger, et al.</u>
U. S. District Court Case No. C05 03286 CW

I, the undersigned, declare that I am over the age of 18 years and not a party to the within action; that my business address is 180 Grand Avenue, Suite 225, Oakland, California; and that on 2/26/2008, I served a true copy of the foregoing document(s) entitled:

**(1) NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION AND MEMORANDUM OF POINTS AND AUTHORITIES PURSUANT TO FED. R. CIV. P. 56(c) AND CIV. L.R. 7-2;**
**(2) DECLARATION OF BRENDAN KENNY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION PURSUANT TO FED. R. CIV. P. 56(c) AND CIV. L.R. 7-2;**
**(3) DECLARATION OF MARK CASTELLAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION PURSUANT TO FED. R. CIV. P. 56(c) AND CIV. L.R. 7-2;**
**(4) DECLARATION OF RAOUL SILVA IN SUPPORT OF DEFENDANTS' FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION PURSUANT TO FED. R. CIV. P. 56(c) AND CIV. L.R. 7-2;**
**(5) DECLARATION OF JOSEPH BEESON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION PURSUANT TO FED. R. CIV. P. 56(c) AND CIV. L.R. 7-2;**
**(6) REQUEST FOR JUDICIAL NOTICE; AND**
**(7) [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION PURSUANT TO FED. R. CIV. P. 56(c) AND CIV. L.R. 7-2**

on the parties in this action by placing a true copy thereof in a sealed envelope addressed as follows:

| **In Pro Per** | **In Pro Per** |
|---|---|
| Todd Ashker, C58191 | Danny Troxell, B76578 |
| Pelican Bay State Prison | Pelican Bay State Prison |
| Box #7500/D1-119 | Box #7500/D1-120 |
| Crescent City, CA 95532 | Crescent City, CA 95532 |

__X__ (By Mail) I caused each envelope with postage fully prepaid to be placed for collection and mailing following the ordinary business practices of Andrada & Associates.

_____ (By Hand) I caused each envelope to be delivered by hand to the person(s) listed above.

_____ (By Telecopy) I caused each document to be sent by fax to the fax as indicated above.

_____ (By Overnight Delivery) I caused each envelope to be delivered by overnight delivery to the person(s) indicated above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on 2/26/2008, at Oakland, California.

LILIAN ROBERTS

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

{00043665.DOC/}DOC 0594
PROOF OF SERVICE

1