Todd Ashker, C58191
Danny Troxell, B76578
Box 7500 (D1-SHU)
Crescent City, CA 95532-7500

Plaintiffs, In pro se

FILED
SEP 26 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND - DIVISION

| | |
|---|---|
| Todd Lewis Ashker, Danny Troxell, Plaintiffs, vs. Arnold Schwarzenegger, et al., Defendants. | Case No. C05-3286 CW DECLARATION OF David Chance, #B40557, IN SUPPORT OF PLAINTIFFS. |

I, David Chance, prison No. B40557, declare as follows:

1) I am a state prisoner serving a term of life, subsequent to my 1972 conviction for first degree murder and robbery. I am not a party to this case, but I am submitting this declaration in support of plaintiffs' cause of action in the above entitled matter. Based upon information, belief and personal knowledge of the matters

-1-

set forth herein, I am willing, able and competent to testify to such matters if called upon to do so.

2) I was received into the custody of the California Department of Corrections & Rehabilitation (CDCR) in March 1972, and my Minimum Eligible Parole Date was 12-01-78. Since my initial parole eligibility hearing, held sometime in 1977, I have had twelve subsequent parole hearings, wherein the Board of Parole Hearings (BPH) panels have all found me unsuitable for parole. In each and every case, the denial was based on a boilerplate formula as follows: 1) The Nature of the commitment offense [Nothing in the commitment offense, murder/robbery, was more aggravated or violent than the minimum necessary to commit the crime for which I was convicted]; 2) Failure to obtain "necessary" programming; and 3) Failure to reduce custody level so as to get out of the SHU and have access to vocational/academic upgrading, as well as self-help programs.

3) As of March 13, 2008, my classification score was at 270 points; my last Rules Violation Report prior to the June 5, 2007 BPH hearings was on October 17, 2002. (The first rules violation in 12 years).

4) I have been confined to the Security Housing Unit (SHU) for approximately 34 of the

-2-

more than 36 years that I have been incarcerated. I have been in SHU on Indeterminate status since 1985, based solely on alleged gang Association/Membership. (Note: On December 7, 2002, I, along with 39 co-defendants, was taken into custody by the U.S. Marshals Service and arraigned in the U.S. District Court, Los Angeles, on charges related to prison gang activites under R.I.C.O, in <u>U.S. vs. Mills, etal.</u>, No. CR 02938 GHK, and on November 3, 2006, ALL charges against me were dismissed WITH PREJUDICE.) Nevertheless, upon my return to PBSP on 1-31-07, I was immediately placed back in the SHU based on the identical factors used against me in the federal RICO case that were dismissed with prejudice.

5) I have been confined in the SHU at PBSP since January 1990 without access to vocational/academic programs or self-help opportunities, though, recently some limited educational courses, mostly GED/high school courses, via cell-study, have been made available on the institutional TV channels. There remains no vocational nor any meaningful self-help programs.

6) The BPH has demonstrated a total lack of due process at past parole hearings by their soliciting or attempting to solicit from me and

-3-

other lifers an agreement to waive parole consideration hearings in exchange for 2 or 3 year denials, or else risk a 5 year denial of parole.

7) The BPH maintains a no-parole policy for SHU life prisoners who have failed to "debrief", and have on more than one occasion stated this fact to me on record. The BPH defends this practice by holding that a failure to "debrief" prevents a prisoner's release from SHU to the general population, and thus, access to programs deemed by the BPH as "necessary" before the setting of a release date. (Note: declarant's life sentence did not include any requirement that would make such programming a prerequisite for parole release.

8) I have formally requested to "debrief" on numerous occasions beginning in 1986, and as recently as February 20, 2007, but was refused each time due to a failure/inability to admit gang involvement/membership, and to implicate others.

9) During the fifty months that I was out-to-court in Mills, et al., #CR 02938 GHK, it came to light during my review of the over 500,000 pages of discovery documents, consisting of debriefing reports, confidential files, CDCR

-4-

1  internal memos, policies, and housing records, that
2  no prisoner serving an indeterminate SHU term
3  with a life sentence has ever received a parole
4  release date
5      10)  At my twelfth parole consideration
6  hearing on June 5, 2007, I was again denied
7  a parole release date, and the denial was set
8  at three years, in violation of court order not
9  to hand down lengthier denials than previous
10 panels had given without stating reasons for
11 doing so. (The court order comes from <u>In re
12 Rutherford</u>/<u>In re Inez Tito Lugo</u>, Marin County
13 Superior Court, No. SC135399A, CA1 No. A114111,
14 in which the court was concerned the BPH
15 would hand down lengthier denials in order to
16 comply with another court order that the BPH
17 eliminate their enormous backlog of overdue
18 parole suitability hearings). Declarant had
19 only been denied for two years at his tenth
20 and eleventh subsequent parole hearings.
21 In addition to the two-year denial handed
22 down at my February 26, 2002 (eleventh)
23 hearing, I was unable to attend my twelfth
24 subsequent parole hearing until June 5,
25 2007, over five years later, due to being
26 out-to-court, and yet the most recent
27 BPH panel handed down a three-year
28 denial without stating reasons for the

-5-

lengthier denial.

11) The only alternative to the debriefing requirement is to be "inactive" for a period of six years, a CDCR policy initiated in 1999, whereby the Institutional Gang Investigation unit (IGI) conducts an "inactive" review of each alleged gang member/associate every six years to determine whether the prisoner has involved himself in gang activity. However, the vagueness and arbitrariness of this "review" process makes it impossible to be deemed "inactive". Examples: The IGI ruled that I was "active" in their 2001 review based solely on findings that an un-named prisoner in Tehachapi, (CCI) California Correctional Institution, allegedly sent or received a letter from another un-named person on the outside (free world), in which, it was alleged, my name had been mentioned in some unknown capacity, and that one, or both, of the un-named parties were allegedly members/associates of the Aryan Brotherhood. Their alleged use of my name in some unknown capacity was deemed proof by the IGI that I was "active" in a prison gang for another six years. Then on September 26, 2007, the IGI conducted yet another

-6-

inactive review and concluded once again that I was "active" based on four points: 1) A confidential memo, dated 4-2-05, in which the source identifies me as a gang member; 2) A confidential memo, dated 12-31-06, in which "the source provided information that I had recently sponsored another person for membership into the gang." (Note: as previously indicated, I was not at PBSP or the custody of the CDCR at this time, but rather in the custody of the U.S. Marshals Service from 12-7-02 to 1-31-07); 3) A list of first names and birthdates (no last names or identification numbers). (Note: the list of names followed me back to PBSP from the San Bernardino County Detention Center where I, along with all the names on the list, were co-defendants in U.S. v. Mills, et al., supra, and where we spent three years together and we, being civil human beings, celebrated each other's birthdays — another point lost on the IGI); and 4) Two St. Patrick's Day cards that had shamrocks on them. (IGI holds that the shamrock is one of many logos/signs used by the Aryan Brotherhood — regardless of what it's on or how it's used). Therefore, my alleged gang membership will remain as "active" member for another six years until 2013, at which time I'll receive another

-7-

so-called "inactive review." (Note: The IGI decision of September 26, 2007, is currently under administrative appeal, #PBSP-D-08-00425, and was filed with the Director of Corrections for Third Level Response on March 27, 2008).

12) To the best of my recollection I have never been charged with, nor found guilty of any gang-related activity. Certainly since my incarceration in PBSP from January, 1990 to present, I have not been charged with any illegal, gang-related activity.

13) Throughout my entire 36 years of incarceration within the CDCR, I have never witnessed, nor have I known of a single prisoner to utilize nude photographs, magazine pictures or artwork to harass or harry correctional personnel. In fact, it has been my experience that those inmates who are or have been disruptive and abusive do not use, seek to obtain or require nude pictures in order to become problematic. Furthermore, the CDCR has in the past, and without incident, always been quite competent in setting forth guidelines and restrictions on where and how prisoners may or may not openly display nude pictures within their living quarters. In addition, I have never known nor heard of a single prison guard complain of being harassed or harried by the use of nude pictures. I have, however, heard a very small number of correctional guards

-8-

openly voice their moral aversion to "pornography" as it relates to their religious views. Yet I have never heard a single correctional guard, male or female, religious or not, complain or demonstrate any aversion to the daily strip searches they perform on nude prisoners.

14) From January 1990 to December 2002, I had subscriptions to numerous magazines which included: Tattoo; Flash; Tattoo Savage; Skin and Ink; Skin Art; Easyriders; Biker; Outlaw Biker; In The Wind; and Women of Outlaw Biker, all of which were approved and received in PBSP. However, upon my arrival at PBSP in January 1990, I was denied a large portion of my personal property, including all of my artwork. I filed suit in the Northern District Court, whereupon the court ordered both the Warden of PBSP and the Director of Corrections to file a written report concerning the sending and receiving of art through the U.S. mail, and the possession of art by prisoners. At that time, PBSP disallowed all drawings, sketches, designs or graphics to be sent to or from prisoners. However, when complying with court order to file a written report with the court concerning their policy, PBSP officials radically modified their position and allowed me to have all

of my drawings, designs, sketches and graphics. I failed to prosecute further, having achieved my main goal, and the court denied or dismissed my complaint. The complaint did not include a "tattoo" business, or "tattoo design" business. I continue to receive, send and create sketches, drawings, designs and graphics to this day unless PBSP-IGI officials determine it to be gang related in some manner, ie: Shamrock in a St. Patrick's Day drawing.

    I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and was executed on this <u>29th</u> day of <u>June, 2008</u>, at Pelican Bay State Prison, SHU D3-211, Crescent City, California.

[s] David Chance
David Chance, #B40557
DECLARANT