**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TODD ASHKER and DANNY TROXELL,

       Plaintiffs,

  v.

ARNOLD SCHWARZENEGGER, et al.,

       Defendants.

_____/

No. C 05-03286 CW

ORDER GRANTING, IN
PART, DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND DENYING
PLAINTIFFS' CROSS
MOTION FOR SUMMARY
JUDGMENT AND
PLAINTIFFS' MOTION
FOR PRELIMINARY
INJUNCTION

This is a civil rights action under 42 U.S.C. § 1983 seeking
damages and injunctive relief filed by pro se Plaintiffs Todd
Ashker and Danny Troxell who are housed in the Secured Housing Unit
(SHU) at Pelican Bay State Prison (PBSP).  Defendants[1] move for
summary judgment on Plaintiffs' remaining claims:  (1) violation of
Plaintiffs' First Amendment right of freedom of speech arising from
delayed delivery of their personal mail; (2) violation of
Plaintiffs' First Amendment right of freedom of speech arising from
Defendants' prohibition of magazines that contain frontal nudity or
that promote tattooing; (3) violation of Plaintiffs' due process

---

[1]Under Federal Rule of Civil Procedure 15(d)(1), Francisco
Jacquez, in his official capacity as current warden of PBSP, is
substituted in place of Joe McGrath, the former warden of PBSP.

rights arising from Defendants' Aryan Brotherhood (AB) prison gang validation procedures; (4) violation of Plaintiffs' due process rights arising from a lack of programs available to them because they are housed in the SHU; (5) Mr. Ashker's claim for injunctive relief based on due process violations in his parole suitability determination; and (6) state claims for negligence and an intentional tort.  Defendants argue that the federal claims do not rise to the level of constitutional violations and, in the alternative, that they are protected by qualified immunity. Plaintiffs have filed an opposition, have cross-moved for summary judgment and request a preliminary injunction in the event summary judgment is not granted to them on all claims.  The matters were taken under submission on the papers.  Having read the papers filed by all the parties, the Court GRANTS, in part, Defendants' motion for summary judgment, DENIES Plaintiffs' cross-motion for summary judgment and DENIES Plaintiffs' motion for a preliminary injunction.

BACKGROUND

I. Delayed Mail

     On August 6, 2003, Mr. Ashker filed 602 appeal 03-0226 alleging that his "incoming mail has been taking longer and longer to be processed by the mail-room."  Defs' Request for Judicial Notice (Jud. Not.) Ex. 7.  Mr. Ashker alleged that he received two letters eighteen and nineteen days after they were postmarked, respectively.  Id.  He also alleged that some of his outgoing mail has been delayed or not sent out.  Id.  This appeal was denied at the three levels of review.  Id.  The first level denial, which indicated that it was a controlling response for multiple appeals

United States District Court
For the Northern District of California

of the same issue, stated that outgoing mail was being processed as the mailbags arrived, but that the mailroom was backlogged eleven days. Id.; Pl's Ex., MM.[2]

In his declaration, Mr. Ashker states that he has been housed at PBSP since 1990 and, during this entire time, the processing of ingoing and outgoing mail has been delayed. Ashker Dec. at 17-19. He states that he rarely receives any personal mail, although he writes to his wife, who lives in England, two or three times each week. Id. ¶ 23.

On January 23, 2005, Mr. Troxell filed 602 appeal number 05-0268 alleging that his outgoing mail was delayed for fifteen to twenty-one days. Jud. Not., Ex. 8. Mr. Troxell submitted with his appeal an envelope addressed to the Parole Office in Fresno, California that contained a letter dated December 14, 2004. Id. Mr. Troxell pointed out that the post mark on the envelope was January 6, 2005 which indicated that the letter was not mailed from PBSP until January 5, 2008. Id. He stated that, on December 5, 2004, he sent a Christmas card to his friend, who received it on December 26 or 27, a twenty-one or twenty-two day delay. Id.

The first level denial, which indicated it was a controlling response for multiple appeals, stated that mail was delayed due to the high volume of mail over the holidays and staff shortages due to illness. The director's level decision explained that "incoming and outgoing mail normally starts to be processed in the mailroom

---

[2]Mr. Ashker submitted another appeal, number 05-1170, for mail delays. Kirkland Admissions, Ex. NN. This appeal was denied at the third level of review on January 12, 2006, after the complaint in this case was filed on August 11, 2005. Therefore, appeal number 05-1170 was unexhausted at the time the complaint was filed and is not reviewable in this proceeding.

within twenty-four hours of receipt but that occasionally, when the volume of mail is high, particularly during the holidays and lockdowns, processing is delayed." Id.

In his declaration, Mr. Troxell states that he has been housed at PBSP-SHU since December 27, 1989, and during that time the processing of incoming and outgoing mail has been a problem. Troxell Dec. ¶ 3.  He states that he rarely gets personal mail from family and friends.  Id. ¶ 9.  He states that the mail delays cause a hostile environment between inmates and staff.  Id. ¶ 10.

Plaintiffs submit copies of seventeen envelopes addressed to them, each of which has a postmark date from the United States post office, a hand-stamped date and a handwritten date.  See Defendant Kirkland's Response to Interrogatories, Ex. LL--00.  Plaintiffs declare that they wrote the handwritten dates on the envelopes the day they received each piece of mail.  The hand-stamped dates are placed on the envelopes by the PBSP mailroom staff after each piece of mail is processed by the mailroom staff.  Dec. of Raoul Silva, PBSP Mailroom Supervisor at ¶ 8.[3]  There is a seventeen to thirty-seven day time lag between the postmark date and the dates the envelopes were received by Plaintiffs.

II. Denial of Magazines

A. Nudity

On April 27, 2004, Mr. Troxell filed 602 appeal 04-01126 claiming that the prohibition of magazines with frontal nudity was

[3]Defendants argue that the hand stamped dates were placed on the envelopes when they were first received at PBSP, before they were processed by the mailroom staff.  However, this argument contradicts the declaration of their witness, PBSP Mailroom Supervisor Silva, who states that the envelopes are stamped after they are processed.

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

a First Amendment violation and that the magazine "Juxtapoz" should not be prohibited because it contains art related material.  Jud. Not., Ex. 9.  The denial at the Warden's level indicated that a correctional counselor had reviewed Juxtapoz and noted several pages that portrayed the female breast and nipples and one page portrayed the male penis.  The appeal was denied on the ground that it violated title 15 of the California Code of Regulations (CCR)[4], § 3006(17)(A) and materials containing frontal nudity create a hostile work environment for PBSP staff.

In their declarations, Plaintiffs state that Defendants are banning all magazines and books that contain even a single picture of frontal nudity.  Ashker Dec. ¶ 28, 30; Troxell Dec. ¶ 14.  They state that they have never seen inmates harassing staff with nude photographs nor have they seen inmates fighting over such material.  Ashker Dec. ¶ 39; Troxell Dec. ¶ 17.  They state that the ban has made the inmates more hostile toward staff.  Id. ¶ 22; Ashker Dec. ¶ 44.  They state that biker magazines have been banned because of the frontal nudity depicted in them and that they feel disconnected from the biker lifestyle without these magazines.  Id. at 46, 49; Troxell Dec. ¶ 22.

B. Tattoos

On December 28, 2003, Mr. Troxell filed 602 appeal 04-00026 and on February 29, 2004 Mr. Ashker filed 602 appeal 04-00527 claiming that the prohibition of the tattoo magazines titled "Tattoo Savage," "Tattoo Flash," and "Tattoo," violated the First

---

[4]Unless otherwise noted, all further references to code sections are to title 15 of the California Code of Regulations (CCR).

**United States District Court**
For the Northern District of California

Amendment and that certain publications are art magazines that should be excepted from the prohibition.  Jud. Not., Exs. 5, 6. The appeals were denied on the grounds that the magazines contained pictures of tattoos which could be utilized as templates to replicate tattoo patterns, and articles on how to tattoo and how to make paraphernalia.  Id.  In their declarations, Plaintiffs state that between 1989 and 2003, they subscribed to tattoo art magazines such as "Tattoo," "Flash," and "Tabu Tattoo," but these were subsequently banned.  Plaintiffs state the magazines keep them up-to-date on the tattoo art scene which is a lucrative business about which they want to stay informed, and that the art reference material and artists' profiles are inspirational for their own artistic endeavors.  Ashker Dec. at ¶ 61, Troxell Dec. ¶ 34.

III. Gang Validation

On May 23, 1988, Mr. Ashker was first validated as a member of the AB Prison Gang and he was re-validated on July 13, 1995.  Kenny Dec., Ex. A.  In July, 2001, Mr. Ashker requested that he be classified as "inactive."[5]  Id.  The Institutional Gang Investigator (IGI) examined Mr. Ashker's Central File[6] and found four documents providing evidence that he was a member of the AB gang and could not be reclassified as inactive.  Id.  On September 3, 2001, Mr. Ashker filed 602 appeal 01-2335 in which he alleged that the inactive review was a sham and that the four documents were false.  Jud. Not., Ex. 10.  On February 21, 2002, the appeal

---

[5]An inmate who has been validated or re-validated as an active gang member may apply for an official change in status to inactive. CCR §§ 3378(c) and (d).

[6]The record of an inmate's activities in prison are maintained in his Central File.

was denied at the third level of review on the ground that staff of IGI familiar with the activities of gangs thoroughly reviewed the four confidential memos in Mr. Ashker's file and determined that they constituted sufficient and reliable documentation to support the finding that Mr. Ashker was an active member of the AB prison gang.  Id.  Mr. Ashker was informed of the IGI's investigation, but refused to participate in interviews with the IGI.  Kenny Dec. Ex. A.  The IGI sent these findings to the Law Enforcement and Investigations Unit (LEIU) which, citing sixteen independent documents, re-validated Mr. Ashker as a member of the AB on February 19, 2002 and on July 8, 2003.  On August 4, 2004, the Institutional Classification Committee (ICI) retained Mr. Ashker in the SHU based on his revalidations.  Jud. Not., Ex. 10.  On September 15, 2004, Mr. Ashker filed 602 appeal 04-2600 challenging the 2002 and 2003 revalidations and the 2004 decision to retain him in the SHU.  On December 17, 2004, the appeal was denied.  Jud. Not. Ex. 10.  In his declaration, Mr. Ashker avers that he is not, nor has he ever been, a participant in illegal gang activity.  Ashker Dec. ¶ 89.

Mr. Troxell was initially validated as a member of the AB in 1984.  Comp. ¶ 104.  On January 4, 1988, while he was housed in the SHU at Tehachapi State Prison, Mr. Troxell filed 602 appeal 88-1657 alleging that the policy of placing him in the SHU without finding him guilty of disciplinable behavior violated his due process rights.  The appeal was denied at the third level of review on April 11, 1988.  Jud. Not., Ex. 11; Woodford Responses, Ex. V.  Mr. Troxell was re-validated on August 1, 1995 and on July 8, 2003.  Kenny Dec, Ex. B.  Before the filing of this complaint, he

exhausted no other appeals relating to his gang re-validations.

VI. Lack of Access to Programs

On February 23, 2004, Mr. Ashker filed 602 appeal 04-00566 alleging that PBSP denied him access to programs required for parole. Jud. Not., Ex. 13. On July 22, 2004, this appeal was denied at the third level of review on the ground that programs for inmates housed in the SHU must be limited based upon safety and security concerns. Id.

V. Denial of Parole

The parole hearing at issue is Mr. Ashker's August 7, 2003 hearing before the Board of Prison Terms[7] (Board). The Board concluded that Mr. Ashker was not suitable for parole and would pose a threat to public safety if released based on the following: (1) his lengthy criminal history; (2) the commitment offense of second degree murder; (3) his negative behavior since incarceration; (4) membership in the AB prison gang; (5) failure to participate in self-help and vocational programs; (6) failure to participate in scheduled psychiatric evaluations; (7) lack of either parole plans or a work record; and (8) the opposition of the Sacramento District Attorney's Office and Mr. Ashker's PBSP counselor to a finding of parole suitability.

LEGAL STANDARD

I. Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the

---

[7]The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings. Cal. Penal Code § 5075(a).

United States District Court

For the Northern District of California

evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods.  Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an
> essential element of the nonmoving party's case, or,
> after suitable discovery, the moving party may show that
> the nonmoving party does not have enough evidence of an
> essential element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v.</u> <u>NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  <u>Nissan</u>, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a <u>prima facie</u> showing in support of its position on that issue.  <u>UA Local 343 v.</u>

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  Id.  Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case.  UA Local 343, 48 F.3d at 1471.  The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible."  Id.

II. Section 1983

     Title 42 U.S.C. § 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States."  Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983).  Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).  In order to state a claim under § 1983, Plaintiffs must allege two elements:  (1) the violation of a right secured by the Constitution or laws of the United States, and (2) the alleged violation was committed by a person acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

     An individual defendant is liable for money damages under § 1983 only if the defendant personally participated in or otherwise proximately caused the unconstitutional deprivations of which the plaintiff complains.  Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988).  To establish individual liability, a plaintiff must allege one of the following: (1) the defendant personally participated in or ordered the constitutional violation; (2) the defendant, acting in a supervisory capacity, failed to train

11

United States District Court
For the Northern District of California

properly or supervise personnel, resulting in the violation;
(3) the defendant was responsible for an official policy or custom
which caused the violation; or (4) the defendant knew of the
violation and failed to prevent it.  Taylor v. List, 880 F.2d 1040,
1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home, 723
F.2d 675, 680 (9th Cir. 1984).

Officials of the state while acting in their official
capacities, are not "persons" within the meaning of § 1983.  Will
v. Michigan Dep't of State Police, 491 U.S. 58, 64 (1989).  The
distinction derives from the Eleventh Amendment.  Id. at 66-67;
Kentucky v. Graham, 473 U.S. 159, 165-168 (1985).  The Eleventh
Amendment bars suits in federal court for damages and retrospective
injunctive relief against state officials, acting in their official
capacity, unless the defendant has waived immunity or Congress has
exercised its Fourteenth Amendment power to override immunity.
Will, 491 U.S. at 66.  In enacting 42 U.S.C. § 1983, Congress did
not intend to eliminate Eleventh Amendment immunity.  Id.  The
Eleventh Amendment also bars pendent state law claims against state
officials in federal court.  Pennhurst State Schl. & Hosp. v.
Halderman, 465 U.S. 89, 106, 121 (1984).  Neither a state nor its
officials acting in their official capacities therefore may be sued
under § 1983 for damages or retrospective injunctive relief.  Will,
491 U.S. at 71.

However, a state official in his official capacity is
considered a "person" for § 1983 purposes when sued for prospective
injunctive relief.  Id. at n.10.  In what has become known as the
Ex Parte Young doctrine, a suit for prospective injunctive relief
provides a narrow exception to Eleventh Amendment immunity.  Ex

**United States District Court**
For the Northern District of California

Parte Young, 209 U.S. 123 (1908); <u>Doe v. Lawrence Livermore Nat'l</u>
<u>Lab.</u>, 131 F. 3d 836, 839 (9th Cir. 1997).

EVIDENTIARY OBJECTIONS

Defendants object to some of the evidence submitted by
Plaintiffs.  The Court has reviewed these evidentiary objections
and has not relied on any inadmissible evidence.  The Court will
not discuss each objection individually.  To the extent that the
Court has relied on evidence to which Defendants have objected,
such evidence has been found admissible and the objections are
overruled.

DISCUSSION

I. First Amendment Claim Based on Mail Delays

Defendants argue that Mr. Ashker's claim based on mail delays
is precluded because he did not state such a claim in his
complaint.  Mr. Ashker responds that this was an oversight and
requests that he be allowed to state this claim.  The Court will
allow Mr. Ashker's claim.

Plaintiffs claim that PBSP has an ongoing problem with
processing personal mail in a timely manner and that this has been
harmful to inmates and their relationships with family and friends.
Defendants argue that a temporary delay in the delivery of mail,
resulting from security inspections, does not violate the First
Amendment.  Defendants also argue that, even if there was a
constitutional violation, they are protected from suit by qualified
immunity.

Prisoners enjoy a First Amendment right to send and receive
mail.  <u>Witherow v. Paff</u>, 52 F.3d 264, 265 (9th Cir. 1995) (citing
<u>Thornburgh v. Abbott</u>, 490 U.S. 401, 407 (1989)).  A prison,

13

however, may adopt regulations or practices which impinge on a prisoner's First Amendment rights as long as the regulations are "reasonably related to legitimate penological interests." <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  The <u>Turner</u> standard applies to regulations and practices concerning all correspondence between prisoners and to regulations concerning incoming mail received by prisoners from non-prisoners.  <u>Thornburgh</u>, 490 U.S. at 413.  In the case of outgoing correspondence from prisoners to non-prisoners, however, an exception to the <u>Turner</u> standard applies.  Because outgoing correspondence from prisoners does not, by its very nature, pose a serious threat to internal prison order and security, there must be a closer fit between any regulation or practice affecting such correspondence and the purpose it purports to serve.  <u>Id.</u> at 411-12.

Prison officials have a responsibility to forward mail to inmates promptly.  <u>Bryan v. Werner</u>, 516 F.2d 233, 238 (3d Cir. 1975).  Allegations that mail delivery was delayed for an inordinate amount of time are sufficient to state a claim for violation of the First Amendment.  <u>Antonelli v. Sheahan</u>, 81 F.3d 1422, 1432 (7th Cir. 1996).  A temporary delay or isolated incident of delay does not violate a prisoner's First Amendment rights. <u>Crofton v. Roe</u>, 170 F.3d 957, 961 (9th Cir. 1999) (policy of diverting publications through property room reasonably related to prison's interest in inspecting mail for contraband).

CCR §§ 3120-3146 govern the receipt, processing and delivery of inmate mail.  First class mail shall be delivered to the inmate as soon as possible, but not later than seven calendar days from receipt of the mail at the facility mailroom.  CCR § 3133(a)(1).

14

**United States District Court**
For the Northern District of California

All non-confidential mail addressed to an inmate will be opened and inspected before delivery to the inmate and all non-confidential mail, whether incoming or outgoing, is subject to being read in its entirety by designated staff.  CCR § 3133(b)(3).

Raoul Silva, a PBSP employee who has been a mail room supervisor since January 7, 2008, submits a declaration detailing the procedures used to process the mail at PBSP.  PBSP receives several thousand items of incoming mail each day.  First, mail is divided into the categories of personal and legal mail.  Legal mail is not opened, except in limited circumstances set forth in the regulations.  Personal mail is sorted into bins, with a separate bin for each housing unit.  Mail room workers sort through the bins, opening each non-legal letter or package to ensure that there is no contraband and that stamps, money orders and pictures are properly processed.  Each piece of mail is then stamped and placed in a delivery bag that corresponds to the housing unit of the addressee.  Correctional officers in each housing unit review the incoming mail to ensure that it does not contain illegal communications.  Near holidays such as Christmas, Valentine's Day, Easter and Father's Day, the mail room must process approximately three times the amount of mail received on non-holidays and this causes processing delays.

In regard to outgoing mail, Defendants are correct that the evidence consists of Mr. Troxell's January 23, 2005 602 appeal in which he complains about two pieces of mail that were delayed.  Because this appeal pertains to only two incidents of delayed outgoing mail at the time of the Christmas holidays, it does not rise to the level of a constitutional violation.  See Crofton, 170

**United States District Court**
For the Northern District of California

F.3d at 961 (isolated incident of mail delay does not violate First Amendment).

In regard to incoming mail, the evidence consists of Plaintiffs' two appeals and the envelopes submitted to show ongoing delays.  There are seventeen envelopes postmarked from July 17, 2003 to May 2, 2005, none sent around the holidays, that were received by Plaintiffs from seventeen to thirty-seven days after the date of the postmark.  Although Defendants argue there are only a few pieces of mail that Plaintiffs received late, Plaintiffs' evidence is sufficient to raise a material dispute of fact regarding whether Defendants violated Plaintiffs' First Amendment rights by delaying mail delivery for an inordinate period of time. However, Plaintiffs' evidence is not sufficient to justify summary judgment in their favor either.

Plaintiffs seek injunctive relief on this claim.  In their complaint, Plaintiffs do not specify the type of injunctive relief they seek.  The Court assumes they seek an injunction directing Defendants to deliver their mail promptly.  For injunctive relief purposes, Plaintiffs need only name a defendant who, in his official capacity, has responsibility for the mail procedures at PBSP.  Francisco Jacquez, in his official capacity as warden of PBSP, is an appropriate Defendant because he has authority over the mail procedures at PBSP.  Therefore, this claim may proceed as to Warden Jacquez.

However, as a request for damages, this claim must be denied because Plaintiffs' evidence fails to tie any particular Defendant to the act of delivering mail late.  As stated above, § 1983 claims for damages require proof that a particular defendant participated

16

United States District Court
For the Northern District of California

1  in or directly ordered the constitutional violation.  Summary

2  judgment is granted on this claim to all Defendants other than

3  Warden Jacquez.  Further, even if Plaintiffs had proof of the

4  participation of the other Defendants, they would be protected from

5  liability for damages by qualified immunity.

6      A. Qualified Immunity

7      The defense of qualified immunity protects "government

8  officials . . . from liability for civil damages insofar as their

9  conduct does not violate clearly established statutory or

10 constitutional rights of which a reasonable person would have

11 known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The

12 threshold question is whether, if all factual disputes were

13 resolved in favor of the party asserting the injury, the evidence

14 would show the defendant's conduct violated a constitutional right.

15 Saucier v. Katz, 533 U.S. 194, 201 (2001).  "If no constitutional

16 right would have been violated were the allegations established,

17 there is no necessity for further inquiries concerning qualified

18 immunity."  Id.  On the other hand, if a violation could be made

19 out on the allegations, the next step is to ask whether the

20 constitutional right in issue was clearly established.  Id.  The

21 question here is whether it would be clear to a reasonable officer

22 that his conduct was unlawful in the situation he confronted.  Id.

23 If the law did not put the officer on notice that his conduct would

24 be clearly unlawful, summary judgment based on qualified immunity

25 is appropriate.  Id.

26     In  Pearson v. Callahan, __ S.Ct. __, 2009 WL 128768, * 9

27 (U.S. Jan. 21, 2009), the Supreme Court overruled Saucier's

28 requirement that the court must determine first whether there was a

constitutional deprivation and then whether such right was clearly established.  Under <u>Pearson</u>, the court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case.  <u>Id.</u> (noting that though the <u>Saucier</u> sequence is often appropriate and most efficient, it is no longer mandatory).

The Court concludes that, even if ongoing delays of the delivery of incoming mail violated Plaintiffs' First Amendment rights, qualified immunity applies because the law was not clearly established at the time of the conduct at issue and Defendants' conduct was objectively reasonable.  <u>Thornburgh v. Abbott</u> is the only Supreme Court case to discuss the First Amendment rights of prisoners to receive incoming mail.  In <u>Thornburgh</u>, the Court examined regulations governing the censorship and distribution of prisoners' incoming publications.  The Court found the regulations at issue were facially constitutional because they met the <u>Turner v. Safely</u> test and were reasonably related to legitimate penological interests.  <u>Thornburgh</u>, 490 U.S. at 419.

Here, Plaintiffs are not complaining that the regulations at issue are unconstitutional.  They agree that PBSP has a legitimate penological interest in screening their incoming mail.  Their complaint is that PBSP mail screening procedure takes too long and PBSP does not hire enough staff to process the mail efficiently.  The only Ninth Circuit case cited by Plaintiffs is <u>Morrison v. Hall</u>, 261 F.3d 896, 905 (9th Cir. 2001), which held that Oregon state prison regulations prohibiting bulk rate, third and fourth class mail did not meet the <u>Turner</u> factors and was unconstitutional as applied to pre-paid, for-profit, subscription publications.

18

This case does not establish how promptly or efficiently mail must be delivered to inmates.  Plaintiffs also cite a Third Circuit case, <u>Bryan v. Werner</u>, 516 F.2d 233, 238 (3rd Cir. 1975), which stated, in <u>dicta</u>, that prison officials have a responsibility to deliver mail from the courts promptly to inmates.  This out-of-circuit case, which focuses on legal mail, does not create clearly established law in the Ninth Circuit as to how promptly personal mail must be delivered.  In <u>Antonelli</u>, 81 F.3d at 1432, the Seventh Circuit held that the allegation that mail delivery was being delayed for an inordinate amount of time and sometimes mail was stolen was sufficient to withstand a motion to dismiss for failure to state a claim.  However, this Seventh Circuit case likewise does not create clearly established law in the Ninth Circuit as to how promptly mail must be delivered.

Therefore, Defendants are qualifiedly immune from suit for damages on this claim.

II. First Amendment Claim Based on Withheld Magazines

Plaintiffs bring a facial and an as-applied First Amendment challenge to the regulations which ban magazines that contain frontal nudity and tattoo art.  They also claim the ban on magazines containing frontal nudity violates California Penal Code § 2602(c).

Regulations limiting prisoners' access to publications or other information are valid only if they are reasonably related to legitimate penological interests.  <u>Thornburgh</u>, 490 U.S. at 413 (citing <u>Turner</u>, 482 U.S. at 89).  Considerable deference is given to the determination of prison administrators who, in the interest of security, regulate the relations of prisoners with the outside

19

**United States District Court**
For the Northern District of California

world.   Id. at 408.   There are four factors to consider when
determining whether a regulation is reasonably related to
legitimate penological interests: (1) whether there is a "valid,
rational connection between the prison regulation and the
legitimate governmental interest put forward to justify it"; (2)
"whether there are alternative means of exercising the right that
remain open to prison inmates"; (3) "the impact accommodation of
the asserted constitutional right will have on guards and other
inmates and on the allocation of prison resources generally"; and
(4) the "absence of ready alternatives", or, in other words,
whether the rule at issue is an "exaggerated response to prison
concerns." Turner, 482 U.S. at 89-90.

A. Nudity

The California Code of Regulations provides that inmates may
not possess obscene materials.   CCR § 3006.   In 2002, this
regulation was amended to add subsection (c)(17) which provides
that inmates may not possess "sexually explicit images that depict
frontal nudity in the form of personal photographs, drawings,
magazines, or other pictorial format."   CCR § 3006(c)(17).
Sexually explicit material is defined as "material that shows the
frontal nudity of either gender, including the exposed female
breast(s) and/or genitals of either gender."   CCR § 3006(c)(17)A).
There is an exception for educational, medical, scientific or
artistic materials approved by the head of the institution or his
or her designee on a case-by-case basis.   CCR § 3006(c)(17)(B).
PBSP Operating Procedure (OP) 205, dated August, 2005, lists
magazines that are permanently excluded, including the magazine
"Juxtapoz," which is at issue here.

**United States District Court**
For the Northern District of California

1        1. Facial Challenge to Regulation

2        Defendants argue CCR § 3006(c)(17) is constitutional because,

3 under <u>Turner</u>, it is reasonably related to legitimate penological

4 interests.  In support of their argument, Defendants rely on <u>Mauro</u>

5 <u>v. Arpaio</u>, 188 F.3d 1054, 1059-63 (9th Cir. 1999) (<u>en banc</u>), in

6 which the court found that a jail policy banning materials

7 depicting frontal nudity passed constitutional muster because it

8 met all four prongs of the <u>Turner</u> test.  Additionally, Defendants

9 rely on <u>Nelson v. Woodford</u>, 2006 WL 571359, at *3-5 (N.D. Cal. Mar.

10 2, 2006), in which the district court applied <u>Mauro</u> to find that

11 CCR § 3006(c)(17) is constitutional because it is reasonably

12 related to legitimate penological interests.  On appeal, the Ninth

13 Circuit affirmed the district court's ruling in <u>Nelson</u>, holding:

14 "The district court properly concluded that the regulations

15 prohibiting Nelson's possession of obscene or sexually explicit

16 material, 15 Cal. Code Reg. §§ 3006(c)(15) & (17), respectively,

17 are constitutional because the regulations' underlying policies are

18 reasonably related to legitimate penological interests." <u>Nelson v.</u>

19 <u>Woodford</u>, 249 Fed. Appx. 529, 530 (9th Cir. 2007).

20        Plaintiffs contend <u>Mauro</u> is inapposite because it was a county

21 jail case where the average stay was fourteen days, as opposed to

22 Plaintiffs' life sentences.  <u>Mauro</u> is directly relevant to the

23 instant case.  Although <u>Mauro</u> arose in a county jail, other courts

24 in this district have applied its reasoning to CCR § 3006(c)(17) in

25 cases brought by inmates incarcerated at PBSP.  <u>See</u> <u>Nelson</u>, 2006 WL

26 571359, at *4; <u>Self v. Horel</u>, 2008 WL 5048392, at *1 (N.D. Cal.

27 Nov. 24, 2008) (plaintiff housed in PBSP SHU).

28        Plaintiffs also argue that Defendants have failed to produce

21

United States District Court
For the Northern District of California

evidence of sexual harassment of PBSP staff caused by publications portraying frontal nudity.  However, under the <u>Turner</u> test, Defendants need not show specific instances of incidents that occurred as a result of the challenged policy.  <u>Casey v. Lewis</u>, 4 F.3d 1516, 1521 (9th Cir. 1993).  It is sufficient that a prison regulation is justified on the basis of anticipated security problems.  <u>Id.</u>

Therefore, CCR § 3006(c)(17) is facially constitutional.

2. As-Applied Challenge to Regulation

Plaintiffs argue that § 3006(c)(17) is unconstitutional as applied to them because Juxtapoz is an artistic magazine which includes some incidental nudity relating to art subjects and should be allowed under the artistic exception.  Defendants determined that Juxtapoz did not meet the artistic exception because the frontal nudity it displayed created a hostile work environment for staff.  <u>See</u> Kirkland Admissions, Ex. LL.

Prison officials have broad discretion to determine what publications may enter a prison.  <u>Thornburgh</u>, 490 U.S. at 416. Regulations that provide for individualized determinations as opposed to predetermined categorical exclusions strike an acceptable balance between the prison's legitimate governmental objectives and prisoners' First Amendment rights.  <u>Id.</u> at 416-17 & n. 15.  CCR § 3006(c)(17) provides for individualized determinations as to what sexually explicit materials inmates may possess.  Even if, as Plaintiffs argue, Juxtapoz has artistic value, it was neither arbitrary nor irrational for Defendants to deny Plaintiffs access to the publication.  Although CCR § 3006(c)(17)(B)(2) allows inmates to possess some sexually

22

1    explicit materials, it does not require that inmates be allowed to

2    possess sexually explicit material solely because they believe it

3    has artistic value.  Defendants' decision did not deprive

4    Plaintiffs of the right to possess either educational art materials

5    that meet the requirements of CCR § 3006(c)(17)(B)(2).

6        Mr. Troxell argues that magazines like Juxtapoz are invaluable

7    to him because he used them as art reference material for his art

8    work and that all adult fantasy art, which is the kind he does,

9    portrays some partial nudity.  Plaintiffs also explain that,

10   previous to their incarceration, they were part of the biker

11   culture and lament their loss of connection to this lifestyle

12   because certain biker lifestyle magazines have been banned on the

13   ground that they contain frontal nudity.

14       Plaintiffs have no constitutional right to this connection.

15   As stated above, Mr. Troxell has access to other educational or art

16   materials that do not contain frontal nudity or that meet the

17   requirements of CCR § 3006(c)(17)(B)(2) and Plaintiffs have access

18   to any biker lifestyle magazines that do not display frontal

19   nudity.  Therefore, Defendants' determination to ban Juxtapoz was a

20   constitutional application of 3006(c)(17).

21           3. Violation of California Penal Code § 2601

22       Plaintiffs contend that CCR § 2006(c)(17) violates California

23   Penal Code § 2601(c)(1) because the legislative history of § 2601

24   establishes that the legislature declined to include a ban on

25   frontal nudity.  Defendants argue that this claim is waived because

26   Plaintiffs did not include it in their complaint.  Plaintiffs

27   correctly point out that they referred to § 2601 in ¶ 233 of their

28   First Amended Complaint.  However, this claim is foreclosed by _Snow_

23

United States District Court
For the Northern District of California

v. Woodford, 128 Cal. App. 4th 383, 394 (2005), which held that CCR § 2006 was enacted to prevent conditions which tend to incite riot or violence and, thus, does not violate Penal Code § 2601.

        B. Tattoo Publications

        California regulations provide that inmates shall not tattoo themself or others, and shall not permit tattoos to be placed on themselves.  CCR § 3063.  Tattooing or the possession of tattoo paraphernalia is a serious rule violation.  CCR § 3315.  A serious rule violation is defined as a violation of the law.  CCR § 3312(a)(3).  Based on these regulations, magazines whose primary purpose is to encourage tattooing are prohibited at PBSP.  Silva Dec. ¶ 14.  The magazines "Savage Tattoo," "Tattoo," and "Flash Tattoo," at issue here, are on the list of banned publications. Jud. Not., Exs. 3, 4.

        Defendants denied Mr. Ashker's 602 appeal for the following reasons: (1) tattooing is recognized as a means for transmitting serious diseases such as AIDS and hepatitis between inmates; (2) the primary function of the tattoo magazines at issue is to promote tattooing, they often contain articles on how to tattoo or how to make tattoo paraphernalia, and they are used for tattoo patterns; and (3) other forms of media, such as newspapers, could be used to keep current on tattoo art.  Jud. Not., Exs. 5 and 6. Defendants also argue that tattoos can be used for gang identification, which promotes gang violence and threatens the security of PBSP.

        The four factor Turner test applies to determine if the regulation prohibiting tattoo magazines violates Plaintiffs' First Amendment rights.  The first Turner factor is met because the

24

United States District Court
For the Northern District of California

regulation promotes penological interests in maintaining the health, safety and security of the prison, its inmates and its employees.   Furthermore, it is neutral in that it prohibits all publications that promote tattooing without regard for the content of the tattoos.

The second Turner factor is met because inmates have access to other artistic books and magazines and can read about tattooing in newspapers and other periodicals.

The third Turner factor is met because the regulation protects the interests and security of guards and inmates, which outweighs the restriction on Plaintiffs' rights.   The fourth Turner factor is met because Plaintiffs, who have the burden of putting forth alternatives to the regulation, have failed to do so.

Plaintiffs argue that they received the magazines at issue for over twenty years before PBSP banned them in 2003 and that the content is about benign subjects such as artist profiles, lifestyle and philosophies, history, music and fashion.   However, they do not dispute that the magazines' purpose is to promote tattooing and to describe the methods for tattooing.   Therefore, this argument is unpersuasive.

Plaintiffs submit declarations of two inmates who were previously housed in the SHU at Corcoran State Prison (Corcoran) who state that tattoo magazines were not banned in the SHU at Corcoran.   (Docket ## 293 and 294).   Citing Griffin v. Lombardi, 946 F.2d 604, 607-08 (8th Cir. 1991), Plaintiffs argue that these declarations raise a factual dispute as to the legitimacy of PBSB's ban.   Griffen is distinguishable.   In Griffen, the declarations that raised a factual dispute were from prisoners who had received

25

original diplomas and transcripts at other institutions and were allowed to retain them when they were transferred to the prison where the plaintiffs were incarcerated.  Here, Plaintiffs submit only two declarations from inmates formerly housed in the SHU at Corcoran, which may not have had the same characteristics as the SHU at PBSP.

In <u>Brown v. Peyton</u>, 437 F.2d 1228, 1232 (4th Cir. 1971), another case cited by Plaintiffs, the court indicated that distribution of the religious magazine in question had increased at other prisons and that the experience of those institutions would be probative of the question of the state interests in forbidding the publication.  Here, the publication at issue is not a religious magazine and there is no evidence that its distribution is increasing at other penal institutions.

Furthermore, both <u>Griffin</u> and <u>Brown</u> are out-of-circuit decisions that are not binding on this Court; Plaintiffs have not cited any Ninth Circuit authority on this issue.

Therefore, the regulations at issue are constitutional on their face and as applied to Plaintiffs.

Even if there were a constitutional violation, the doctrine of qualified immunity would apply to any damages claim.  As noted, Plaintiffs have not submitted relevant Ninth Circuit or Supreme Court authority on this claim.  Thus the law is not clearly established and Defendants could not have understood their actions would violate Plaintiffs' rights.

Accordingly, summary judgment is granted in favor of Defendants on this claim and Plaintiffs' cross-motion for summary judgment is denied.

III. Gang Validation Procedures and Placement in SHU

    A. Due Process Legal Standard

    California's policy of housing suspected gang members in the SHU is not a disciplinary measure, but an administrative strategy to preserve order in the prison and protect the safety of all inmates. <u>Bruce v. Ylst</u>, 351 F.3d 1283, 1287 (9th Cir. 2003). However, California statutes and prison regulations create a liberty interest in freedom from administrative segregation. <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1098, 1100 (9th Cir. 1986).[8] In <u>Wilkinson v. Austin</u>, 545 U.S. 209, 223-25 (2005), the Supreme Court held that indefinite placement in Ohio's "supermax" facility, where inmates are not eligible for parole consideration, imposes an "atypical and significant hardship within the correctional context." Based on <u>Wilkinson</u>, because indefinite placement in California's SHU may render inmates ineligible for parole consideration, California prisoners may have a liberty interest in not being placed indefinitely in the SHU.

    When prison officials initially determine whether a prisoner is to be segregated for administrative reasons, due process requires that they comply with the following procedures: (1) they must hold an informal non-adversary hearing within a reasonable time after the prisoner is segregated, (2) the prisoner must be informed of the charges against him or the reasons segregation is

United States District Court
For the Northern District of California

---

[8]CCR § 3335(a) permits placement in administrative segregation where the presence of an inmate in the general population poses a threat to his own safety and/or to an ongoing investigation of serious misconduct or criminal activity. CCR § 3339(a) provides that release from segregation shall occur at the earliest possible time. <u>Toussaint v. McCarthy</u> held that when read together, these regulations create a liberty interest in freedom from administrative segregation. 801 F.2d at 1098.

United States District Court
For the Northern District of California

being considered, and (3) the prisoner must be allowed to present his views. Toussaint, 801 F.2d at 1100. Due process does not require detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity to present witnesses, a written decision describing the reasons for placing the prisoner in administrative segregation or disclosure of the identity of any person providing information leading to the prisoner's placement in administrative segregation. Id. at 1100-01; accord Wilkinson, 545 U.S. at 228-29 (determining that prisoners are constitutionally entitled only to the informal, non-adversary procedures set forth in Greenholtz v. Inmates of Neb. Penal and Correctional Complex, 442 U.S. 1 (1979), and Hewitt v. Helms, 459 U.S. 460 (1983), prior to assignment to "supermax" facility).

Following placement in administrative segregation, prison officials must engage in some sort of periodic review of the inmate's confinement. Hewitt, 459 U.S. at 477 n.9; Toussaint, 801 F.2d at 1101. Due process is satisfied if the decision to segregate the inmate is reviewed by prison officials every 120 days, Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990), cert. denied 502 U.S. 874 (1991), and the review amounts to more than "meaningless gestures," Toussaint v. Rowland, 711 F. Supp. 536, 540 n.11 (N.D. Cal. 1989) (citing Toussaint v. McCarthy, 801 F.2d at 1102). Violation of procedural due process rights requires only procedural correction and not a reinstatement of the substantive right. Raditch v. United States, 929 F.2d 478, 481 (9th Cir. 1991).

The Ninth Circuit requires that "some evidence" support a decision to place an inmate in segregation for administrative

United States District Court
For the Northern District of California

reasons.  <u>Toussaint</u>, 801 F.2d at 1104.  This standard applies to placement in a SHU for gang affiliation.  <u>Bruce</u>, 351 F.3d at 1287-88.  The standard is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced.  <u>Id.</u> at 1105 (citing <u>Superintendent v Hill</u>, 472 U.S. 445, 455 (1985)).  Ascertaining whether the standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence.  <u>Id.</u>  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached.  <u>Id.</u>

The Ninth Circuit requires that the evidence relied upon by prison disciplinary boards contain "some indicia of reliability," <u>Cato v. Rushen</u>, 824 F.2d 703, 705 (9th Cir. 1987), but has not directly considered whether a corresponding need for evidentiary reliability exists when prison officials segregate an inmate for administrative reasons.  Some district courts have extended the reliability requirement to the administrative context, however, holding that "the evidence relied upon to confine an inmate to the SHU for gang affiliation must have 'some indicia of reliability' to satisfy due process requirements." <u>Madrid v. Gomez</u>, 889 F. Supp. 1146, 1273-74 (N.D. Cal. 1995); <u>see</u> <u>Jones v. Gomez</u>, 1993 WL 341282, *3-4 (N.D. Cal.) (due process requires indicia of reliability due to high risk of false information by informants, inherent prisoner conflicts and necessity for independent fact-finding by prison officials).  Adequate indicia of reliability are (1) the oath of the investigating officer as to the truth of his report that contains confidential information; (2) corroborating testimony; (3) a statement by the chairman of the committee that he had first-

**United States District Court**
For the Northern District of California

hand knowledge of sources of information and considered them reliable based on the informant's past record; and (4) an in camera review of the documentation from which credibility was assessed. Zimmerlee v. Keeney, 831 F.2d 183, 186-87 (9th Cir. 1987).

B. California's Regulations for Placement in the SHU

CCR § 3378 sets forth the procedures followed to validate inmates as active members or associates of prison gangs. Validation requires three independent source items of documentation indicative of actual membership. CCR §§ 3378(c)(3) and (4). Prior to the submission of a validation package, an inmate is given an opportunity to challenge, in an interview with the IGI, the items used in the validation. CCR § 2278(c)(6)(A). Inmates are to be given written notice at least twenty-four hours in advance of the interview. CCR § 2278(c)(6)(B). All non-confidential source items shall be disclosed to the inmate at the time of notification and any confidential information is disclosed generally. CCR § 2278(c)(6)(C). A validated gang member or associate is deemed to be a severe threat to the safety of others or the security of the institution and will be placed in the SHU for an indeterminate term. CCR § 3341.5(c)(2)(A)2. An inmate assigned to the SHU on an indeterminate basis shall be reviewed by a classification committee at least every 180 days for consideration of release to the general population. CCR § 3341.5(c)(2)(A)1. As part of the review, the IGI reviews evidence previously relied upon to ensure that it was reviewed by the OCS and is reliable. Beeson Dec. ¶ 15. If the evidence was reviewed by the OCS and is deemed to be reliable, the ICC keeps the inmate in the SHU. Id.

An inmate housed in the SHU as a gang member or associate may

United States District Court

For the Northern District of California

be considered for reclassification to inactive status when the inmate has not been identified as having been involved in gang activity for a minimum of six years.  CCR § 3341.5(c)(5); CCR § 3378(e).  A full review of the validated inmate's gang status takes place every six years.  Beeson Dec. ¶ 16.  If the review shows that the most recent evidence of gang activity is more than six years old, the IGI reviews the inmate's C-File for evidence of more recent gang membership.  Beeson Dec. ¶ 17.  If the C-File contains no evidence of recent activity, the investigation proceeds to other areas that may reveal such evidence such as cell searches, information from other agencies and review of the inmate's newer tattoos.  Beeson Dec. ¶ 18.

The evidence used for gang validation may be based on self-admission, tattoos and symbols, written material, photographs, staff information, information from other agencies, association, informants, offenses, legal documents, visitors, communications observed by prison employees and debriefing reports.  CCR § 3378(c)(8).  The evidence must meet the criteria for reliability set forth in the CDCR Department Operations Manual (DOM) §§ 61020.7-10.  Beeson Dec. ¶ 12.

Debriefing is the process by which the IGI determines whether an inmate has dropped out of a gang.  Beeson Dec. ¶ 24.  Its purpose is not to acquire incriminating evidence against the inmate, but to provide the IGI with enough information reasonably to conclude that the inmate has dropped out of the gang.  Beeson Dec. ¶¶ 25, 26.

C. Statute of Limitations

The Court's June 14, 2007 Order Granting in Part Defendants'

31

United States District Court
For the Northern District of California

Motion to Dismiss held that Mr. Ashker's 602 appeals 01-2335 and 04-2600 and Mr. Troxell's 602 appeal 88-1657 exhausted their due process claim based on Defendants' AB validation procedures and denied without prejudice Defendants' motion to dismiss on statute of limitations grounds.  The Court's December 26, 2007 Order Denying Plaintiffs' Motions for Leave to File A Second Amended Complaint noted that Defendants conceded that Mr. Ashker's due process claim based on his 2001 and 2004 appeals were timely, but that they argued that Mr. Troxell's claim, which was exhausted in appeal 88-1657, was barred because it was based on events that occurred prior to August 11, 2001, the date the applicable statute of limitations expired.  The Court ruled that the continuing violation theory premised on a systematic policy or practice of discrimination might apply and denied Defendants' motion to dismiss Mr. Troxell's claim on statute of limitations grounds without prejudice to refiling it with their motion for summary judgment.[9]

Defendants now argue that Mr. Troxell's AB validation claim is barred by the statute of limitations because it does not meet the requirements of a continuing violation as set forth in Knox v. Davis, 260 F.3d 1009 (9th Cir. 2001).  In Knox, the court explained that because the plaintiff did not allege a system or practice of discrimination, the only way he could show a continuing violation

_____

[9]A plaintiff who claims a policy and practice of systematic discrimination, as opposed to alleging only individual discriminatory acts, may, in certain circumstances, utilize the continuing violations doctrine.  Gutowski v. County of Placer, 108 F.3d 256, 259 (9th Cir. 1997).  Under this approach, an action is always timely if brought by a plaintiff currently subject to the policy, because such policy continually deters the plaintiff from seeking full rights or threatens to adversely affect the plaintiff in the future.  Id.

**United States District Court**
For the Northern District of California

was to "state facts sufficient to support a determination that the alleged discriminatory acts are related closely enough to constitute a continuing violation, and that one or more of the acts falls within the limitations period." Id. at 1013.  The court also differentiated between the continuing impact of a past violation, which does not affect the statute of limitations, and a continuing violation.  Id. at 1014.  The former occurs when the defendants' previous decision causes them to take subsequent action based upon that decision.  Id.  Because the first decision puts the plaintiff on notice of the future wrongful acts, the statute of limitations is deemed to have commenced at the time of the first decision.  Id.

Plaintiffs argue that Defendants have arbitrarily applied the applicable California regulations as a pretext for keeping them in the SHU until they become informants.  Plaintiffs have made an insufficient showing to establish a pattern or practice of discrimination; thus, Plaintiffs must show that the alleged discriminatory acts are related closely enough to constitute a continuing violation and that one or more of the acts fell within the limitations period.  Defendants argue that the acts of which Mr. Troxell complains are continuing effects of previous actions, not the independent actions required to prove a continuing violation.

Mr. Troxell was first validated as a member of the AB gang in 1985; he was re-validated in 1995 and 2003.  From 1985 to 1995, the interim decisions to retain Mr. Troxell in the SHU were related to the 1985 validation.  Between 1995 and 2003, the interim decisions to retain Mr. Troxell in the SHU were related to the 1995 re-validation decision.

33

United States District Court
For the Northern District of California

The Court finds that the interim decisions through 1995 are continuing effects of the 1985 validation and the 1995 re-validation is too far removed in time to be considered a continuing violation of the 1985 validation. Because Mr. Troxell has only exhausted his administrative remedies with respect to the 1985 validation, his claim is barred by the statute of limitations.

D. Ashker's Due Process Claim

Mr. Ashker claims his procedural due process rights were violated because he was not given an adequate opportunity to challenge his 2001 inactive review and his 2002 and 2003 re-validations as a gang member. However, Mr. Ashker does not argue that he did not receive the required notice and opportunity to participate in the hearings at issue. Mr. Ashker states that he did not participate in the 180-day reviews of his status "because such 'reviews' are meaningless [shams], due to the fact these committees have absolutely no authority at all to do anything about my SHU status unless I had previously debriefed" or had been recommended for inactive status. Ashker Dec. ¶ 93. His refusal to participate in the process does not constitute a due process violation by Defendants.

Although Mr. Ashker concedes he was provided with a summary of the confidential information used to validate him as a gang member, he argues he was entitled to the confidential information itself. However, due process does not require prison officials to release confidential information if disclosure would compromise institutional security. Toussaint, 801 F.2d at 1101. As indicated by Defendants, disclosure of the confidential information to Mr. Ashker would compromise ongoing investigations of prison gang

34

activity and would allow Mr. Ashker to disseminate the confidential information which would threaten the safety and security of the confidential informants.

Mr. Ashker argues that the fact that he has never been issued a CDC-115 Rule Violation Report (RVR) establishes that he is not a member of a gang. His theory is that the definition of gang activity includes the commission of felonious acts for which an RVR must be issued. This argument is frivolous.

Mr. Ashker also contends that the regulations are enforced arbitrarily because there are many gang members in the general population. However, the evidence submitted for this contention is inadmissible newspaper and magazine articles. Furthermore, this evidence does not support his claim that Defendants improperly reviewed him for gang validation.

Mr. Ashker also claims that the debriefing process is a sham because it forces inmates who are not gang members and who want to be released from the SHU to lie about gang involvement. He states that he would not debrief because it would put his life at risk from retaliation by other inmates. Thus, he argues, once an inmate is placed in the SHU because of gang membership, he can never get out of the SHU. However, the regulations provide that an inmate may be placed on inactive status and released from the SHU if there is no new evidence of gang activity for six years. Furthermore, as discussed above, the regulations contain adequate due process considerations for the determination that an inmate is a gang member.

Mr. Ashker argues that the evidence used for his inactive review and the resulting re-validation as a gang member was based

35

United States District Court

For the Northern District of California

on innocuous associational activity and unsubstantiated allegations
of confidential informants.

Defendants have submitted, for in camera review, eight
confidential memos which the IGI relied upon to conclude that Mr.
Ashker was still a member of the AB prison gang.  These documents
were in Mr. Ashker's Central File in August, 2001 and reviewed by
the IGI for the purpose of determining whether to re-validate him
as a gang member.  See Kenny Dec., Ex. 1 August 2, 2001 Memo from
Lt. G.H. Wise, IGI Investigator.  The Court has reviewed these
memos and finds that they constitute more than the required some
evidence that Mr. Ashker is a member of the AB gang and that they
contain adequate indicia of reliability.

Mr. Ashker's main argument regarding the evidence is that it
must be false because he was not issued a serious rule violation.
However, as discussed above, to be validated as a member of a gang,
all that is needed is evidence of active gang activity such as that
contained in the confidential memos discussed above.  Furthermore,
Mr. Ashker's attestations that he has never been a member of the AB
gang raises a dispute of fact regarding whether he was in a gang,
but not whether there is some evidence to validate him as a gang
member.

Therefore, Mr. Ashker's due process claim regarding gang
validation fails.  Summary judgment on this claim is granted in
favor of Defendants and Plaintiffs' cross-motion is denied.

IV. Inability to Participate in Certain Programs

Plaintiffs contend that their due process and equal protection
rights were violated in that they were unable to participate in
certain programs because they are housed in the SHU.

36

**United States District Court**
For the Northern District of California

The hardship associated with administrative segregation, such as loss of recreational and rehabilitative programs or confinement to one's cell for a lengthy period of time, is not so severe as to violate the Due Process Clause itself. <u>Toussaint</u>, 801 F.2d at 1091-92; <u>Moody v. Daggett</u>, 429 U.S. 78, 88 n.9 (1976) (no due process right to institutional programs); <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1254-55 (9th Cir. 1982) (no constitutional right to rehabilitation). CCR § 3040 provides that inmates shall be assigned to programs taking into account the inmate's eligibility for the program, the institution's security and operational needs, and the safety of the inmate, staff and the general public. CCR § 3343(k) provides that inmates housed in the SHU are permitted to participate in programs that can be reasonably provided without endangering security or safety.

Citing the declarations of twenty-four inmates, Mr. Ashker disputes the claim that SHU inmates are violent. Most of the declarants state that they have never been charged with committing an illegal or violent act. However, these self-serving statements do not raise an issue of material fact with regard to the violence potential of SHU inmates.

Defendants submit the declaration of Mark Castellaw, who worked as a correctional training officer at PBSP from 1989 to June, 2006 and who is familiar with the programs offered at PBSP and those offered to inmates in the SHU. Castellaw Dec. ¶¶ 1, 5. Mr. Castellaw states that because the SHU is the highest security level at PBSP, many programs available to the general population, particularly those that entail interacting with others or taking classes in a group situation, are not available to inmates in the

SHU.  Id. at ¶¶ 7, 9-13.  However, in the last five years, high school classes leading to a general equivalency diploma (GED) and college correspondence courses have been available to SHU inmates. Id. at ¶ 9.  Also, the Corrections Learning Network, which provides educational and work-based training via television, is available for SHU inmates.  Id.  Mr. Castellaw states that, based on his experience working in the SHU, he believes the programs available to SHU inmates are appropriate given their propensity for violence and the necessity to ensure the safety of PBSP staff, inmates and the public.  Id. at ¶ 14.

Mr. Ashker admits that, beginning in 1999, SHU inmates were given GED assistance and that Correctional Learning Videos and college courses are now available to SHU inmates.  Still, he argues that the number of openings in some programs is limited due to lack of financial resources.

Because there is no liberty interest in rehabilitative programs, Mr. Ashker's complaint of limited access to programs fails to state a claim for a constitutional violation.

Mr. Ashker also argues that, because participating in programs is one of the factors considered in parole eligibility, lack of access to such programs violates his due process rights in being granted parole.  However, any connection between SHU conditions and Mr. Ashker's desire to be granted parole is too attenuated to support a federal due process claim.  See Sandin v. Conner, 515 U.S. 472, 487 (1995) (claim that misconduct will affect parole decision too attenuated to invoke due process protections); Dorrough v. On Habeas Corpus, 2008 WL 4532516, *3 (E.D. Cal.) (any connection between SHU lack of programming and decision regarding

sentence commutation too attenuated to support due process claim).

Mr. Ashker also argues that his equal protection rights are violated because inmates in the general population at PBSP and high-security prisoners in other institutions are allowed access to more programs than PBSP SHU inmates.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). Because there is no fundamental right to prison programs, and because Plaintiffs are not in a suspect class, the Equal Protection claim is reviewed under a rational basis standard. More v. Farrier, 984 F.2d 269, 271 (8th Cir. 1993). Under this standard, plaintiffs must show that they are similarly situated with persons who are treated differently and that there is no rational basis for the dissimilar treatment. Id. Plaintiffs must also show that defendants acted with an intent or purpose to discriminate against them based upon their membership in a protected class. Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003).

Here, the regulations in question and the restrictions on SHU inmates' access to programs are rationally related to the legitimate penological interest of maintaining security in the institution. Plaintiffs' Equal Protection claim fails for this reason alone. Furthermore, inmates housed in the SHU are not similarly situated with prisoners in the general population because of the higher security risk presented by those placed in the SHU.

39

**United States District Court**
For the Northern District of California

Inmates in the PBSP SHU do not constitute a suspect class vis a vis inmates in other high-security institutions.

Even if there was a constitutional violation, Defendants would be entitled to qualified immunity because there is no clearly established law that limiting program access of SHU inmates violated a constitutional right.

Accordingly, summary judgment is granted in favor of Defendants on the due process and equal protection claims based on lack of access to programs.

V. Ashker's Due Process Claims Regarding Parole Determination

Mr. Ashker brings due process claims for injunctive relief against the Board based on its finding him ineligible for parole on its alleged unwritten policy to predetermine the outcome of parole eligibility hearings for SHU inmates by requiring them to meet goals that are unavailable to those housed in the SHU.

A. Legal Standard

The Supreme Court has established that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)). An examination of the entire record is not required nor is an independent weighing of the evidence. Hill, 472 U.S. at 455. The relevant question is whether there is any evidence in the record that could support the conclusion reached by the administrative board. Id.

When assessing whether a state parole board's unsuitability

40

**United States District Court**
For the Northern District of California

1   determination was supported by "some evidence," the court's

2   analysis is framed by the statutes and regulations governing parole

3   suitability determinations in the relevant state.  <u>Sass</u>, 461 F.3d

4   at 1128.  Accordingly, in California, the court must look to

5   California law to determine the findings that are necessary to deem

6   a prisoner unsuitable for parole, and then must review the record

7   to determine whether the state court decision constituted an

8   unreasonable application of the "some evidence" principle.  <u>Id.</u>

9       California law provides that a parole date is to be granted

10  unless it is determined "that the gravity of the current convicted

11  offense or offenses, or the timing and gravity of current or past

12  convicted offense or offenses, is such that consideration of the

13  public safety requires a more lengthy period of incarceration

14  . . .."  Cal. Penal Code § 3041(b).

15      The California Code of Regulations sets out the factors

16  showing suitability or unsuitability for parole that the parole

17  authority is required to consider.  CCR § 2402(b).  These include

18  "[a]ll relevant, reliable information available," such as:

19          the circumstances of the prisoner's social history; past
            and present mental state; past criminal history,
20          including involvement in other criminal misconduct which
            is reliably documented; the base and other commitment
21          offenses, including behavior before, during and after the
            crime; past and present attitude toward the crime; any
22          conditions of treatment or control, including the use of
            special conditions under which the prisoner may safely be
23          released to the community; and any other information
            which bears on the prisoner's suitability for release.
24          Circumstances which taken alone may not firmly establish
            unsuitability for parole may contribute to a pattern
25          which results in a finding of unsuitability.

26  <u>Id.</u>

27      Circumstances tending to show unsuitability for parole

28  include the nature of the commitment offense and whether "[t]he

41

**United States District Court**
For the Northern District of California

prisoner committed the offense in an especially heinous, atrocious or cruel manner." CCR § 2402(c). This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id.

Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. Id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. CCR § 2402(d).

B. Claimed Due Process Violation

At the August 7, 2003 Board hearing at issue here,[10] the Board reviewed Mr. Ashker's record at length and noted that he was first arrested at thirteen years of age and, after committing many crimes, was sentenced to six years in prison for assault with a deadly weapon, infliction of great bodily injury and burglary.  In 1987, while serving this sentence, he murdered inmate Dennis Murphy.  Jud. Not., Ex. 12 at 14-17.  Although disputed by Mr. Ashker, the record shows that the murder was part of an AB gang "hit."  Id. at 28.  Mr. Ashker engaged in negative behavior while in prison by assaulting PBSP employees and inmates and he has been validated and re-validated as an AB gang member.  Id. at 22-23. Additionally, the Board noted that Mr. Ashker had refused to participate in psychiatric evaluations, did not have any parole plans, had no work record, and had no letters of support from family members.  The district attorney and Mr. Ashker's PBSP counselor opposed parole based on Mr. Ashker's extremely high degree of threat to the public if released.  Id. at 28-32.

For all these reasons, the Board found that Mr. Ashker would be a danger to the public if released on parole.  Id. at 31-32. These reasons constitute more than the "some evidence" that is required for the Board to find an inmate a danger to the public if released.

Mr. Ashker complains that the Board recommended that he participate in self-help classes and upgrade vocationally, knowing

---

[10]Mr. Ashker submits evidence of a 2008 parole hearing. However, this hearing is not before the Court and, thus, it cannot be considered.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   that such programs are not available to him because he is housed in

2   the SHU.  However, this argument, even if true, would not negate

3   the fact that the Board's findings constituted the required quantum

4   of evidence for finding Mr. Ashker a danger to the public if he

5   were to be released.  Therefore, the Board did not violate Mr.

6   Ashker's due process rights by finding him unsuitable for parole.

7        C. No Parole Policy

8        Mr. Ashker argues that the Board has a no parole policy for

9   SHU inmates because it requires them to participate in work, self-

10   help and education programs which are not available to them.

11        As stated previously, CCR § 2402(b) specifies that many

12   factors are to be weighed by the Board in determining whether an

13   inmate is eligible for parole and that all relevant, reliable

14   information available to the Board shall be considered in

15   determining eligibility for parole.

16        Under CCR § 2402(b), the Board may consider an inmate's

17   participation in self-help, educational and work programs to

18   evaluate his suitability for parole.  Mr. Ashker does not argue

19   that this criteria is not relevant to parole suitability

20   determinations.  Rather, he complains that he is at a disadvantage

21   because, as an inmate in the SHU, he cannot participate in these

22   programs.  However, as discussed above, there is no constitutional

23   right to access to programs in prison.

24        Mr. Ashker claims that the Board "knows" that the only way out

25   of the SHU is debriefing, which he refuses to consider because it

26   would mark him as an informant and place him and his family at

27   risk.  However, as the Court has previously found, Mr. Ashker's

28   constitutional rights were not violated by his placement in the SHU

United States District Court
For the Northern District of California

as a validated gang member.  Mr. Ashker's own actions have warranted his placement in the SHU and it is his own decision not to undertake the available methods for release from the SHU.

The state superior court case cited by Mr. Ashker, In re Criscione, 71614 (Santa Clara County Superior Court, August 30, 2007) (addressing a constitutional vagueness challenge to the regulation allowing the Board to deny parole where the commitment offense was especially heinous, atrocious or cruel), is not applicable to Mr. Ashker's claim.

For all these reasons, the Board's policy of evaluating SHU inmates' participation in educational, self-help and vocational programs in determining their suitability for parole does not violate Mr. Ashker's due process rights.  Summary judgment on this claim is granted in favor of Defendants.

VI. State Law Claims

Plaintiffs bring claims of negligence and negligence per se against Defendants for violating CCR §§ 3040 and 3343(k) in failing to provide programs for Plaintiffs, for creating a no-parole policy followed by the Board, and for using Plaintiffs' gang status against them by housing them in the SHU where they have no access to programs unless they debrief.  Also, Plaintiffs bring a tort claim against Defendants for intentionally depriving Plaintiffs' of their parole rights.

Defendants argue that the state claims are barred by the applicable statute of limitations.

The Tort Claims Act, California Government Code §§ 810 et al., provides that claims for money damages against the State of California must first be presented to and rejected by the

45

United States District Court
For the Northern District of California

California Victim Compensation and Government Claims Board (Claims Board). Cal. Gov't Code §§ 905.2, 925; <u>Richards v. Dep't of Alcoholic Beverages</u>, 139 Cal. App. 4th 304, 317 (2006). A law suit must be filed within six months after the Claims Board rejects a claim. Cal. Gov't Code § 945.6(a)(1). This section applies to persons incarcerated in state prison. Cal. Gov't Code § 945.6(c).

The parties agree that Plaintiffs' state claims were rejected by the Claims Board on October 7, 2004 and November 4, 2004 and that the initial complaint in this case was filed on August 16, 2005. Therefore, under California Government Code § 945.6(a)(1), Plaintiffs' state claims are untimely.

Nevertheless, Plaintiffs argue that their claims are timely because they are entitled to the two-year tolling period provided for prisoners in California Civil Procedure § 352.1(a). However, as correctly pointed out by Defendants, § 352.1(b) provides that the tolling provision is not applicable to any action against a public entity or public employee for which a claim is required to be presented in accordance with the Tort Claims Act. Therefore, the two-year tolling period under § 352.1(a) does not apply to Plaintiffs' state claims.

Plaintiffs also argue that the statute of limitations on their claims should be equitably tolled. State claims are subject to the forum state's statute of limitations and tolling laws. <u>Hardin v. Straub</u>, 490 U.S. 536, 539 (1989); <u>Cervantes v. City of San Diego</u>, 5 F.3d 1273, 1275 (9th Cir. 1993). Under California law, equitable tolling "relieves a plaintiff from the bar of a limitations statute when, possessing several legal remedies, he, reasonably and in good faith, pursues one designed to lessen the extent of his injuries or

46

damage." <u>Addison v. California</u>, 21 Cal. 3d 313, 317 (1978).  A plaintiff's pursuit of a remedy in another forum equitably tolls the limitations period if the plaintiff's actions satisfy three factors: (1) timely notice to the defendants in filing the first claim; (2) lack of prejudice to the defendants in gathering evidence for the second claim; and (3) good faith and reasonable conduct in filing the second claim.  <u>Collier v. City of Pasadena</u>, 142 Cal. App. 3d 917, 924 (1983); <u>Hull v. Central Pathology Serv. Med. Clinic</u>, 28 Cal. App. 4th 1328, 1335 (1994).  In <u>Wood v. Elling Corp.</u>, 20 Cal. 3d 353, 361-62 (1977), the California Supreme Court listed the three elements necessary for the application of equitable tolling as: (1) the plaintiff must have diligently pursued his or her claim; (2) the plaintiff's lack of a judicial forum for resolution of the claim must be attributable to forces outside the plaintiff's control; and (3) the defendant must not be prejudiced by application of equitable tolling.

Here, Plaintiffs did not pursue a remedy in another forum nor do they indicate the reason for their delay in filing their lawsuit.  Moreover, their lack of a judicial forum for their claims is not attributable to forces outside of their control.  Equitable tolling does not apply under these circumstances.

Furthermore, even if equitable tolling applied, the claims would be denied on their merits.  As Defendants correctly point out, they are statutorily immune from liability on these claims. <u>See</u> Cal. Gov't Code § 820.2 ("except as provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such

47

United States District Court
For the Northern District of California

discretion be abused"); Cal. Gov't Code § 845.8 (public entities
and public employees immune from liability for injury resulting
from determining whether to parole or release prisoner); <u>Leyva v.
Nielsen</u>, 83 Cal. App. 4h 1061, 1067 (2000) (parole determination
process is discretionary; thus, Board commissioners immune from
suit for parole decisions under §§ 820.2 and 845.8); Cal. Gov't
Code § 845.2 (public entities and public employees immune from suit
for failure to provide prison programs); <u>Estate of Abdollahi v.
County of Sacramento</u>, 405 F. Supp. 2d 1194, 1214 (E.D. Cal. 2005)
(failure to provide prison program discretionary policy decision
immune from suit under § 820.2).

     Therefore, summary judgment is granted in favor of Defendants
on the state law claims.

VII. Plaintiffs' Motion for Preliminary Injunction

     Plaintiffs seek a preliminary injunction in the event they are
not granted summary judgment on their claims.

     "The function of a preliminary injunction is to maintain the
<u>status quo ante litem</u> pending determination of the action on the
merits." <u>Washington Capitols Basketball Club, Inc. v. Barry</u>, 419
F.2d 472, 476 (9th Cir. 1969).  The moving party is entitled to a
preliminary injunction if it establishes either: (1) a combination
of probable success on the merits and the possibility of
irreparable harm, or (2) that serious questions regarding the
merits exist and the balance of hardships tips sharply in the
moving party's favor.  <u>Clear Channel Outdoor, Inc. v. City of Los
Angeles</u>, 340 F.3d 810, 813 (9th Cir. 2003); <u>Rodeo Collection, Ltd.
v. West Seventh</u>, 812 F.2d 1215, 1217 (9th Cir. 1987).  The test is
a "continuum in which the required showing of harm varies inversely

**United States District Court**
For the Northern District of California

1  with the required showing of meritoriousness."  <u>Id.</u>

2      Because summary judgment has been entered against Plaintiffs

3  on all their claims except the claim for prospective injunctive

4  relief for late delivery of mail, there is no likelihood of their

5  success on the merits on these claims.  Furthermore, Plaintiffs

6  have not met their burden of showing that a preliminary injunction

7  is warranted on the claim for late delivery of mail.  Therefore,

8  Plaintiffs' motion for a preliminary injunction is denied.

9                            CONCLUSION

10     Based upon the foregoing, Defendants' motion for summary

11  judgment is granted as to all claims with the exception of the

12  claim for prospective injunctive relief for late delivery of

13  incoming mail, against Warden Francisco Jacquez, acting in his

14  official capacity.  Plaintiffs' cross-motion for summary judgment

15  and motion for preliminary injunction are denied.

16     Because Plaintiff's only remaining claim is for injunctive

17  relief, it must be adjudicated in a trial to the Court.  <u>Danjaq LLC</u>

18  <u>v. Sony Corp.</u>, 263 F.3d 942, 962 (9th Cir. 2001) (Seventh Amendment

19  preserves right to jury for all legal claims, but no such right for

20  equitable claims).  The first question for trial will be how

21  pervasive and lengthy are the delays in incoming mail at times

22  other than holidays, compared to the volume of mail that is

23  delivered timely.  Delays in first class mail will be considered

24  more important than delays in other types of mail.  The second

25  question is whether Defendant Jacquez could utilize different

26  methods for processing incoming inmate mail that would not cause

27  such delay.  Most of the evidence on these points will be

28  documentary and not subject to determinations of credibility.

**United States District Court**
For the Northern District of California

Accordingly, each side's case in chief will be presented by
declarations of witnesses with personal knowledge of the facts,
attaching evidence of mail either timely or untimely delivered.
Plaintiffs' evidence of the seventeen pieces of mail discussed in
this order will be considered.  Additional evidence as to whether
this represents first class mail would be considered.  Plaintiffs'
evidence of fourteen envelopes postmarked after August 11, 2005,
when the complaint in this case was filed, cannot be grounds for
relief but will be considered as evidence of the continuing nature
of the problem.  Plaintiffs are advised to submit these envelopes,
and any other documentary evidence, as attachments to a declaration
from an individual who can testify, from his or her personal
knowledge, as to the authenticity of the documents.  Plaintiffs
shall submit any additional trial declarations, and documentary
evidence authenticated by declarations, sixty days from the date of
this order.  Sixty days thereafter, Defendant Jacquez shall submit
any countering declarations and documentary evidence, demonstrating
that mail is most often delivered timely or that there are no other
mail procedures available that would result in more timely delivery
or both.  Defendant shall also file a trial brief indicating
whether he believes that cross-examination of Plaintiffs or of any
of their declarants is needed and, if so, why, and how that should
be accomplished.  Defendant may also include in this brief his
objections to any of Plaintiffs' trial evidence.  Thirty days after
Defendant's submission, Plaintiffs may submit a trial brief stating
whether and, if so, why they believe that cross-examination of any
of Defendant's declarants is needed, and any objections to
Defendant's evidence.  They may also submit additional declarations

and authenticated documentary evidence rebutting Defendant's
evidence.  Thereafter, the Court will either arrange for cross-
examination or issue its decision.

　　　　IT IS SO ORDERED.


Dated: 3/25/09

_____
CLAUDIA WILKEN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

ASHKER ET AL et al,

        Plaintiff,

  v.

SCHWARZENEGGER ET AL et al,

        Defendant.

_____/

Case Number: CV05-03286 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 25, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Danny  Troxell B-76578
Pelican Bay State Prison
P.O. Box 7500, C-8-101
Crescent City,  CA 95531

Todd  Ashker C-58191
Pelican Bay State Prison
P.O. Box 7500, D1-119
Crescent City,  CA 95531

Dated: March 25, 2009

                            Richard W. Wieking, Clerk
                            By: Sheilah Cahill, Deputy Clerk

**United States District Court**
For the Northern District of California